**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| MYRA BROWN and ALEXANDER TAYLOR, <br><br> PLAINTIFFS, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as the Secretary of Education, <br><br> DEFENDANTS. | CIVIL ACTION NO. _____ |

## COMPLAINT

Plaintiffs Myra Brown and Alexander Taylor bring this civil action against Defendants the U.S. Department of Education and Miguel Cardona, in his official capacity as the Secretary of Education, for declaratory and injunctive relief, and allege as follows:

## INTRODUCTION

1.      The Administrative Procedure Act's notice-and-comment procedures exist for good reason: "to ensure that unelected administrators, who are not directly accountable to the populace, are forced to justify their quasi-legislative rulemaking before an informed and skeptical public." *New Jersey v. HHS*, 670 F.2d 1262, 1281 (3d Cir. 1981).

2.      By requiring notice and comment, the APA "ensure[s] that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas." *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979).

3.      Simply put, the APA's notice-and-comment requirements promote "openness, explanation, and participatory democracy" and are a critical check on "the dangers of arbitrariness and

irrationality in the formulation of rules." *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1027-28 (D.C. Cir. 1978).

4.      The Department of Education has flagrantly violated the APA's notice-and-comment requirements. Behind closed doors, the Department promulgated a new Debt Forgiveness Program that will affect tens of millions of Americans and cost more than 400 billion dollars.

5.      Instead of providing notice and seeking comment from the public, the Department hammered out the critical details of the Program in secret and with an eye toward securing debt forgiveness in time for the November election.

6.      Along the way, the Department made numerous arbitrary decisions about the Program, including which individuals will receive debt forgiveness, how much of their debt will be forgiven, and which types of debt will qualify for the Program.

7.      The result of this arbitrariness is predictable: some will benefit handsomely, some will be shortchanged, and others will be left out entirely.

8.      Plaintiffs are just a few of the millions of Americans who are being harmed by the Department's arbitrary decisionmaking. Plaintiff Myra Brown does not qualify for debt forgiveness because the Debt Forgiveness Program does not cover commercially held loans that are not in default, and Plaintiff Alexander Taylor does not qualify for the full amount of debt forgiveness because he did not receive a Pell Grant when he was in college.

9.      By adopting the Program without providing notice and comment, the Department deprived Plaintiffs of their "'procedural right to protect [their] concrete interests.'" *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) (cleaned up); *see id.* ("A violation of the APA's notice-and-comment requirements is one example of a deprivation of a procedural right.").

10.      If the Department is going to pursue debt forgiveness, Plaintiffs believe that their student loan debt should be forgiven too. Ms. Brown believes it is irrational, arbitrary, and unfair to

exclude her from the Program because her federal student loans are commercially held and not in default. Mr. Taylor believes that it is irrational, arbitrary, and unfair to calculate the amount of debt forgiveness he receives based on the financial circumstances of his *parents* many years ago. Plaintiffs want an opportunity to present their views to the Department and to provide additional comments on any proposal from the Department to forgive student loan debts.

11.     Without relief from this Court, Plaintiffs will be forever denied their procedural rights to protect their concrete interests.

12.     Because the Debt Forgiveness Program was adopted in violation of the APA, the Program must be vacated and set aside and the Department should be enjoined from implementing or enforcing the Program in any manner.

## PARTIES

13.     Plaintiff Myra Brown received her undergraduate degree from the University of Texas at El-Paso in 1993. Ms. Brown then attended graduate school at the Cox School of Business at Southern Methodist University in Dallas, Texas. Ms. Brown completed her graduate school studies in 2002. To pay for graduate school, Ms. Brown received student loans through the Federal Family Education Loan Program ("FFELP").

14.     Ms. Brown currently has two FFELP loans totaling more than $17,000. Because Ms. Brown's loans are commercially held and not in default, she is ineligible for debt forgiveness under the Debt Forgiveness Program.

15.     Plaintiff Alexander Taylor received his undergraduate degree from the University of Dallas. To pay for his undergraduate studies, Mr. Taylor received federal student loans through the Direct Loan Program.

16.     Mr. Taylor currently has four loans totaling more than $35,000. Mr. Taylor's loans are held by the Department of Education and he made less than $125,000 in 2020 and 2021. Because Mr.

Taylor never received a Pell Grant, he is ineligible for the full $20,000 in debt forgiveness under the Debt Forgiveness Program.

17.     Defendant U.S. Department of Education is an agency of the United States government subject to the APA. *See* 5 U.S.C. §551(1).

18.     Defendant Miguel Cardona is the U.S. Secretary of Education. The Secretary is sued in his official capacity as the head of the Department of Education.

## JURISDICTION & VENUE

19.     This Court has subject-matter jurisdiction over this case because it arises under the laws of the United States. *See* 5 U.S.C. §§701, *et seq.*; 28 U.S.C. §§1331, 2201-2202.

20.     Venue is proper in this Court under 28 U.S.C. §1391(e) because this is an action against an officer and an agency of the United States, a plaintiff resides in this judicial district, and no real property is involved in the action. Venue is proper in the Fort Worth Division of this Court because Plaintiff Myra Brown resides in this division.

## BACKGROUND

### I.     The Department of Education's Grant and Loan Programs

21.     The Department of Education offers two primary types of financial aid to help students pay for their higher education: grants and loans. *See Types of Aid*, U.S. Dep't of Educ., https://bit.ly/3S51Heu.

22.     Federal grants are "[f]inancial aid that generally [don't] have to be repaid." *Id.*

23.     For example, the Department provides Pell Grants to undergraduate students if their parents' income is below a certain threshold when they applied for the grant. *Federal Pell Grant Program*, U.S. Dep't of Educ., https://bit.ly/3DKV6BG; 20 U.S.C. §1070a, *et seq*. The maximum Pell Grant award for the 2022-2023 year is $6,895. *Federal Pell Grants*, U.S. Dep't of Educ., https://bit.ly/3BCraVq.

24.     Federal loans, by contrast, are "[b]orrowed money for college or career school [that] must be repaid with interest." *Types of Aid*, *supra*.

25.     The Department currently administers three student loan programs.

26.     Under the William D. Ford Federal Direct Loan Program, the federal government makes loans directly to borrowers, who are then responsible for repaying the government. *See* 20 U.S.C. §1087a, *et seq*. Direct Loans account for about $1.4 trillion of outstanding student debt. *See Federal Student Loan Portfolio*, U.S. Dep't of Educ., https://bit.ly/3qYd5Nm.

27.     Under the Federal Family Education Loan Program, the federal government paid lenders to make student loans, and the federal government guaranteed their repayment. 20 U.S.C. §1071, *et seq*. The authority to issue loans under this program expired in 2010. 20 U.S.C. §1071(d). FFELP loans currently account for about $213.7 billion of outstanding student debt nationwide. *See Federal Student Loan Portfolio*, *supra*.

28.     Under the Perkins Loan Program, colleges and universities made loans to financially needy students, and the federal government guaranteed their repayment. 20 U.S.C. §1087aa, *et seq*. The authority to issue loans under the Perkins program expired in 2017. 20 U.S.C. §1087aa(b). Perkins Loans currently account for about $4 billion of outstanding student debt. *See Federal Student Loan Portfolio*, *supra*.

29.     About 43 million individuals have debts arising under these three programs. *See Federal Student Loan Portfolio*, *supra*. These individuals collectively have more than $1.61 trillion in outstanding debts. *Id*.

## II.     The Department's Limited Authority to Compromise Student Loan Debt

30.     Because federal agencies are a "creature of statute," the Department of Education has "*only* those authorities conferred upon it by Congress." *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C.

Cir. 2002) (cleaned up). The Department thus cannot forgive student loan debt unless Congress has authorized it to do so.

31.     The primary statute governing when agencies may forgive debts is the Federal Claims Collection Act of 1966, which provides that agencies "shall try to collect a claim of the United States Government for money or property arising out of the activities of, or referred to, the agency." 31 U.S.C. §3711(a)(1).

32.     The Federal Claims Collection Standards ("FCCS"), which implement the Federal Claims Collection Act, require that "[f]ederal agencies shall aggressively collect all debts arising out of activities of . . . that agency." 31 C.F.R. §901.1.

33.     Under the FCCS, agencies are permitted to "compromise a debt" only in four circumstances: (1) where "the debtor is unable to pay the full amount in a reasonable time, as verified through credit reports or other financial information"; (2) the agency is "unable to collect the debt in full within a reasonable time by enforced collection proceedings"; (3) "the cost of collecting the debt does not justify the enforced collection of the full amount"; or (4) "[t]here is significant doubt concerning the Government's ability to prove its case in court." 31 C.F.R. §902.2(a); *see also id.* §902.2(b) (requiring agencies to consider individualized factors, including "[a]ge and health," "[p]resent and potential income," and "[i]nheritance prospects," when determining a debtor's inability to pay).

34.     The Department of Education's regulations expressly incorporate the FCCS. Under the Department's regulations, the Department "uses the standards in the FCCS, 31 CFR part 902, to determine whether compromise of a debt is appropriate if the debt arises under a program administered by the Department." 34 C.F.R. §30.70(a)(1); *see also id.* §30.70(e)(1) ("[U]nder the provisions of 31 CFR part 902 or 903, the Secretary may compromise a debt in any amount, or suspend or terminate collection of a debt in any amount, if the debt arises under the Federal Family Education

Loan Program . . . , the William D. Ford Federal Direct Loan program . . . , or the Perkins Loan Program."); *see also* 81 Fed. Reg. 75,926, 76,070 (Nov. 1, 2016) (adopting these regulations after notice and comment).

35.     "It is a fundamental principle of administrative law that an agency is bound to adhere to its own regulations." *Fuller v. Winter,* 538 F. Supp. 2d 179, 186 (D.D.C. 2008); *see Richardson v. Joslin*, 501 F.3d 415, 418 (5th Cir. 2007) (an agency "must abide by its own regulations").

### III.    The Debt Forgiveness Program

36.     In the summer of 2022, reports emerged that the White House was considering executive action to forgive student loan debt for tens of millions of individuals. *See* T. Pager, *Latest White House Plan Would Forgive $10,000 in Student Debt Per Borrower*, Wash. Post (May 27, 2022), https://wapo.st/39lXnpW.

37.     Behind closed doors, White House officials were debating the various issues that would arise from such a program. *Id.* None of these discussions were open to the public.

38.     According to reports, White House officials "dr[ew] up a range of proposals" and were "waiting on the president to make a final decision." *See* A. Restuccia, *Biden Decision on Student-Loan Forgiveness Unlikely Until Later in Summer, Officials Say*, Wall St. J. (June 6, 2022), https://on.wsj.com/3qZN53V.

39.     A primary point of debate was the size of the debt forgiveness to each individual. Although Senator Elizabeth Warren and others were pushing for forgiving up to $50,000 in student debt per borrower, the President was "more comfortable with debt cancellation in the $10,000-per-borrower range." A. Restuccia, *As Biden Zeroes In on Student-Loan Forgiveness Decision, Voter Anxiety Grows*, WSJ (May 23, 2022), https://on.wsj.com/3S46zAl. As of late May, White House officials were "planning to cancel $10,000 in student debt per borrower." Pager, *supra.*

40.     The White House also was debating whether high-income individuals should be excluded from the debt forgiveness program. As of late May, the plan was to limit debt forgiveness to Americans "who earned less than $150,000 in the previous year, or less than $300,000 for married couples filing jointly." *Id.* These income limits were "aimed at fending off criticism that across-the-board loan forgiveness would benefit some Americans with higher incomes who don't need the help." M. Stratford, *Harder Than It Sounds: Income-Targeted Student Loan Forgiveness Invites a 'Train Wreck,'* Politico (May 13, 2022), https://politi.co/3LEtXC1. These "income caps [were] in flux," however, because "some Democratic lawmakers [were] implor[ing] the White House to abandon means-testing." D. Douglas-Gabriel, *Student Loan Borrowers Anxious as Decision Lingers on Debt Cancellation*, Wash. Post (June 10, 2022), https://wapo.st/3NUdlXg. White House officials were also debating alternatives to income thresholds, such as limiting debt forgiveness to "undergraduates or people who attend public universities." Restuccia, *Biden Decision on Student-Loan Forgiveness*, *supra*.

41.     Another factor "complicating the decision" was the best way "to implement [this] large new government program." *Id.* Department officials "privately raised concerns about the complexity of adding an income test to student loan forgiveness" and "warn[ed] the White House that the agency lacks the data to automatically cancel loans based on a borrower's earnings." Stratford, *supra*. The Department thus believed that it would likely "need to set up some sort of application process to determine whether borrowers qualify for relief." *Id.*

42.     White House officials were also concerned "about the possible effects the move could have on record inflation" and were "cautious about doing anything that could be perceived as contributing to high prices." Restuccia, *Biden Decision on Student-Loan Forgiveness*, *supra*. While some in the Administration dismissed these concerns, others warned that "student debt cancellation would exacerbate price pressures." *Id.* Debt cancellation would also "encourage colleges and universities to

continue to raise tuition prices with the expectation that the costs would ultimately not be borne by their students." *Id.*

43.     Whether the President had the legal authority for such a program was also being debated. The Justice Department and the Department of Education were "weighing whether Mr. Biden has the legal authority to unilaterally wipe away loans through executive action." Restuccia, *As Biden Zeroes In*, *supra*. The Department of Education under President Trump had determined that it lacked such authority, *see Memo. to Betsy DeVos Re: Student Loan Principal Balance Cancellation, Compromise, Discharge, and Forgiveness Authority*, U.S. Dep't of Educ. Off. of the Gen. Counsel, (Jan. 12, 2021), https://bit.ly/3LBA36n, and key Democrats agreed, including Speaker of the House Nancy Pelosi, *see* A. Nova, *Pelosi Says Biden Doesn't Have Power to Cancel Student Debt*, CNBC (July 28. 2021), https://cnb.cx/3S85wzp; *see also* G. Rubin, *Mass Student Debt Cancellation Legally Risky Says Top Obama Education Lawyer*, Wall St. J. (May 4, 2022), https://on.wsj.com/3DO0tjx. President Biden nevertheless instructed the Department to prepare a memorandum exploring possible legal avenues to justify the Program. *See* L. Egan, *Biden to Review Executive Authority to Cancel Student Debt*, NBC News (Apr. 1, 2021), https://nbcnews.to/3dD85dV.

44.     Finally, the White House was "weighing the political boost that could come from forgiving loans among young people and others against the backlash from voters who didn't go to college, don't have loans, or already paid them off." Restuccia, *Biden Decision on Student-Loan Forgiveness*, *supra*. An overriding goal was to get the program done fast—so that debt forgiveness would occur in time for the November election. Restuccia, *As Biden Zeroes In*, *supra*.

45.     White House officials indicated that the President would announce his decision in July or August of 2022. Restuccia, *Biden Decision on Student-Loan Forgiveness*, *supra*.

46.    At no point did the Department of Education provide notice of its plans or seek public comment on the program. Instead, the countless legal, policy, economic, and other issues implicated by such a program were all debated and determined in secret.

47.    On August 24, the White House announced that the President would "fulfill[] [his] campaign commitment" by providing debt forgiveness to millions of borrowers. *See Fact Sheet: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*, The White House (Aug. 24, 2022), https://bit.ly/3dATj7p.

48.    Under the Program, individuals would receive different levels of debt forgiveness based on whether they had received a Pell Grant in college. Those who received a Pell Grant could get up to $20,000 in debt forgiveness while those who did not could get only $10,000 in debt forgiveness. *One-Time Student Loan Debt Relief*, U.S. Dep't of Educ., https://bit.ly/3ygbuGz (website as of Sept. 8, 2022).

49.    The Department also announced that those individuals who exceeded an income threshold would be ineligible for the program. Under the Program, individuals with student loans would be ineligible if they earned more than $125,000 (or $250,000 if married filing jointly) in 2020 and 2021. *Id.*

50.    The Department further stated that "most federal student loans" would qualify for debt forgiveness, including Direct Loans, FFELP loans held by the Department or in default, and Perkins Loans held by the Department. *Id.* But individuals with FFELP loans that are commercially held would "not [be] eligible for debt relief." *Id.* The Department asserted that it was currently "assessing whether to expand eligibility to borrowers with privately owned federal student loans, including FFEL and Perkins Loans." *Id.*

51.    The Department also released a five-page legal memorandum asserting that the Higher Education Relief Opportunities for Students ("HEROES") Act of 2003 gave it the legal authority to

enact the Debt Forgiveness Program. *See The Secretary's Legal Authority for Debt Cancellation*, U.S. Dept of Educ. (Aug. 23, 2022), https://bit.ly/3fcXeYJ.

52. The HEROES Act was enacted following the September 11 attacks and again shortly after the start of the Iraq War, and was designed primarily to ensure that the "[h]undreds of thousands of Army, Air Force, Marine Corps, Navy, and Coast Guard reservists and members of the National Guard [who] ha[d] been called to active duty or active service" would not be "placed in a worse position financially in relation to that financial assistance" because of their military service. *See* 20 U.S.C. §§1098aa(b)(4), 1098bb(a)(2)(A).

53. The Department's legal justification for the Program was widely criticized following the White House's announcement, even by those supporting debt cancelation. *See, e.g.*, Jed Shugerman, *Biden's Student-Debt Rescue Plan Is a Legal Mess*, The Atlantic (Sept. 4, 2022), https://bit.ly/3qVEK18.

54. On September 27, the Secretary of Education sent a memorandum to the Assistant Secretary for Postsecondary Education in which he officially "issu[ed] waivers and modifications" to certain statutes and regulations in order to effectuate the Debt Forgiveness Program. Citing the HEROES Act, the Secretary directed the Department to "take all necessary actions to implement these waivers and modifications and to provide notice of these waivers and modifications in the Federal Register."

55. The memorandum contained no estimate of the Program's cost. But the nonpartisan Congressional Budget Office has estimated that the Program will cost over $400 billion. *Costs of Suspending Student Loan Payments and Canceling Debt*, Cong. Budget Off. (Sept. 26, 2022), https://bit.ly/3SpZk6g. Other economists put that number even higher at $469 billion to $519 billion. *The Biden Student Loan Forgiveness Plan: Budgetary Costs and Distributional Impact*, Penn Wharton, Univ. of Pa. (Aug. 26, 2022), https://bit.ly/3UAxpBI.

56.     According to the Department, about 8 million borrowers will soon receive automatic debt forgiveness because the government already has these individuals' income data. *One-Time Student Loan Debt Relief, supra.*

## IV.     Plaintiffs and Others Excluded from the Debt Forgiveness Program

57.     Because the Department adopted the Program without going through the notice-and-comment process, Plaintiffs were deprived of their "procedural right to protect [their] concrete interests." *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) (cleaned up); *see id.* ("A violation of the APA's notice-and-comment requirements is one example of a deprivation of a procedural right.").

58.     Plaintiff Myra Brown is one of the millions of Americans who is ineligible for the Debt Forgiveness Program because her student loan debt is commercially held and not in default.

59.     If the Department is going to provide debt forgiveness, Ms. Brown believes that her student loan debt should be forgiven too. She believes it is irrational, arbitrary, and unfair to exclude her from the Program because her student loan debt is commercially held and not in default. Ms. Brown wants an opportunity to present her views to the Department and provide additional comments on any proposal from the Department to forgive student loan debts.

60.     Plaintiff Alexander Taylor is one of the millions of Americans who is ineligible for the full $20,000 in debt forgiveness because he did not receive a Pell Grant in college.

61.     If the Department is going to provide debt forgiveness, Mr. Taylor believes that his student loan debt should be forgiven too and that he should not be penalized because he did not receive a Pell Grant in college. Mr. Taylor makes less than $25,000 a year, but he is ineligible for the full $20,000 in debt forgiveness. Yet others making more than *five times* as much as he does (up to $125,000 a year) will receive $20,000 in debt forgiveness if they got a Pell Grant in college. Mr. Taylor believes that it is irrational, arbitrary, and unfair to calculate the amount of debt forgiveness he receives based on the financial circumstances of his *parents* many years ago. Mr. Taylor wants an opportunity

to present his views to the Department and provide additional comments on any proposal from the Department to forgive student loan debts.

## CLAIMS FOR RELIEF

### COUNT I
### Administrative Procedure Act, 5 U.S.C. §706
### (Failure to Follow Proper Rulemaking Procedures)

62.    Plaintiffs incorporate all of their prior allegations.

63.    The APA requires courts to "hold unlawful and set aside agency action[s]" that are adopted "without observance of procedure required by law." 5 U.S.C. §706(2).

64.    The APA obligates agencies to subject their substantive rules to notice and comment. *See* 5 U.S.C. §553.

65.    A "rule" is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. §551(4).

66.    Legislative rules typically "grant rights, impose obligations, or produce other significant effects on private interests." *W&T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 237 (5th Cir. 2019).

67.    Moreover, "[i]f a second rule repudiates or is irreconcilable with a prior legislative rule, the second rule must be an amendment of the first; and, of course, an amendment to a legislative rule must itself be legislative." *Clean Water Action v. EPA*, 936 F.3d 308, 314 & n.11 (5th Cir. 2019) (cleaned up).

68.    The Debt Forgiveness Program is a legislative rule.

69.    It creates a new program designed to implement a policy of eliminating or reducing debt obligations for certain individuals. 5 U.S.C. §551(4). It "grant[s] rights" by promising to eliminate individuals' debt, it "impose[s] obligations" on the Department to forgive debt, and it produces "significant effects on private interests." *W&T Offshore, Inc.*, 946 F.3d at 237.

70.     The Program also effectively amends or repeals the Department's existing regulations that prohibit the Department from forgiving debt except under certain narrow circumstances. *See U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 35 (D.C. Cir. 2005) (If the agency "effects a substantive change in the regulation, notice and comment are required." (cleaned up)).

71.     In addition, to the extent the Program "pertain[s]" to Title IV of the Higher Education Act, the Department was also required to use "negotiated rulemaking" to develop the rule. 20 U.S.C. §1098a(b)(2); *see The Negotiated Rulemaking Process for Title IV Regulations—Frequently Asked Questions*, U.S. Dep't of Educ., https://bit.ly/3SCFqFf.

72.     The Department adopted the Program without publishing prior notice and affording Plaintiffs and other members of the public an opportunity to submit written comments. The Department also did not adopt the Program through the "negotiated rulemaking" process.

73.     Because the Program is a legislative rule that did not go through the proper procedures, the Program must be held unlawful and set aside. *See* 5 U.S.C. §706(2)(D).

**WHEREFORE**, Plaintiffs ask this Court to enter judgment in their favor and to provide them with the following relief:

a.   Declare that the Debt Forgiveness Program has been adopted without observance of procedure required by law and therefore violates the APA.

b.   Preliminarily and permanently enjoin Defendants from enforcing, applying, or implementing the Program anywhere within the Department's jurisdiction.

c.   Vacate and set aside the Program.

d.   Award all other relief to which Plaintiffs are entitled, including but not limited to Plaintiffs' attorneys' fees and costs.

e.   Grant all other relief that this Court deems just and proper.

Respectfully submitted,

Dated: October 10, 2022

*/s/   James F. Hasson*

J. Michael Connolly (VA Bar No. 77632)
James F. Hasson (TX Bar No. 24109982)
Matthew Pociask* (IL Bar No. 6336568)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Tel: (703) 243-9423
Fax: (703) 243-9423
mike@consovoymccarthy.com
james@consovoymccarthy.com
matt@consovoymccarthy.com

Steven C. Begakis (VA Bar No. 95172)
CONSOVOY MCCARTHY PLLC
Fort Worth, TX
Tel: (703) 243-9423
Fax: (703) 243-9423
steven@consovoymccarthy.com

*Admitted in Illinois, but not Virginia.*
*Supervised by principals at firm.*

*Counsel for Plaintiffs*