**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| MYRA BROWN and ALEXANDER TAYLOR, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as the Secretary of Education, <br><br> *Defendants*. | CIVIL ACTION NO. 4:22-cv-908 |

**PLAINTIFFS' BRIEF IN SUPPORT OF
MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................... ii

Introduction ............................................................................................................................ 1

Background ............................................................................................................................. 3

I.      The Department of Education's Grant and Loan Programs ..................................... 3

II.     The Department's Limited Authority to Compromise Student Loan Debt ............ 4

III.    The Debt Forgiveness Program ................................................................................. 5

IV.    Plaintiffs and Others Excluded from the Debt Forgiveness Program ................... 10

Argument ............................................................................................................................... 11

I.      Plaintiffs are likely to prevail on the merits. ......................................................... 11

        A.      Plaintiffs have standing ................................................................................. 11

        B.      The Department violated the APA by adopting the Program without following
                the proper rulemaking procedures. ............................................................. 13

II.     Plaintiffs are likely to suffer irreparable harm without a preliminary injunction. ..................... 22

III.    The balance of harms and public interest weigh in favor of a preliminary injunction. ........... 23

Conclusion ............................................................................................................................. 25

Certificate of Service ............................................................................................................ 26

## TABLE OF AUTHORITIES

**Cases**

*Ala. Ass'n of Realtors v. HHS,*
  141 S. Ct. 2485 (2021) ........................................................................................ 17

*Ass'n of Cmty. Cancer Ctrs. v. Azar,*
  509 F. Supp. 3d 482 (D. Md. 2020) ................................................................... 2, 23

*Atl. City Elec. Co. v. FERC,*
  295 F.3d 1 (D.C. Cir. 2002) .................................................................................. 4

*Azar v. Allina Health Servs.,*
  139 S. Ct. 1804 (2019) ........................................................................................ 14

*BST Holdings, LLC v. OSHA,*
  17 F.4th 604 (5th Cir. 2021) ................................................................................ 18

*City & Cnty. of San Fran. v. U.S. Citizenship & Immigr. Servs.,*
  408 F. Supp. 3d 1057 (N.D. Cal. 2019) ............................................................... 11

*Davis v. Mich. Dep't of Treasury,*
  489 U.S. 803 (1989) ............................................................................................ 16

*Ecosystem Invest. Partners v. Crosby Dredging, LLC,*
  729 F. App'x 287 (5th Cir. 2018) ......................................................................... 12

*Eli Lilly & Co. v. Cochran,*
  526 F. Supp. 3d 393 (S.D. Ind. 2021) ............................................................... 22, 23

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ............................................................................................ 17

*Fuller v. Winter,*
  538 F. Supp. 2d 179 (D.D.C. 2008) ....................................................................... 5

*Fund For Animals, Inc. v. Norton,*
  322 F.3d 728 (D.C. Cir. 2003) ............................................................................. 12

*Gordon v. City of Houston, Tex.,*
  79 F. Supp. 3d 676 (S.D. Tex. 2015) .................................................................... 24

*In re Deepwater Horizon,*
  732 F.3d 326 (5th Cir. 2013) ............................................................................... 24

*Kaepa, Inc. v. Achilles Corp.,*
  76 F.3d 624 (5th Cir. 1996) ................................................................................. 24

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ............................................................................................ 11

*MCI Tel. Corp. v. AT&T,*
  512 U.S. 218 (1994) ............................................................................................ 17

*N. Mariana Islands v. United States,*
  686 F. Supp. 2d 7 (D.D.C. 2009) ...................................................................... 22, 23

*Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*,
   979 F.2d 227 (D.C. Cir. 1992) ........................................................................... 14

*Nat'l Min. Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ........................................................................... 13

*New Jersey v. HHS*,
   670 F.2d 1262 (3d Cir. 1981) ............................................................................. 1

*NFIB v. OSHA*,
   142 S. Ct. 661 (2022) ................................................................................... 17, 20

*Nken v. Holder*,
   556 U.S. 418 (2009) ........................................................................................ 23

*Pendergest-Holt v. Certain Underwriters at Lloyd's of London*,
   600 F.3d 562 (5th Cir. 2010) ........................................................................... 11

*Richardson v. Joslin*,
   501 F.3d 415 (5th Cir. 2007) ............................................................................. 5

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ........................................................................................ 11

*Tex. Democratic Party v. Benkiser*,
   459 F.3d 582 (5th Cir. 2006) ........................................................................... 12

*Texas v. Biden*,
   10 F.4th 538 (5th Cir. 2021) ............................................................................ 24

*Texas v. EEOC*,
   933 F.3d 433 (5th Cir. 2019) ....................................................................*passim*

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) ........................................................................... 11

*Texas v. United States*,
   787 F.3d 733 (5th Cir. 2015) ........................................................................... 13

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ................................................................. 12, 13, 24

*U.S. Navy SEALs 1-26 v. Biden*,
   578 F. Supp. 3d 822 (N.D. Tex. 2022) ............................................................ 23

*U.S. Steel Corp. v. EPA*,
   595 F.2d 207 (5th Cir. 1979) ................................................................. 1, 12, 22

*U.S. Telecom Ass'n v. FCC*,
   400 F.3d 29 (D.C. Cir. 2005) ........................................................................... 14

*Utility Air Reg. Grp. v. EPA*,
   573 U.S. 302 (2014) ................................................................................... 17, 18

*W. Virginia v. EPA*,
   142 S. Ct. 2587 (2022) ..................................................................... 17, 18, 19, 20

*W&T Offshore, Inc. v. Bernhardt,*
   946 F.3d 227 (5th Cir. 2019) .................................................................................... 13

*Wages & White Lion Invest. LLC v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ................................................................................... 24

*Weyerhaeuser Co. v. Costle,*
   590 F.2d 1011 (D.C. Cir. 1978) ................................................................................. 1

*Whitman v. Am. Trucking Ass'ns., Inc.,*
   531 U.S. 457 (2001) ................................................................................................. 17

**Statutes & Rules**

5 U.S.C. §551 ....................................................................................................................... 13

5 U.S.C. §553 ....................................................................................................................... 13

5 U.S.C. §705 ....................................................................................................................... 11

5 U.S.C. §706 ....................................................................................................................... 13

20 U.S.C. §1078-11 .............................................................................................................. 20

20 U.S.C. §1070a .................................................................................................................... 3

20 U.S.C. §1071 ...................................................................................................................... 3

20 U.S.C. §1087a .................................................................................................................... 3

20 U.S.C. §1087aa .................................................................................................................. 3

20 U.S.C. §1087ee ................................................................................................................ 20

20 U.S.C. §1087j .................................................................................................................. 20

20 U.S.C. §1098a ............................................................................................................ 14, 15

20 U.S.C. §1098aa ............................................................................................................ 9, 16

20 U.S.C. §1098bb ....................................................................................................... *passim*

20 U.S.C. §1098ee ..................................................................................................... 16, 21, 22

31 U.S.C. §3711 ...................................................................................................................... 4

31 C.F.R. §901.1 ..................................................................................................................... 4

31 C.F.R. §902.2 ............................................................................................................... 4, 14

34 C.F.R. §30.70 .............................................................................................................. 5, 14

81 Fed. Reg. 75,926 (Nov. 1, 2016) ................................................................................. 5, 14

H.R. 6800, 116th Cong. §150117(h) (2020) ......................................................................... 18

Pub. L. 107-122, 115 Stat. 2386 (Jan. 15, 2002) ................................................................. 15

Pub. L. 108-76, 117 Stat. 904 (Aug. 18, 2003) .................................................................... 15

Pub. L. 116-136, 134 Stat. 281 (Mar. 2020) ........................................................................ 20

**Other Authorities**

147 Cong. Rec. H7155 (Oct. 23, 2001) .................................................................................... 18

147 Cong. Rec. S13311 (Dec. 14, 2001) ................................................................................. 18

149 Cong. Rec. H2522 (Apr. 1, 2003) ........................................................................... 16, 19, 20

A. Nova, *Pelosi Says Biden Doesn't Have Power to Cancel Student Debt*,
CNBC (July 28. 2021), https://cnb.cx/3S85wzp ............................................................... 7

A. Restuccia, *As Biden Zeroes In on Student-Loan Forgiveness Decision, Voter Anxiety Grows*,
Wall St. J. (May 23, 2022), https://on.wsj.com/3S46zAl ............................................... 6, 7

A. Restuccia, *Biden Decision on Student-Loan Forgiveness Unlikely Until Later in Summer,
Officials Say*, Wall St. J. (June 6, 2022), https://on.wsj.com/3qZN53V ......................... 5, 6, 7

B. Sullivan, *How Biden's Declaring the Pandemic 'Over' Complicates Efforts to Fight COVID*,
NPR (Sept. 20, 2022), https://n.pr/3Sjuw70 ................................................................. 21

*Costs of Suspending Student Loan Payments and Canceling Debt*,
Cong. Budget Off. (Sept. 26, 2022), https://bit.ly/3SpZk6g ........................................... 9

*COVID-19 Loan Payment Pause and 0% Interest*,
Fed. Student Aid, U.S. Dep't of Educ., https://bit.ly/3UNYMsi .................................... 21

D. Douglas-Gabriel, *Student Loan Borrowers Anxious as Decision Lingers on Debt Cancellation*,
Wash. Post (June 10, 2022), https://wapo.st/3NUdlXg .................................................. 6

Daniel Mangrum, et al., *Liberty Street Economics: Three Key Facts from the Center for
Microeconomic Data's 2022 Student Loan Update*,
Fed. Rsrv. Bank of N.Y. (Aug. 9, 2022), https://nyfed.org/3dYCGCT ........................... 22

*Fact Sheet: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*,
The White House (Aug. 24, 2022), https://bit.ly/3dATj7p ............................................ 8

*Federal Pell Grant Program*,
U.S. Dep't of Educ., https://bit.ly/3DKV6BG .............................................................. 3

*Federal Pell Grants*,
U.S. Dep't of Educ., https://bit.ly/3BCraVq ............................................................... 3

*Federal Student Loan Portfolio*,
U.S. Dep't of Educ., https://bit.ly/3qYd5Nm ........................................................... 3, 4

G. Rubin, *Mass Student Debt Cancellation Legally Risky Says Top Obama Education Lawyer*,
Wall St. J. (May 4, 2022), https://on.wsj.com/3DO0tjx ................................................. 7

Jed Shugerman, *Biden's Student-Debt Rescue Plan Is a Legal Mess*,
The Atlantic (Sept. 4, 2022), https://bit.ly/3qVEK18 .................................................... 9

L. Egan, *Biden to Review Executive Authority to Cancel Student Debt*,
NBC News (Apr. 1, 2021), https://nbcnews.to/3dD85dV .............................................. 7

M. Shear, *Biden Gave In to Pressure on Student Debt Relief After Months of Doubt*,
N.Y. Times (Aug. 26, 2022), https://nyti.ms/3foJ2vy ................................................... 18

M. Stratford, *Harder Than It Sounds: Income-Targeted Student Loan Forgiveness Invites
a 'Train Wreck,'* Politico (May 13, 2022), https://politi.co/3LEtXC1 ............................. 6

*Memo. to Betsy DeVos Re: Student Loan Principal Balance Cancellation, Compromise, Discharge, and Forgiveness Authority*,
  U.S. Dep't of Educ. Off. of the Gen. Counsel, (Jan. 12, 2021), https://bit.ly/3LBA36n ............... 7

N. Bose, *Biden Administration Changes Student Loan Guidance, as Republican-Led States File Lawsuit*, Reuters (Sept. 29, 2022), https://reut.rs/3rhEPwD ........................................................ 9

*One-Time Student Loan Debt Relief*,
  U.S. Dep't of Educ. (Sept. 8, 2022), https://bit.ly/3ygbuGz ............................................. 2, 8, 10, 23

*One-Time Student Loan Debt Relief*,
  U.S. Dep't of Educ. (Oct. 1, 2022), https://bit.ly/3fBmyrm ............................................................. 8

S. Horsley, *The Unemployment Rate Fell to 3.5%, Matching its Lowest Level in the Last 50 Years*, NPR (Aug. 5, 2022), https://n.pr/3RhZQla ............................................................... 22

T. Pager, *Latest White House Plan Would Forgive $10,000 in Student Debt Per Borrower*,
  Wash. Post (May 27, 2022), https://wapo.st/39lXnpW ............................................................ 5, 6

*The Biden Student Loan Forgiveness Plan: Budgetary Costs and Distributional Impact*,
  Penn Wharton, Univ. of Pa. (Aug. 26, 2022), https://bit.ly/3UAxpBI ................................................ 9

*The Negotiated Rulemaking Process for Title IV Regulations—Frequently Asked Questions*,
  U.S. Dep't of Educ., https://bit.ly/3SCFqFf ............................................................................ 14, 15

*The Secretary's Legal Authority for Debt Cancellation*,
  U.S. Dep't of Educ. (Aug. 23, 2022), https://bit.ly/3fcXeYJ ........................................................... 9

*Types of Aid*,
  U.S. Dep't of Educ., https://bit.ly/3S51Heu ........................................................................... 3, 18

*Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans*,
  Off. of Legal Counsel, 2022 WL 3975075 (Aug. 23, 2022) ............................................................ 15

## INTRODUCTION

The Administrative Procedure Act's notice-and-comment procedures exist for good reason: "to ensure that unelected administrators, who are not directly accountable to the populace, are forced to justify their quasi-legislative rulemaking before an informed and skeptical public." *New Jersey v. HHS*, 670 F.2d 1262, 1281 (3d Cir. 1981). By requiring notice and comment, the APA "ensure[s] that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas." *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979). Simply put, the APA's notice-and-comment requirements promote "openness, explanation, and participatory democracy" and are a critical check on "the dangers of arbitrariness and irrationality in the formulation of rules." *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1027-28 (D.C. Cir. 1978).

Defendants ("the Department") have flagrantly violated the APA's notice-and-comment requirements. Behind closed doors, the Department promulgated a new Debt Forgiveness Program that will affect tens of millions of Americans and cost more than 400 billion dollars. Instead of providing notice and seeking comment from the public, the Department hammered out the critical details of the Program in secret and with an eye toward securing debt forgiveness in time for the November election. Along the way, the Department made numerous arbitrary decisions about the Program, including which individuals will receive debt forgiveness, how much of their debt will be forgiven, and which types of debt will qualify for the Program.

The result of this arbitrariness is predictable: some will benefit handsomely, some will be shortchanged, and others will be left out entirely. Plaintiffs are just a few of the millions of Americans who are being harmed by the Department's arbitrary decisionmaking. Plaintiff Myra Brown does not qualify for debt forgiveness because the Program does not cover commercially held federal loans that

are not in default, and Plaintiff Alexander Taylor does not qualify for the full amount of debt forgiveness because he did not receive a Pell Grant when he was in college.

By adopting the Program without providing notice and comment, the Department deprived Plaintiffs of their "'procedural right to protect [their] concrete interests.'" *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) (cleaned up); *see id.* ("A violation of the APA's notice-and-comment requirements is one example of a deprivation of a procedural right."). If the Department is going to provide debt forgiveness, Plaintiffs believe that their student loan debt should be forgiven too. Ms. Brown believes it is irrational, arbitrary, and unfair to exclude her from the program because her federal student loans are commercially held and not in default. Mr. Taylor believes that it is irrational, arbitrary, and unfair to calculate the amount of debt forgiveness he receives based on the financial circumstances of his *parents* many years ago. Plaintiffs want an opportunity to present their views to the Department and to provide additional comments on any proposal from the Department to forgive student loan debts.

Without a preliminary injunction from this Court, Plaintiffs will be forever denied their procedural rights to protect their concrete interests. The Department will almost certainly complete (or substantially complete) the Program before the Court can rule on the merits. And the Department has repeatedly stressed that it will provide debt forgiveness only "one time." *One-Time Student Loan Debt Relief*, U.S. Dep't of Educ. (Sept. 8, 2022), https://bit.ly/3ygbuGz (Exhibit A) [App. 10]. Without relief, Plaintiffs will "never have an equivalent opportunity to influence the [Program's] contents." *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020). Moreover, the Program affects nearly every American, including those with student loans and the general public that must ultimately pay for the Program. They all have a strong interest in providing their views to the government. By contrast, no public interest is served by allowing unlawful agency action to occur.

The Court should grant Plaintiffs' motion for a preliminary injunction.

## BACKGROUND

I.     **The Department of Education's Grant and Loan Programs**

The Department of Education offers two primary types of financial aid to help students pay for their higher education: grants and loans. *See Types of Aid*, U.S. Dep't of Educ., https://bit.ly/3S51Heu. Federal grants are "[f]inancial aid that generally [don't] have to be repaid." *Id.* For example, the Department provides Pell Grants to undergraduate students if their parents' income is below a certain threshold when they applied for the grant. *Federal Pell Grant Program*, U.S. Dep't of Educ., https://bit.ly/3DKV6BG; 20 U.S.C. §1070a, *et seq.* The maximum Pell Grant award for the 2022-2023 year is $6,895. *Federal Pell Grants*, U.S. Dep't of Educ., https://bit.ly/3BCraVq.

Federal loans, by contrast, are "[b]orrowed money for college or career school [that] must be repaid with interest." *Types of Aid*, *supra*. The Department currently administers three student loan programs. Under the William D. Ford Federal Direct Loan Program, the federal government makes loans directly to borrowers, who are then responsible for repaying the government. *See* 20 U.S.C. §1087a, *et seq.* Direct Loans account for about $1.4 trillion of outstanding student debt. *See Federal Student Loan Portfolio*, U.S. Dep't of Educ., https://bit.ly/3qYd5Nm. Under the Federal Family Education Loan Program ("FFELP"), the federal government paid lenders to make student loans, and the federal government guaranteed their repayment. 20 U.S.C. §1071, *et seq.* The authority to issue loans under this program expired in 2010. *Id.* §1071(d). FFELP loans currently account for about $213.7 billion of outstanding student debt nationwide. *See Federal Student Loan Portfolio*, *supra*. Under the Perkins Loan Program, colleges and universities made loans to financially needy students, and the federal government guaranteed their repayment. 20 U.S.C. §1087aa, *et seq.* The authority to issue loans under the Perkins program expired in 2017. *Id.* §1087aa(b). Perkins Loans currently account for about $4 billion of outstanding student debt. *See Federal Student Loan Portfolio*, *supra*.

About 43 million individuals have debts arising under these three programs. *See Federal Student Loan Portfolio*, *supra*. These individuals collectively have more than $1.61 trillion in outstanding debts. *Id.*

## II.     The Department's Limited Authority to Compromise Student Loan Debt

Because federal agencies are a "creature of statute," the Department of Education has "*only* those authorities conferred upon it by Congress." *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) (cleaned up). The Department thus cannot forgive student loan debt unless Congress has authorized it to do so. The primary statute governing when agencies may forgive debts is the Federal Claims Collection Act of 1966, which provides that agencies "shall try to collect a claim of the United States Government for money or property arising out of the activities of, or referred to, the agency." 31 U.S.C. §3711(a)(1). The Federal Claims Collection Standards ("FCCS"), which implement the Federal Claims Collection Act, require that "[f]ederal agencies shall aggressively collect all debts arising out of activities of . . . that agency." 31 C.F.R. §901.1.

Under the FCCS, agencies are permitted to "compromise a debt" only in four circumstances: (1) where "the debtor is unable to pay the full amount in a reasonable time, as verified through credit reports or other financial information"; (2) the agency is "unable to collect the debt in full within a reasonable time by enforced collection proceedings"; (3) "the cost of collecting the debt does not justify the enforced collection of the full amount"; or (4) "[t]here is significant doubt concerning the Government's ability to prove its case in court." 31 C.F.R. §902.2(a); *see also id.* §902.2(b) (requiring agencies to consider individualized factors, including "[a]ge and health," "[p]resent and potential income," and "[i]nheritance prospects," when determining a debtor's inability to pay).

The Department of Education's regulations expressly incorporate the FCCS. Under the Department's regulations, the Department "uses the standards in the FCCS, 31 CFR part 902, to determine whether compromise of a debt is appropriate if the debt arises under a program

administered by the Department." 34 C.F.R. §30.70(a)(1); *see also id.* §30.70(e)(1) ("[U]nder the provisions of 31 CFR part 902 or 903, the Secretary may compromise a debt in any amount, or suspend or terminate collection of a debt in any amount, if the debt arises under the Federal Family Education Loan Program . . . , the William D. Ford Federal Direct Loan program . . . , or the Perkins Loan Program."); *see also* 81 Fed. Reg. 75,926, 76,070 (Nov. 1, 2016) (adopting these regulations after notice and comment). "It is a fundamental principle of administrative law that an agency is bound to adhere to its own regulations." *Fuller v. Winter*, 538 F. Supp. 2d 179, 186 (D.D.C. 2008); *see Richardson v. Joslin*, 501 F.3d 415, 418 (5th Cir. 2007) (an agency "must abide by its own regulations").

## III.    The Debt Forgiveness Program

In the summer of 2022, reports emerged that the White House was considering taking executive action to forgive student loan debt for tens of millions of individuals. *See* T. Pager, *Latest White House Plan Would Forgive $10,000 in Student Debt Per Borrower*, Wash. Post (May 27, 2022), https://wapo.st/39lXnpW. Behind closed doors, White House officials were debating the various issues that would arise from such a program. *Id.* None of these discussions were open to the public. According to reports, White House officials "dr[ew] up a range of proposals" and were "waiting on the president to make a final decision." *See* A. Restuccia, *Biden Decision on Student-Loan Forgiveness Unlikely Until Later in Summer, Officials Say*, Wall St. J. (June 6, 2022), https://on.wsj.com/3qZN53V.

A primary point of debate was the size of the debt forgiveness to each individual. Although Senator Elizabeth Warren and others were pushing for forgiving up to $50,000 in student debt per borrower, the President was "more comfortable with debt cancellation in the $10,000-per-borrower range." A. Restuccia, *As Biden Zeroes In on Student-Loan Forgiveness Decision, Voter Anxiety Grows*, Wall St. J. (May 23, 2022), https://on.wsj.com/3S46zAl. As of late May, White House officials were "planning to cancel $10,000 in student debt per borrower." Pager, *supra.*

The White House also was debating whether high-income individuals should be excluded from the debt forgiveness program. As of late May, the plan was to limit debt forgiveness to Americans "who earned less than $150,000 in the previous year, or less than $300,000 for married couples filing jointly." *Id.* These income limits were "aimed at fending off criticism that across-the-board loan forgiveness would benefit some Americans with higher incomes who don't need the help." M. Stratford, *Harder Than It Sounds: Income-Targeted Student Loan Forgiveness Invites a 'Train Wreck,'* Politico (May 13, 2022), https://politi.co/3LEtXC1. These "income caps [were] in flux," however, because "some Democratic lawmakers [were] implor[ing] the White House to abandon means-testing." D. Douglas-Gabriel, *Student Loan Borrowers Anxious as Decision Lingers on Debt Cancellation*, Wash. Post (June 10, 2022), https://wapo.st/3NUdlXg. White House officials were also debating alternatives to income thresholds, such as limiting debt forgiveness to "undergraduates or people who attend public universities." Restuccia, *Biden Decision on Student-Loan Forgiveness*, *supra*.

Another factor "complicating the decision" was the best way "to implement [this] large new government program." *Id.* Department officials "privately raised concerns about the complexity of adding an income test to student loan forgiveness" and "warn[ed] the White House that the agency lacks the data to automatically cancel loans based on a borrower's earnings." Stratford, *supra*. The Department thus believed that it would likely "need to set up some sort of application process to determine whether borrowers qualify for relief." *Id.*

White House officials were also concerned "about the possible effects the move could have on record inflation" and were "cautious about doing anything that could be perceived as contributing to high prices." Restuccia, *Biden Decision on Student-Loan Forgiveness*, *supra*. While some in the Administration dismissed these concerns, others warned that "student debt cancellation would exacerbate price pressures." *Id.* Debt cancellation would also "encourage colleges and universities to

continue to raise tuition prices with the expectation that the costs would ultimately not be borne by their students." *Id.*

Whether the President had the legal authority for such a program was also being debated. The Justice Department and the Department of Education were "weighing whether Mr. Biden has the legal authority to unilaterally wipe away loans through executive action." Restuccia, *As Biden Zeroes In*, *supra*. The Department of Education under President Trump had determined that it lacked such authority, *see Memo. to Betsy DeVos Re: Student Loan Principal Balance Cancellation, Compromise, Discharge, and Forgiveness Authority*, U.S. Dep't of Educ. Off. of the Gen. Counsel, (Jan. 12, 2021), https://bit.ly/3LBA36n, and key Democrats agreed, including Speaker of the House Nancy Pelosi, *see* A. Nova, *Pelosi Says Biden Doesn't Have Power to Cancel Student Debt*, CNBC (July 28. 2021), https://cnb.cx/3S85wzp; *see also* G. Rubin, *Mass Student Debt Cancellation Legally Risky Says Top Obama Education Lawyer*, Wall St. J. (May 4, 2022), https://on.wsj.com/3DO0tjx. President Biden nevertheless instructed the Department to prepare a memorandum exploring possible legal avenues to justify the Program. *See* L. Egan, *Biden to Review Executive Authority to Cancel Student Debt*, NBC News (Apr. 1, 2021), https://nbcnews.to/3dD85dV.

Finally, the White House was "weighing the political boost that could come from forgiving loans among young people and others against the backlash from voters who didn't go to college, don't have loans, or already paid them off." Restuccia, *Biden Decision on Student-Loan Forgiveness*, *supra*. An overriding goal was to get the program done fast—so that debt forgiveness would occur in time for the November election. Restuccia, *As Biden Zeroes In*, *supra*. White House officials indicated that the President would announce his decision in July or August of 2022. Restuccia, *Biden Decision on Student-Loan Forgiveness*, *supra*.

At no point did the Department of Education provide notice of its plans or seek public comment on the program. Instead, the countless legal, policy, economic, and other issues implicated by such a program were all debated and determined in secret.

On August 24, the White House announced that the President would "fulfill[] [his] campaign commitment" by providing debt forgiveness to millions of borrowers. *See Fact Sheet: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*, The White House (Aug. 24, 2022), https://bit.ly/3dATj7p. Under the Program, individuals would receive different levels of debt forgiveness based on whether they had received a Pell Grant in college. Those who received a Pell Grant could get up to $20,000 in debt forgiveness while those who did not could get only $10,000 in debt forgiveness. Exhibit A, *One-Time Student Loan Debt Relief, supra* [App. 10]. The Department also announced that those individuals who exceeded an income threshold would be ineligible for the program. Under the Program, individuals with student loans would be ineligible if they earned more than $125,000 (or $250,000 if married filing jointly) in 2020 and 2021. *Id.* [App. 10].

The Department further stated that "most federal student loans" would qualify for debt forgiveness, including Direct Loans, FFELP loans held by the Department or in default, and Perkins Loans held by the Department. *Id.* [App. 13-14]. But individuals with FFELP loans that are commercially held would "not [be] eligible for debt relief." *Id.* [App. 15]. The Department asserted that it was currently "assessing whether to expand eligibility to borrowers with privately owned federal student loans, including FFEL and Perkins Loans." *Id.* [App. 15].

The Department also released a five-page legal memorandum asserting that the Higher Education Relief Opportunities for Students ("HEROES") Act of 2003 gave it the legal authority to enact the Debt Forgiveness Program. *See The Secretary's Legal Authority for Debt Cancellation*, U.S. Dep't of Educ. (Aug. 23, 2022), https://bit.ly/3fcXeYJ. The HEROES Act was enacted following the September 11 attacks and again shortly after the start of the Iraq War, and was designed primarily to

8

ensure that the "[h]undreds of thousands of Army, Air Force, Marine Corps, Navy, and Coast Guard reservists and members of the National Guard [who] ha[d] been called to active duty or active service" would not be "placed in a worse position financially in relation to that financial assistance" because of their military service. *See* 20 U.S.C. §§1098aa(b)(4), 1098bb(a)(2)(A). The Department's legal justification for the Program was widely criticized following the White House's announcement, even by those supporting debt cancelation. *See, e.g.*, Jed Shugerman, *Biden's Student-Debt Rescue Plan Is a Legal Mess*, The Atlantic (Sept. 4, 2022), https://bit.ly/3qVEK18.

For most of September, the Department told the public that "borrowers with privately held federal student loans, such as through the FFEL, Perkins, and HEAL programs, can receive this relief by consolidating these loans into the Direct Loan Program." Exhibit A, *One-Time Student Loan Debt Relief*, *supra* [App. 15]. But in late September, the Department switched course, instructing that "[a]s of Sept. 29, 2022, borrowers with federal student loans not held by ED cannot obtain one-time debt relief by consolidating those loans into Direct Loans." *One-Time Student Loan Debt Relief*, U.S. Dep't of Educ. (Oct. 1, 2022), https://bit.ly/3fBmyrm (Exhibit B) [App. 28]; *see also* N. Bose, *Biden Administration Changes Student Loan Guidance, as Republican-Led States File Lawsuit*, Reuters (Sept. 29, 2022), https://reut.rs/3rhEPwD.

On September 27, the Secretary of Education sent a memorandum to the Assistant Secretary for Postsecondary Education in which he officially "issu[ed] waivers and modifications" to certain statutes and regulations in order to effectuate the Debt Forgiveness Program. *Waivers Relating to Pandemic-Connected General Loan Discharge*, Secretary of Educ. (Sept. 27, 2022) [App. 62].[1] Citing the HEROES Act, the Secretary directed the Department to "take all necessary actions to implement

---

[1] The Secretary's memorandum was not made public until the evening of October 7, when the Department submitted it in response to a lawsuit brought by Nebraska and five other states. *See Nebraska v. Biden*, No. 22-cv-1040, Doc. 27-1 (E.D. Mo. 2022) [App. 62].

these waivers and modifications and to provide notice of these waivers and modifications in the Federal Register." *Id.*

The Secretary's memorandum made no mention of the Debt Forgiveness Program's costs. But the nonpartisan Congressional Budget Office has estimated that the Program will cost over $400 billion. *Costs of Suspending Student Loan Payments and Canceling Debt*, Cong. Budget Off. (Sept. 26, 2022), https://bit.ly/3SpZk6g. Other economists put that number even higher at $469 billion to $519 billion. *The Biden Student Loan Forgiveness Plan: Budgetary Costs and Distributional Impact*, Penn Wharton, Univ. of Pa. (Aug. 26, 2022), https://bit.ly/3UAxpBI.

On October 7, in response to a federal lawsuit, the Department told a federal district court in Missouri that "[o]ver the next several weeks, the Department will be taking steps to implement the debt relief plan." App. 39. The Department represented that it "will not discharge any student loan debt under the debt relief plan prior to October 23, 2022." *Id.*

## IV.    Plaintiffs and Others Excluded from the Debt Forgiveness Program

Plaintiff Myra Brown is one of the millions of Americans who is ineligible for the Debt Forgiveness Program because her student loan debt is commercially held and not in default. Brown Decl. ¶¶5-6 [App. 1-2]. If the Department is going to provide debt forgiveness, Ms. Brown believes that her student loan debt should be forgiven too. *Id.* ¶7 [App. 2]. She believes it is irrational, arbitrary, and unfair to exclude her from the Program because her student loan debt is commercially held and not in default. *Id.* ¶8 [App. 2]. Ms. Brown wants an opportunity to present her views to the Department and provide additional comments on any proposal from the Department to forgive student loan debts. *Id.* ¶9 [App. 2].

Plaintiff Alexander Taylor is one of the millions of Americans who is ineligible for $20,000 in debt forgiveness because he did not receive a Pell Grant in college. Taylor Decl. ¶¶3-5 [App. 4]. If the Department is going to provide debt forgiveness, Mr. Taylor believes that his student loan debt should

be forgiven too. *Id.* ¶6 [App. 5]. Mr. Taylor believes he should not be penalized because he did not receive a Pell Grant in college. *Id.* [App. 5]. Mr. Taylor makes less than $25,000 a year, but he is ineligible for the full $20,000 in debt forgiveness. *Id.* ¶7 [App. 5]. Yet others making more than *five times* as much (up to $125,000 a year) will receive $20,000 in debt forgiveness if they got a Pell Grant in college. Mr. Taylor believes that it is irrational, arbitrary, and unfair to calculate the amount of debt forgiveness he receives based on the financial circumstances of his *parents* many years ago. *Id.* ¶9 [App. 5]. Mr. Taylor wants an opportunity to present his views to the Department and provide additional comments on any proposal from the Department to forgive student loan debts. *Id.* ¶10 [App. 5].

## ARGUMENT

Plaintiffs are entitled to a preliminary injunction if they are "likely to succeed on the merits," they are "likely to suffer irreparable harm in the absence of preliminary relief," the "balance of equities tips in [their] favor," and an injunction "is in the public interest." *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 568-69 (5th Cir. 2010). In addition, under the Administrative Procedure Act, "to the extent necessary to prevent irreparable injury," the Court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. §705. The factors governing issuance of a preliminary injunction also govern issuance of relief under Section 705. *See Texas v. EPA*, 829 F.3d 405, 424, 435 (5th Cir. 2016); *City & Cnty. of San Fran. v. U.S. Citizenship & Immigr. Servs.*, 408 F. Supp. 3d 1057, 1078 (N.D. Cal. 2019). Plaintiffs meet those requirements here.

**I.     Plaintiffs are likely to prevail on the merits.**

**A.     Plaintiffs have standing.**

A plaintiff has standing if he suffered an "injury in fact" that is "fairly traceable to the challenged action of the defendant" and can be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up). In the APA context, a plaintiff can "show a

cognizable injury if [he] has been deprived of 'a procedural right to protect [his] concrete interests.'" *EEOC*, 933 F.3d at 447 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). "A violation of the APA's notice-and-comment requirements is one example of a deprivation of a procedural right." *Id.* The redressability requirement, in turn, "is lighter when the plaintiff asserts deprivation of a procedural right." *Id.* "'When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.'" *Id.* (quoting *Texas v. United States*, 809 F.3d 134, 150-51 (5th Cir. 2015)). Moreover, where, as here, the plaintiffs are "an object of the action," there is "ordinarily little question that the action or inaction has caused [them] injury, and that a judgment preventing or requiring the action will redress it." *Id.* at 446 (cleaned up). In these situations, a plaintiff's "standing to seek review of [the] administrative action is self-evident." *Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 733 (D.C. Cir. 2003) (cleaned up).

Here, Plaintiffs both have student loan debt and the Department is pursuing a program of debt forgiveness. Under the APA, Plaintiffs should have had "an opportunity to participate in and influence [the Department's] decision making at an early stage, when the agency [was] more likely to give real consideration to alternative ideas." *U.S. Steel Corp.*, 595 F.2d at 214. But the Department adopted the Program without providing notice and the opportunity to comment. In doing so, the Department deprived Plaintiffs of their "procedural right to protect [their] concrete interests." *EEOC*, 933 F.3d at 447 (cleaned up). Plaintiffs want the "opportunity to pursue [the] benefit" of debt forgiveness. *Ecosystem Invest. Partners v. Crosby Dredging, LLC*, 729 F. App'x 287, 292-93 (5th Cir. 2018). If the Department is going to pursue debt forgiveness, Plaintiffs believe that their student loan debt should be forgiven too. Brown Decl. ¶7 [App. 2]; Taylor Decl. ¶6 [App. 5]. But under the Program, Ms. Brown will receive no debt forgiveness at all because her loans are commercially held and not in default. Brown Decl. ¶¶5-6 [App. 1-2]. And Mr. Taylor will not receive the full $20,000 in debt

forgiveness because he did not receive a Pell Grant in college. Taylor Decl. ¶¶3-5 [App. 4]. These economic injuries are "'a quintessential injury upon which to base standing.'" *Ecosystem Invest. Partners*, 729 F. App'x at 292 (quoting *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006)).

In addition, Plaintiffs' injuries were caused by the Defendants because their "lost chance" to receive debt forgiveness flows directly from the Program's eligibility requirements. *Id.* at 293. And Plaintiffs satisfy the "lighter" redressability requirements because if the Program is vacated and set aside and the Department must go through the proper rulemaking procedures, there is unquestionably "some possibility" that the Department could reconsider its decision. *EEOC*, 933 F.3d at 447; *see, e.g.*, *Texas v. United States*, 787 F.3d 733, 753-54 (5th Cir. 2015) (finding standing because "[e]njoining the implementation of DAPA until it undergoes notice and comment could prompt DHS to reconsider its decision, which is all a litigant must show when asserting a procedural right"). Indeed, the critical details of the Program—such as which individuals will receive debt forgiveness, the amount of debt to be forgiven, and the types of debt that qualify—were all debated internally for months. *Supra* 5-7. Plaintiffs have standing.

### B.     The Department violated the APA by adopting the Program without following the proper rulemaking procedures.

The APA requires agencies to subject their substantive rules to notice and comment. *See* 5 U.S.C. §553. A "rule" is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* §551(4). Legislative rules typically "grant rights, impose obligations, or produce other significant effects on private interests." *W&T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 237 (5th Cir. 2019). The APA requires courts to "hold unlawful and set aside agency action[s]" that are adopted "without observance of procedure required by law." 5 U.S.C. §706(2); *e.g.*, *Texas*, 809 F.3d at 146 (affirming preliminary injunction of DHS's DAPA program for failing to go through the notice-and-comment process).

The Debt Forgiveness Program is a legislative rule. It creates a new program designed to implement a policy of eliminating or reducing debt obligations for certain individuals. 5 U.S.C. §551(4). It "grant[s] rights" by promising to eliminate individuals' debt if they meet certain requirements, and it "impose[s] obligations" on the Department to forgive debt for those who meet the requirements. *W&T Offshore, Inc.*, 946 F.3d at 237; *see also Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251-52 (D.C. Cir. 2014) ("An agency action that sets forth legally binding requirements for a private party to obtain a permit or license is a legislative rule."). The Program also produces "significant effects on private interests." *W&T Offshore, Inc.*, 946 F.3d at 237. Indeed, the Program "touches the lives of [tens of millions of] Americans" with student loan debt. *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1808 (2019).

The Program also effectively amends or repeals the Department's existing regulations. "[I]f an agency adopts a new position inconsistent with an existing regulation, or effects a substantive change in the regulation, notice and comment are required." *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 35 (D.C. Cir. 2005) (cleaned up). Under the Department's regulations, the agency can compromise student loan debt only (1) where "the debtor is unable to pay the full amount in a reasonable time, as verified through credit reports or other financial information"; (2) the Department is "unable to collect the debt in full within a reasonable time by enforced collection proceedings"; (3) "the cost of collecting the debt does not justify the enforced collection of the full amount"; or (4) "[t]here is significant doubt concerning the Government's ability to prove its case in court." 31 C.F.R. §902.2(a)-(b); 34 C.F.R. §30.70(a)(1), (e)(1); *see also* 81 Fed. Reg. at 75,928, 76,070 (adopting regulations after notice and an opportunity for public comment). None of those circumstances apply here. Because the Debt Forgiveness Program is irreconcilable with the Department's own regulations, the Department could not adopt the Program without conducting notice-and-comment rulemaking. *See, e.g., Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227, 240 (D.C. Cir. 1992).

In addition, for any "regulations pertaining to [Title IV of the Higher Education Act of 1965]," the Department is also required to use "negotiated rulemaking" to develop the rule. 20 U.S.C. §1098a(b)(2); *see The Negotiated Rulemaking Process for Title IV Regulations—Frequently Asked Questions*, U.S. Dep't of Educ., https://bit.ly/3SCFqFf ("The Department is specifically required by law to use negotiated rulemaking to develop NPRMs [notices of proposed rulemaking] for programs authorized under Title IV of the Higher Education Act of 1965[.]"). In negotiated rulemaking, before proposing its rule, the Department "obtain[s] the advice of and recommendations from individuals and representatives of the groups involved in student financial assistance programs under [Title IV], such as students, legal assistance organizations that represent students, institutions of higher education, State student grant agencies, guaranty agencies, lenders, secondary markets, loan servicers, guaranty agency servicers, and collection agencies." 20 U.S.C. §1098a(a)(1). The Department's proposed regulations must then "conform to agreements resulting from such negotiated rulemaking unless the Secretary reopens the negotiated rulemaking process or provides a written explanation to the participants in that process why the Secretary has decided to depart from such agreements." *Id.* §1098a(b)(2); *see also The Negotiated Rulemaking Process for Title IV Regulations—Frequently Asked Questions*, *supra* ("If consensus is achieved, the Department uses that regulatory language in its NPRM. . . . When the NPRM is published in the Federal Register, it contains a request for public comments and a deadline for submitting those comments."). Thus, to the extent the Debt Forgiveness Program "pertain[s]" to Title IV, the Department was also required to adopt its proposed rule through negotiated rulemaking. 20 U.S.C. §1098a(b)(2); *see Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans*, Off. of Legal Counsel, 2022 WL 3975075, at *2 (Aug. 23, 2022) ("The statutory provisions governing each student loan program are set forth in title IV of the Higher Education Act of 1965.").

The Department appears to believe that it has authority under the HEROES Act to promulgate the Debt Forgiveness Program and so the agency can "disregard notice-and-comment requirements." *Id.* at *3 (citing 20 U.S.C. §1098bb(b)(1)-(2)). That is wrong. The HEROES Act does not authorize the Debt Forgiveness Program and thus does not excuse the Department from complying with the APA's requirements.

The HEROES Act was a wartime measure passed in the wake of the September 11 attacks and again shortly after the start of the Iraq War. *See* Pub. L. 107-122, 115 Stat. 2386 (Jan. 15, 2002); Pub. L. 108-76, 117 Stat. 904 (Aug. 18, 2003). Congress recognized that "[h]undreds of thousands of Army, Air Force, Marine Corps, Navy, and Coast Guard reservists and members of the National Guard [had] been called to active duty or active service." 20 U.S.C. §1098aa(b)(4). Through the HEROES Act, Congress sought to "provide[] to the Reservists who are leaving from their jobs to go overseas right now relief from making student loan payments for a period of time while they are away." 149 Cong. Rec. H2522 (Apr. 1, 2003) (Rep. Garrett); *id.* at H2524 (Rep. Ryan) (the Act gives the Secretary "the opportunity to forbear a loan as our servicemen and servicewomen are activated" so that they will not have "to pay on their student loans for the time that they are active.").

The Act accomplishes this goal by giving the Secretary of Education the power to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the Act as the Secretary deems necessary in connection with a war or other military operation or national emergency to provide the waivers or modifications authorized by paragraph (2)." 20 U.S.C. §1098bb(a)(1). Paragraph 2, in turn, authorizes the Secretary to "waive or modify any provision described in paragraph (1) as may be necessary to ensure that recipients of student financial assistance under title IV of the Act who are affected individuals are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." *Id.* §1098bb(a)(2)(A). An "affected individual" is an individual who "(A) is serving on active duty during

a war or other military operation or national emergency; (B) is performing qualifying National Guard duty during a war or other military operation or national emergency; (C) resides or is employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency; or (D) suffered direct economic hardship as a direct result of a war or other military operation or national emergency, as determined by the Secretary." *Id.* §1098ee(2).

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). "Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be 'shaped, at least in some measure, by the nature of the question presented'—whether Congress in fact meant to confer the power the agency has asserted." *W. Virginia v. EPA*, 142 S. Ct. 2587, 2607-08 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). In these "major questions" cases, "the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *Id.* at 2608 (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. at 159-60).

In these cases, courts presume that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* at 2609 (cleaned up). Courts thus demand "something more than a merely plausible textual basis for the agency action." *Id.* The agency "must point to 'clear congressional authorization' for the power it claims.'" *Id.* (quoting *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)) That is because "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or subtle device[s].'" *Id.* (quoting *Whitman v. Am. Trucking Ass'ns., Inc.*, 531 U.S. 457, 468 (2001)). "Nor does Congress typically use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme." *Id.* (quoting *MCI Tel. Corp. v. AT&T*, 512 U.S. 218, 229 (1994)). The Supreme Court has recently and

17

repeatedly found agency actions unlawful under this "major questions" doctrine. *See, e.g.*, *id.* at 2610 (EPA lacked authority to "substantially restructure the American energy market" through a "gap filler" provision in the agency's enabling act.); *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (HHS lacked authority to prohibit evictions in "80% of the country," encompassing "between 6 and 17 million tenants," in response to COVID-19.); *NFIB v. OSHA*, 142 S. Ct. 661, 665 (2022) (OSHA lacked authority to "order[] 84 million Americans to either obtain a COVID-19 vaccine or undergo weekly medical testing at their own expense.").

There is no doubt that "this is a major questions case." *W. Virginia*, 142 S. Ct. 2610. The Program is a policy with "vast economic and political significance." *Utility Air Reg. Grp.*, 573 U.S. at 324 (cleaned up). The Debt Forgiveness Program wipes away the debts of tens of millions of individuals at a cost of more than *400 billion dollars. Supra* 10. And the Program is unquestionably "one of today's most hotly debated issues." *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 614 (5th Cir. 2021); *see, e.g.*, M. Shear, *Biden Gave In to Pressure on Student Debt Relief After Months of Doubt*, N.Y. Times (Aug. 26, 2022), https://nyti.ms/3foJ2vy (noting that the Program "has drawn fierce criticism from Republicans, who describe it as a costly giveaway to many who do not deserve it," and has "ignited an intense debate about the economic consequences"). The Department of Education also has "claimed to discover in a long-extant statute an unheralded power representing a transformative expansion of its regulatory authority." *W. Virginia*, 142 S. Ct. at 2610 (cleaned up). And the Department's discovery here "allowed it to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself." *Id.* For example, in 2020, legislators attempted to pass a bill directing the Secretary of Education to "cancel or repay" Federal student loans up to "$10,000 [of] the total outstanding balance" for borrowers with financial hardship. *See* H.R. 6800, 116th Cong. §150117(h) (2020). But the bill failed in the Senate and was never signed into law.

Congress never could have fathomed that the HEROES Act would be relied on to justify an agency action like the Debt Forgiveness Program. The HEROES Act initially passed by unanimous voice vote in both the House and the Senate, 147 Cong. Rec. H7155 (Oct. 23, 2001); 147 Cong. Rec. S13311 (Dec. 14, 2001), and it was reauthorized and amended in 2003 by unanimous voice vote in the Senate and with only one dissenting voice in the House, 149 Cong. Rec. S10866 (July 31, 2003); 149 Cong. Rec. H2553-54 (Apr. 1, 2003). The Act was uncontroversial because Congress thought it was doing little more than relieving active duty military from "making student loan payments for a period of time while they are away." 149 Cong. Rec. at H2522 (Apr. 1, 2003) (Rep. Garrett). Over and over, legislators recognized this purpose of the Act. *See, e.g.*, *id.* at H2524 (Rep. Isakson) (the Act ensures that our troops who "serve us in the Middle East and in Iraq" and their families "are not harassed by collectors and that their loan payments are deferred until they return"); *id.* at H2524-25 (Rep. Boehner) ("None of us believe that our active duty soldiers should be in a position where they are going to have to make payments on their student loans while in fact they are not here. . . . What we want to do here is to make it clear to the Secretary that . . . he can, in fact, defer these payments."); *id.* at H2525 (Rep. Burns) ("[W]e have before us today a sensible piece of legislation that will support our troops in completing their education. . . . The HEROES bill would excuse military personnel from their Federal student loan obligations while they are on active duty in service to the United States."); *see also id.* H2524 (Rep. Ryan) (same); *id.* at H2522 (Rep. Garrett) (same).

"Given these circumstances, there is every reason to 'hesitate before concluding that Congress' meant to confer on [the Department] the authority it claims under [the HEROES Act]." *W. Virginia*, 142 S. Ct. at 2610. *Nothing* in the HEROES Act gives the Department "clear congressional authorization" to implement the Program. *Id.* at 2609. That should end the matter.

Yet the Department's assertion of authority is so strained that it would fail even if this were not a major questions case. The HEROES Act does not authorize the Department to cancel student

loan debt. The Department relies on its ability to "waive" or "modify" certain provisions. 20 U.S.C. §1098bb(a)(1). But these "modest words" cannot bear the weight the Department places on them. *W. Virginia*, 142 S. Ct. at 2609. Under the Act, the Department's waivers or modifications can do nothing more than ensure that borrowers "are not place[d] in a *worse* position financially *in relation to* that financial assistance because of their status as affected individuals." 20 U.S.C. §1098bb(a)(2)(A) (emphasis added). But cancelling student debt does not place these individuals back in the same position in relation to their debt before the "war or other military operation or national emergency," *id.* §1098bb(a)(1)—it places them in a *better* position because their debts are gone. The Act's legislative history confirms this understanding of the Department's powers. *See generally* 149 Cong. Rec. H2522-27 (legislators expressing that the Department would defer payment obligations, not cancel them); *supra* 18-19.

The HEROES Act was not an unfettered grant of authority to the Department of Education to provide money to individuals in response to wars, natural disasters, and the like. Those functions are "simply not part of what the [Department of Education] was built for." *NFIB*, 142 S. Ct. at 665 (cleaned up). It is *Congress's* job to adopt such legislation. *See, e.g.*, The Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. 116-136, 134 Stat. 281 (Mar. 2020) (providing trillions of dollars to individuals, businesses, governments, and others in response to COVID-19). The grant of power to the Department under the HEROES Act was far more limited in scope. Indeed, when Congress gives the Department the power to cancel student loan debt, it does so explicitly. *See, e.g.*, 20 U.S.C. §1087j(a)-(b) (authorizing the Secretary to "carry out a program of canceling the obligation [of teachers] to repay a qualified loan amount" if certain conditions are met); 20 U.S.C. §1078-11 ("The Secretary shall forgive . . . the qualified loan amount . . . of the student loan obligation of a borrower who is employed full-time in an area of national need."); 20 U.S.C. §1087ee ("Loans shall be canceled" for certain individuals engaging in public service). Congress never did that here.

20

But even if the HEROES Act could be read to authorize the Secretary to cancel student loan debt—which it cannot—the Secretary still would not have the power under the Act to implement the Debt Forgiveness Program. The Department has far exceeded any authority to ensure that affected individuals "are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." 20 U.S.C. §1098bb(a)(2)(A). The Program fails to tie debt cancellation to an individual's debts—*e.g.*, by pausing his or her repayment obligations during an emergency. It instead provides arbitrary debt cancellation—either $10,000 or $20,000—that has no "relation to" the debts themselves. *Id.* Indeed, the Department *already suspended* most individuals' obligations to make loan payments in March 2020 and set interest rates to 0%, which remains in place through the end of 2022. *See COVID-19 Loan Payment Pause and 0% Interest*, Fed. Student Aid, U.S. Dep't of Educ., https://bit.ly/3UNYMsi. Moreover, the Department failed to recognize that any "national emergency" involving COVID-19 has long been over. As the President recently declared, "the pandemic is over. . . . If you notice, no one's wearing masks. Everybody seems to be in pretty good shape. And so I think it's changing." B. Sullivan, *How Biden's Declaring the Pandemic 'Over' Complicates Efforts to Fight COVID*, NPR (Sept. 20, 2022), https://n.pr/3Sjuw70. The Program takes none of these circumstances into account.

The Program also improperly deems every American with student loan debt to be an "affected individual." The Program is not limited to those who "reside[d] or [were] employed in an area that is declared a disaster area," 20 U.S.C. §1098ee(2), because individuals who were living abroad during the pandemic are eligible for debt forgiveness. And the Department did not establish that those receiving debt cancellation "suffered *direct* economic hardship as a *direct* result of a war or other military operation or national emergency." *Id.* §1098ee(2)(D) (emphasis added). Indeed, unemployment has been at historically low numbers, *see* S. Horsley, *The Unemployment Rate Fell to 3.5%, Matching its Lowest Level in the Last 50 Years*, NPR (Aug. 5, 2022), https://n.pr/3RhZQla; nearly 80 percent of all student-

loan borrowers have *higher* credit scores than before the start of COVID-19, *see* Daniel Mangrum, et al., *Liberty Street Economics: Three Key Facts from the Center for Microeconomic Data's 2022 Student Loan Update*, Fed. Rsrv. Bank of N.Y. (Aug. 9, 2022), https://nyfed.org/3dYCGCT; and, since 2020, the Department has paused loan payments and set interest rates at 0%, *see COVID-19 Loan Payment Pause and 0% Interest*, *supra*. Given these circumstances, the Department cannot simply assume that all individuals making less than $125,000 "suffered direct economic hardship" as a "direct result" of COVID-19.

Because the HEROES Act does not authorize the Debt Forgiveness Program, the Department could not adopt the Program without following the proper rulemaking procedures. Plaintiffs are likely to prevail on the merits of their claims.

## II.    Plaintiffs are likely to suffer irreparable harm without a preliminary injunction.

As explained, Plaintiffs have suffered a cognizable injury because they were "deprived of 'a procedural right to protect [their] concrete interests." *EEOC*, 933 F.3d at 447. In the preliminary-injunction context, "'many courts have found that a preliminary injunction may be issued solely on the grounds that a regulation was promulgated in a procedurally defective manner.'" *Eli Lilly & Co. v. Cochran*, 526 F. Supp. 3d 393, 408 (S.D. Ind. 2021) (listing cases). That is because the "purpose of the notice and comment requirement is to permit regulated entities to influence rulemaking at the beginning of the process and not simply after rules are already in place, at which point the agency 'is far less likely to be receptive to comments.'" *Id.* (quoting *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 18 (D.D.C. 2009)); *see U.S. Steel Corp*, 595 F.2d at 214 (the APA is "designed to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas"). Here, if the Debt Forgiveness Program "were permitted to go into effect and was later determined to have been promulgated without an adequate, fair opportunity for advance notice and comment, Plaintiffs would

be deprived of their right, under the APA, to provide meaningful input into the agency's decision at a time when it is most likely to be carefully considered, a harm which the Court would be unable to fully remedy after the fact." *Eli Lilly & Co.*, 526 F. Supp. 3d at 409.

Indeed, Plaintiffs' irreparable harm is even clearer here because of the temporary nature of the Program. The Department intends to hand out hundreds of billions of dollars in debt cancellation in the coming weeks, and the Department will complete (or substantially complete) the Program before the Court can ever rule on the merits. Nearly eight million individuals will soon receive debt forgiveness automatically and all others "can expect relief within six weeks" of applying. *The Biden-Harris Administration's Student Debt Relief Plan Explained*, U.S. Dep't of Educ., https://bit.ly/3RSLc4a; *see also id.* (encouraging individuals "to apply by mid-November in order to receive relief before the payment pause expires on December 31, 2022"). And when the money is gone, the Program will be over. The Department has repeatedly stressed that the Program will provide only "one-time" debt cancellation. *See* Exhibit A, *One-Time Student Loan Debt Relief*, *supra* [App. 10]; *see also* Opp. to P.I. Mot. at 27, *Nebraska,* No. 22-cv-1040 (E.D. Mo.) (noting that the Secretary "concluded that it was necessary and appropriate to order a limited, one-time discharge of student loan debt for [certain] borrowers"). Without a preliminary injunction, Plaintiffs will "'never have an equivalent opportunity to influence the [Program's] contents.'" *Ass'n of Cmty. Cancer Ctrs.*, 509 F. Supp. 3d at 501 (quoting *N. Mariana Islands*, 686 F. Supp. 2d at 18-19).

## III.    The balance of harms and public interest weigh in favor of a preliminary injunction.

The final two factors—the balance of the harms and whether an injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "When balancing the harms, courts must consider whether the movant's injury outweighs the threatened harm to the party whom they seek to enjoin. The public interest element is broader in

scope." *U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 840 (N.D. Tex. 2022). These factors favor a preliminary injunction.

The public would benefit from a preliminary injunction because it will preserve their rights to notice and comment. The Debt Forgiveness Program is an unprecedented program that will affect the entire country. Every American has an interest in commenting on the Program because of its costs, its effects on inflation, its impact on higher education, and countless other reasons. The millions of individuals like Plaintiffs who are being shortchanged or left out of the Program entirely have an interest in commenting on the Program. Universities, loan service providers, and state governments do too. And the list goes on. Without a preliminary injunction, everyone will be denied the opportunity to provide the government with their evidence and views on the Program.

By contrast, the public interest will not be harmed by a preliminary injunction. The "public interest is in having governmental agencies abide by the federal laws that govern their existence and operations." *Texas v. Biden*, 10 F.4th 538, 559 (5th Cir. 2021) (cleaned up)). And there is "no public interest in the perpetuation of unlawful agency action." *Wages & White Lion Invest. LLC v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) (cleaned up).

To be sure, individuals "who may be reaping [debt] recoveries" under the Program may oppose a preliminary injunction. *In re Deepwater Horizon*, 732 F.3d 326, 345 (5th Cir. 2013). But their interests are "outweighed by the potential loss" to Plaintiffs and others who might qualify for forgiveness under a program that was lawfully created. *See id.* (reversing denial of preliminary injunction where settlement fund was being depleted by improper claimants). Moreover, a preliminary injunction will prevent the chaos that will inevitably follow if tens of millions of Americans are wrongly led to believe that their debts have been lawfully cancelled. The inherent "difficulty of restoring the

*status quo ante* if [the Program] were to be implemented" favors a preliminary injunction. *Texas*, 809 F.3d at 187. A preliminary injunction is warranted.[2]

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for a preliminary injunction.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td>Dated: October 10, 2022</td><td>*/s/ James F. Hasson*</td></tr>
</table>

J. Michael Connolly (VA Bar No. 77632)
James F. Hasson (TX Bar No. 24109982)
Matthew Pociask* (IL Bar No. 6336568)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Tel: (703) 243-9423
Fax: (703) 243-9423
mike@consovoymccarthy.com
james@consovoymccarthy.com
matt@consovoymccarthy.com

Steven C. Begakis (VA Bar No. 95172)
CONSOVOY MCCARTHY PLLC
Fort Worth, TX
Tel: (703) 243-9423
Fax: (703) 243-9423
steven@consovoymccarthy.com

*Admitted in Illinois, but not Virginia.*
*Supervised by principals at firm.*

*Counsel for Plaintiffs*

---

[2] The Court should decline to require an injunction bond. Federal courts have broad "discretion" to "elect to require no security at all" when issuing a preliminary injunction. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). When "there is no risk of monetary loss to the defendants as a result of [a] preliminary injunction," courts frequently grant "request[s] that the bond be waived." *Gordon v. City of Houston, Tex.*, 79 F. Supp. 3d 676, 695 (S.D. Tex. 2015). Waiving the bond requirement is particularly appropriate here because Plaintiffs are likely to succeed on the merits and Defendants will incur no harm from an injunction. *Id.*

**CERTIFICATE OF SERVICE**

I certify that on October 10, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System and will serve a copy on each of the Defendants according to the Federal Rules of Civil Procedure.

*/s/ James F. Hasson*
James F. Hasson