**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| MYRA BROWN and ALEXANDER TAYLOR, | |
| Plaintiffs, | |
| v. | Civil Action No. 4:22-cv-00908-P |
| U.S. DEPARTMENT OF EDUCATION and MIGUEL CARDONA, in his official capacity as Secretary of Education, | |
| Defendants. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION AND MOTION TO DISMISS**

# TABLE OF CONTENTS

BACKGROUND ................................................................................................................ 2

   I.   Statutory and Regulatory Background ........................................................... 2

   II.   The HEROES Act ......................................................................................... 3

   III.   The COVID-19 Pandemic ............................................................................ 4

   IV.   The Targeted One-Time Pandemic Loan Discharge Plan ............................ 6

   V.   This Litigation ............................................................................................... 6

LEGAL STANDARD ........................................................................................................ 8

ARGUMENT ...................................................................................................................... 8

   I.   Plaintiffs Lack Standing To Complain That Other Borrowers Are Receiving Relief ................. 8

   II.   Plaintiffs Cannot Show a Likelihood Of Success On The Merits ...................................... 12

      A. The HEROES Act Provides For An Expedited Process That Does Not Include Notice-and-Comment Procedures ........................................................ 13

      B. The HEROES Act Authorizes the Secretary's Provision of Targeted Debt Relief. ........... 14

         1.   The HEROES Act Authorizes the Secretary to Modify Provisions Regarding Loan Discharge. ......................................................... 14

         2.   The Loan Discharges Apply to a Proper Subset of Affected Borrowers ................................................................................. 16

         3.   The Secretary Reasonably Determined That a Measure of Discharge Was Needed to Reduce Delinquency and Default Risk Among Lower-Income Borrowers ........................................................... 19

      C. The Major Questions Doctrine Does Not Undermine the Clear Statutory Authorization Provided by the HEROES Act ............................................... 22

   III.   Plaintiffs Have Failed to Establish Any Legally Cognizable Interest, Let Alone Irreparable Harm ................................................................................ 27

   IV.   The Balance of the Equities and Public Interest Weigh Against Injunctive Relief. .......... 29

   V.   Any Relief Should Be Appropriately Limited. ............................................ 30

CONCLUSION ................................................................................................................ 30

# TABLE OF AUTHORITIES

## Cases

*Ala. Ass'n of Realtors v. HHS*,
  141 S. Ct. 2485 (2021)........................................................................23, 25

*Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*,
  896 F.2d 1283 (11th Cir. 1990)................................................................28

*City of Hearne v. Johnson*,
  929 F.3d 298 (5th Cir. 2019)...................................................................10

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*,
  447 U.S. 102 (1980)...............................................................................26

*Cornish v. Dudas*,
  540 F. Supp. 2d 61 (D.D.C. 2008)...........................................................29

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)...............................................................................8, 9

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000)............................................................................24, 25

*Georgia v. President*,
  46 F.4th 1283 (11th Cir. 2022)...............................................................30

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018)............................................................................30

*Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*,
  512 F.3d 1112 (9th Cir. 2008)................................................................29

*Henderson v. Stalder*,
  287 F.3d 374 (5th Cir. 2002).............................................................11, 12

*Holland Am. Ins. Co. v. Succession of Roy*,
  777 F.2d 992 (5th Cir. 1985)..................................................................27

*In re Compl. of RLB Contracting, Inc.*,
  773 F.3d 596 (5th Cir. 2014).....................................................................8

*Jordan v. Fisher*,
  823 F.3d 805 (5th Cir. 2016).....................................................................8

*Lake Charles Diesel, Inc., v. Gen. Motors Corp.*,
  328 F.3d 192 (5th Cir. 2003).....................................................................8

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
    140 S. Ct. 2367 (2020)................................................................................................27

*Louisiana v. Becerra,*
    20 F.4th 260 (5th Cir. 2021)....................................................................................30

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)..............................................................................................8, 10

*Machete Prods., LLC v. Page,*
    809 F.3d 281 (5th Cir. 2015)......................................................................................8

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994)..................................................................................................30

*Matrixx Initiatives, Inc. v. Siracusano,*
    563 U.S. 27 (2011)....................................................................................................18

*Missouri v. Biden,*
    142 S. Ct. 647 (2022)................................................................................................24

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010)....................................................................................................9

*Morgan v. Huntington Ingalls, Inc.,*
    879 F.3d 602 (5th Cir. 2018)....................................................................................10

*Munaf v. Geren,*
    553 U.S. 674 (2008)....................................................................................................8

*Nat'l Ass'n of Mfrs. v. Dep't of,*
    Def., 138 S. Ct. 617 (2018)......................................................................................27

*Nken v. Holder,*
    556 U.S. 418 (2009)..................................................................................................29

*Optimus Steel, LLC v. U.S. Army Corps of Engr's,*
    492 F. Supp. 3d 701 (E.D. Tex. 2020)....................................................................28

*Ramming v. United States,*
    281 F.3d 158 (5th Cir. 2001)......................................................................................8

*Sampson v. Murray,*
    415 U.S. 61 (1974)....................................................................................................27

*Sepulvado v. Jindal,*
    729 F.3d 413 (5th Cir. 2013)......................................................................................8

iii

*Shrimpers & Fishermen of RGV v. Texas Comm'n on Env't Quality,*
   968 F.3d 419 (5th Cir. 2020) ...........................................................................................10

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016) ...................................................................................................9, 10

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) ...........................................................................................................9

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) .......................................................................................................10

*Texas v. EEOC,*
   933 F.3d 433 (5th Cir. 2019) ...................................................................................11, 12

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) .........................................................................................11

*Texas, Veterans of Foreign Wars v. Texas Lottery Comm'n,*
   760 F.3d 427 (5th Cir. 2014) .........................................................................................12

*TransUnion, LLC v. Ramirez,*
   141 S. Ct. 2190 (2021) .....................................................................................................9

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) ...................................................................................................30

*United States v. Gonzales,*
   520 U.S. 1 (1997) .....................................................................................................passim

*Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans,*
   2022 WL 3975075 (Aug. 23, 2022) ................................................................................4

*Utility Air Regulatory Group v. E.P.A,*
   573 U.S. 302 (5th Cir. 2011) ..........................................................................................23

*West Virginia v. EPA,*
   142 S. Ct. 2587 (2022) ..............................................................................................passim

*Williamson v. Tucker,*
   645 F.2d 404 (5th Cir. 1981) ...........................................................................................8

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ..............................................................................................8, 10, 25

## Statutes

5 U.S.C. § 553 ............................................................................................................13, 14

5 U.S.C. § 553(b)(A) .................................................................................................................. 14

5 U.S.C. § 553(b)(B) .................................................................................................................. 14

5 U.S.C. § 559 .............................................................................................................................. 9

5 U.S.C. § 706(2)(C) .................................................................................................................. 14

20 U.S.C. § 1070 .......................................................................................................................... 2

20 U.S.C. § 1082(a)(6) .............................................................................................................. 25

20 U.S.C. § 1087ll ........................................................................................................................ 2

20 U.S.C. § 1098a .................................................................................................................. 4, 13

20 U.S.C. § 1098bb ............................................................................................................... 15, 23

20 U.S.C. § 1098bb(a)(1) ................................................................................................... *passim*

20 U.S.C. § 1098bb(a)(2) ............................................................................................... 15, 16, 18

20 U.S.C. § 1098bb(a)(2)(A) ........................................................................................ 19, 20, 21, 24

20 U.S.C. § 1098bb(a)-(b) ......................................................................................................... 29

20 U.S.C. § 1098bb(b)(1) ........................................................................................................ 9, 13

20 U.S.C. § 1098bb(b)(3) ..................................................................................................... 16, 18

20 U.S.C. § 1098ee(2) ................................................................................................................ 17

20 U.S.C. § 1232 ........................................................................................................................ 13

20 U.S.C. §§ 1082 ........................................................................................................................ 3

26 U.S.C. § 108 .......................................................................................................................... 27

50 U.S.C. § 1621 .......................................................................................................................... 3

Higher Education Relief Opportunities for Students Act of 2003,
   Pub. L. No. 108-76 117 Stat 904 (2003) ........................................................................... 3

Coronavirus Aid, Relief, and Economic Security Act,
   Pub. L. No. 116-136 134 Stat 281(2020) ........................................................................... 5

American Rescue Plan Act,
   Pub. L. No. 117-2, 135 Stat 4 (2021) ............................................................................... 27

**Administrative and Executive Materials**

34 C.F.R. § 30.70 ...................................................................................................25

Federal Student Aid Programs,
    87 Fed. Reg. 10,289 (Feb. 18, 2022) ....................................................................17

Declaring a National Emergency Concerning the Coronavirus Disease (COVID-19) Outbreak,
    85 Fed. Reg. 15,337 (Mar. 18, 2020)......................................................................4

Federal Student Aid Programs,
    85 Fed. Reg. 79,856, 79,857 (Dec. 11, 2020). .......................................................5

Notice of Debt Cancellation Legal Memorandum,
    87 Fed. Reg. 52,943 (Aug. 30, 2022) .....................................................................4

Federal Student Aid Programs,
    87 Fed. Reg. 61,512 (Oct. 12, 2022) ......................................................................6

**Legislative Materials**

Stop Reckless Student Loan Actions Act of 2022,
    S. 4094, 117th Cong. § 4(d)(1) (Apr. 27, 2022) ...................................................26

Federal Student Loan Integrity Act,
    H.R. 7058, 117th Cong.  (Mar. 11, 2022)..............................................................26

Stop Reckless Student Loan Actions Act of 2022,
    H.R. 7656, 117th Cong. § 4(d)(1) (May 3, 2022) .................................................26

**Other Authorities**

Centers for Disease Control and Prevention, COVID Data Tracker, (Oct. 6, 2022),
    https://perma.cc/5ERQ-4XQW...............................................................................4

Federal Emergency Management Agency, COVID-19 Disaster Declarations, (Oct. 18, 2022),
    https://perma.cc/B7KA-W4KD................................................................................4

Federal Student Aid, Fiscal Year 2020 Annual Report 38, (Oct. 6, 2022),
    https://perma.cc/9ZM7-HWZP...............................................................................5

Merriam Webster's Dictionary, (Oct. 18, 2022),
    https://www.merriam-webster.com/dictionary/ensure............................................16

Student Loan Delinquency and Default,
    https://perma.cc/9T5Y-7Q9L.................................................................................30

U.S. Dep't of Education, "Biden-Harris Administration Announces Final Student Loan Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Transition to Repayment," (Aug. 24, 2022), https://perma.cc/AP3Q-3V6C ................................................................................................. 5

U.S. Dep't of Education, "Education Department Approves $5.8 Billion Group Discharge to Cancel all Remaining Loans for 560,000 Borrowers Who Attended Corinthian," (June 1, 2022), https://perma.cc/MTW6-XABV ................................................................................................. 26

U.S. Dep't of Education, "Secretary DeVos Cancels Student Loans, Resets Pell Eligibility, and Extends Closed School Discharge Period for Students Impacted by Dream Center School Closures," (Nov. 8, 2019), https://perma.cc/FRT6-WAWS ................................................................................................. 26

U.S. Dep't of Educ., FSA, One-Time Student Debt Relief, https://perma.cc/ER4E-6RCS ................................................................................................. 6

Plaintiffs, two individuals, claim to have standing to challenge the Department of Education's student debt forgiveness program based on the fact that they did not have the opportunity to persuade the Department to expand a program that, in the very same motion, they argue was unlawful because of its overbreadth. Plaintiffs' only claim, that the Department failed to subject its decision to provide one-time student-loan debt relief to notice and comment, is belied by the express terms of the Higher Education Relief Opportunities for Students Act of 2003 ("HEROES Act"), which exempts the Secretary's waivers and modifications of student loan debt from notice and comment. Plaintiffs therefore have no procedural right to notice and comment, and its absence cannot be a procedural violation that injured *anyone*. Likewise, Plaintiffs' alleged harm—that they will not receive the full measure of relief offered to other borrowers under the program—is nothing but a generalized grievance shared by tens of millions of borrowers that does not confer standing. Nor are Plaintiffs' purported injuries redressable by an order enjoining debt relief for those included in the program, as it would not require the Department to expand the program to include Plaintiffs. Plaintiffs' complaint should be dismissed for lack of standing, and the lack of cognizable injury also prevents Plaintiffs from establishing irreparable harm for purposes of obtaining emergency relief.

Nor can Plaintiffs transform their sole procedural claim into a substantive claim by arguing that the HEROES Act's exemption from notice-and-comment rulemaking does not apply because the HEROES Act does not authorize the one-time student-loan debt relief. In notable tension to their standing argument—which is based on the theory that the invocation of the HEROES Act was too modest—Plaintiffs' substantive contention is based largely on the assertion that the program's scope is too broad. But Congress authorized the Secretary to undertake the challenged action: The Higher Education Act of 1965, as amended ("HEA"), has long vested the Department with broad authority to manage the federal student financial aid programs, to determine the terms and conditions upon which borrowers are required to repay their student loans to the Department, and to discharge or modify loan obligations in a wide variety of circumstances. In 2003, Congress added to that authority by enacting the HEROES Act, which authorizes the Secretary of Education to waive or modify statutory and regulatory provisions governing the federal student financial aid programs, including

1

those related to the terms of student loans administered by the Department, to ameliorate the economic effects of war or national emergency. COVID-19 is plainly such an emergency, and Plaintiffs do not claim otherwise.

In August 2022, as the Nation focuses on emerging from the pandemic, the Secretary determined that the loan repayment pause initiated by his predecessor should come to an end. But because economically vulnerable borrowers face a high risk of delinquency and default as a result of the pandemic—a risk that is particularly acute when payments resume—the Secretary invoked the HEROES Act to provide targeted student loan cancellation so that affected individuals will not be worse off with respect to their student loans because of the COVID-19 pandemic. The Secretary's action under the HEROES Act is grounded in an analysis of the economic effects of the national emergency and is tailored to recovery from it. Because that decision fits comfortably within his HEROES Act authority, any substantive challenge to the program bootstrapped to Plaintiffs' procedural claim is not likely to succeed on the merits.

Nor does the public interest support the issuance of a preliminary injunction. Plaintiffs' wish to benefit more fully from the Secretary's debt relief program should not tip the scales against the millions of student loan borrowers who, economic researchers and the Secretary have concluded, will be at increased risk of default on their student loans when repayment restarts.

## BACKGROUND

### I.     Statutory and Regulatory Background

The Secretary of Education ("Secretary") is charged with carrying out certain student loan programs under Title IV of the HEA, 20 U.S.C. § 1070 *et seq.* Foremost among these is the William D. Ford Federal Direct Loan Program, which allows students to apply for and receive Direct Loans from the federal government to pay for their educational expenses, including tuition and living expenses. 20 U.S.C. § 1087*ll*. Title IV also includes other programs, such as the Federal Family Education Loan ("FFEL") Program, *id.* §§ 1071-1087-4, and the Perkins Loan Program, *id.* §§ 1087aa-1087ii, although no new loans are authorized under either program. *See id.* § 1078(a)(1) (no new FFEL

loans after July 1, 2010); *id.* § 1087aa(b)(2) (no new Perkins loans after September 30, 2017). The HEA delegates significant authority to the Secretary to administer the Department's portfolio of more than 43 million federal student loans, *see* 20 U.S.C. §§ 1082, 3441, 3471, including the authority to "compromise, waive, or release any right, title, claim, lien, or demand" acquired in the Secretary's performance of his vested "functions, powers, and duties" to administer student loans, *id.* § 1082(a).

## II.     The HEROES Act

The HEROES Act, Pub. L. No. 108-76, 117 Stat. 904 (2003) (codified at 20 U.S.C. §§ 1098aa-1098ee), authorizes the Secretary to take broad and decisive action with respect to the federal student financial aid programs in times of national emergency. Specifically it provides that, "[n]otwithstanding any other provision of law," the Secretary may "waive or modify any statutory or regulatory provision applicable to" the federal student financial aid programs "as the Secretary deems necessary in connection with a ... national emergency to" accomplish certain statutory goals. 20 U.S.C. § 1098bb(a)(1). As relevant here, the Secretary may provide such waivers as "necessary to ensure" that (1) covered Title IV financial aid recipients "are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals," and (2) administrative requirements placed on such covered individuals are "minimized ... to ease the burden on such students and avoid inadvertent, technical violations or defaults." *Id.* § 1098bb(a)(2). The Act defines the covered population of "affected individual[s]" broadly to encompass any individual who, as relevant here, either "resides or is employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency," or "suffered direct economic hardship as a direct result of a [national emergency] as determined by the Secretary." *Id.* § 1098ee(2). And a "national emergency" is "a national emergency declared by the President of the United States." *Id.* § 1098ee(4); *see also* 50 U.S.C. § 1621 (authorizing President to declare national emergency).

The Act exempts any exercise of the Secretary's authority from certain otherwise-applicable procedural requirements, including Administrative Procedure Act ("APA") notice-and-comment rulemaking. Section 1098bb(b)(1) provides that "[n]otwithstanding section 1232 of this title and

section 553 of Title 5, the Secretary shall, by notice in the Federal Register, publish the waivers or modifications of statutory and regulatory provisions the Secretary deems necessary to achieve the purposes of this section." And Section 1098bb(b)(1)(d) states that 20 U.S.C. § 1098a, which requires the Department to engage in negotiated rulemaking to develop certain proposed rules under the HEA, "shall not apply to the waivers and modifications authorized or required by this part."

The statute also explicitly states that the Secretary "is not required to exercise the waiver or modification authority under this section on a case-by-case basis." *Id.* § 1098bb(b)(3). Historically, the Department has exercised this authority to provide categorical relief to borrowers in connection with national emergencies. *See* U.S. Dep't of Just., Office of Legal Counsel, *Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans*, 2022 WL 3975075, at *4-5 (Aug. 23, 2022) ("OLC Opinion"); U.S. Dep't of Educ., Office of the General Counsel, *The Secretary's Legal Authority for Debt Cancellation* (Aug. 23, 2022), *available at* Notice of Debt Cancellation Legal Memorandum, 87 Fed. Reg. 52,943 (Aug. 30, 2022) ("ED Legal Authority Memo").

## III.   The COVID-19 Pandemic

In March 2020, then-President Trump declared a national emergency to contain and combat the virus known as COVID-19. *See* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15,337 (Mar. 18, 2020). That declaration remains in effect, and the federal government has declared every state, the District of Columbia, and the territories to be disaster areas due to COVID-19. *See* Federal Emergency Management Agency, COVID-19 Disaster Declarations, https://perma.cc/B7KA-W4KD. Over the past two and a half years, COVID-19 has killed more than 1 million Americans, *see* Centers for Disease Control and Prevention, COVID Data Tracker (Oct. 6, 2022), https://perma.cc/5ERQ-4XQW, and has caused significant disruptions to all aspects of American life. Even now, COVID-19 is killing more than 300 Americans and causing thousands more to be hospitalized every day. *Id.*

In response to the pandemic and the myriad economic difficulties it has imposed, the federal government has taken several significant actions to provide relief to federal student loan borrowers

with Department-held loans. On March 20, 2020, the Secretary invoked the HEROES Act to pause repayment obligations and suspend interest accrual on Department-held student loans. *See* Federal Student Aid Programs, 85 Fed. Reg. 79,856, 79,857 (Dec. 11, 2020) ("2020 Notice"). Shortly thereafter, Congress enacted legislation directing the Secretary to suspend all payments on any Title IV loans held by the Department and apply a zero-percent interest rate to all such loans, through September 2020. Coronavirus Aid, Relief, And Economic Security Act, Pub. L. No. 116-136, § 3513, 134 Stat. 281 (2020). These protections were extended by both the Trump Administration and the Biden Administration and remain in effect today pursuant to invocations of the Secretary's HEROES Act authority. *See, e.g.*, 2020 Notice, 85 Fed. Reg. at 79,857; Federal Student Aid ("FSA"), Fiscal Year 2020 Annual Report (Nov. 16, 2020), https://perma.cc/9ZM7-HWZP ("FSA Report"); Memo from Secretary Cardona to Chief Operating Officer ("COO") Cordray ("Decision Memo"), Ex. B to Decl. of James Kvaal ("Kvaal Decl."), App'x 22. As a result, federal student loan borrowers with Department-held loans have not been required to make payments on those loans for more than two and a half years. On August 24, 2022, the Secretary announced that he would use his authority under the HEROES Act to extend the payment pause and zero-percent interest protections one final time, through December 31, 2022. *See* U.S. Dep't of Educ., *Biden-Harris Administration Announces Final Student Loan Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Transition to Repayment* (Aug. 24, 2022), https://perma.cc/AP3Q-3V6C.

## IV.    The Targeted One-Time Pandemic Loan Discharge Plan

To address the financial harms to student loan borrowers caused by the pandemic and ensure a smooth transition back to repayment status after this long payment pause, the Secretary announced he would use his HEROES Act authority to provide targeted one-time debt relief to federal student loan borrowers affected by the pandemic.[1] *Id.* Designed to "address the financial harms of the pandemic" by providing relief to "borrowers at highest risk of delinquencies or default once payments

---

[1] The Secretary published the relevant HEROES Act waivers and modifications in a notice in the Federal Register on October 12, 2022. *See* 87 Fed. Reg. 61,512 (Oct. 12, 2022) ("2022 Notice").

resume," the Department's plan will make up to $10,000 in student loan debt relief available to eligible borrowers making less than $125,000 (or married couples making less than $250,000). *Id.* Borrowers who received a Pell Grant to attend college are eligible to receive up to $20,000 in loan relief. *Id.*

This loan forgiveness program is based on the Secretary's determination that such measures are necessary to ensure that "borrowers subject to the payment pause are not placed in a worse position financially by the COVID-19 national emergency as they restart payments." Decision Memo at 1. The Secretary recognized that while the payment pause had "delivered substantial relief to millions of loan borrowers," additional steps are needed to address the "heightened risk of loan delinquency and default" that many borrowers face upon reentering repayment and to ensure that such borrowers are not "in a worse position financially due to the pandemic with regard to their ability to repay their loans." *Id.* That determination was based on, among other things, an economic analysis finding that discharging $10,000 in federal student loan debt (and $20,000 for Pell Grant recipients) for borrowers making less than $125,000 (or households making less than $250,000) would reduce the likelihood of delinquency and default for borrowers transitioning back to repayment and ensure that such borrowers are not made worse off with respect to their financial assistance by the COVID-19 pandemic. *See generally* Rationale for Pandemic-Connected Loan Discharge Program ("Supporting Analysis"), App'x 8-18. Direct Loans, FFEL and Perkins loans held by the Department, as well as most defaulted loans are eligible for one-time debt relief. *See* U.S. Dep't of Educ., FSA, *One-Time Student Debt Relief*, https://perma.cc/ER4E-6RCS. Privately-held FFEL and Perkins loans are not eligible for relief, although borrowers with such loans are eligible for relief if they applied to consolidate into a Department-held loan before September 29, 2022.

## V.   This Litigation

Plaintiffs are two individual Texas residents dissatisfied with the scope of the Secretary's targeted debt-relief plan. Plaintiff Myra Brown has roughly $17,000 in outstanding student loans but, because her loans are commercially held, she is not eligible for this particular exercise of discretionary debt relief. Compl., ECF No. 1, ¶ 14. Plaintiff Alexander Taylor's roughly $35,000 in student loans

6

are held by the Department of Education and, because his most-recent income fell below the $125,000 threshold, Mr. Taylor is eligible for $10,000 in loan forgiveness. *Id.* ¶ 16. Because Mr. Taylor did not receive a Pell Grant in college, however, he is not eligible for the additional $10,000 in debt relief. *Id.*

Plaintiffs' one-count complaint claims that "their student loan debt should be forgiven too" because, they feel, "it is irrational, arbitrary, and unfair" to provide a greater measure of benefits to others but not to themselves. *See* Compl. ¶ 10. Plaintiffs allege that the Secretary erred by not subjecting his debt-relief plan to public notice and comment before finalizing its scope; on this basis, they ask the Court to enjoin the Department "from enforcing, applying, or implementing the Program" for any of the more than 40 million lower-income Americans who currently are eligible for, and expecting to benefit from, debt relief. *Id.* at 14. The same day Plaintiffs filed their suit, they moved for a preliminary injunction seeking to forestall debt relief for millions of Americans. *See* Mot. for Prelim. Inj., ("PI Br."), ECF No. 4.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy" that should "never [be] awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). A plaintiff may obtain this "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The plaintiff must show (1) "a substantial threat of irreparable injury," (2) "a substantial likelihood of success on the merits," (3) "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and (4) "that the grant of an injunction will not disserve the public interest." *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016) (quoting *Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013)). The plaintiff must "clearly carr[y] the burden of persuasion on all four requirements." *Id.* (citation omitted); *see also, e.g.*, *Lake Charles Diesel, Inc., v. Gen. Motors Corp.*, 328 F.3d 192, 203 (5th Cir. 2003).

"Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). To survive a Rule 12(b)(1) motion, a plaintiff bears the burden to

establish a court's jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). It is "presume[d] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (citation omitted). "[I]n examining a Rule 12(b)(1) motion, a district court is empowered to find facts as necessary to determine whether it has jurisdiction." *Machete Prods., LLC v. Page*, 809 F.3d 281, 287 (5th Cir. 2015). Accordingly, "the district court may consider evidence outside the pleadings and resolve factual disputes." *In re Compl. of RLB Contracting, Inc.*, 773 F.3d 596, 601 (5th Cir. 2014); *see also Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (on a Rule 12(b)(1) motion, a district court is "free to weigh the evidence and satisfy itself … of its power to hear the case") (citation omitted).

## ARGUMENT

## I.     Plaintiffs Lack Standing To Complain That Other Borrowers Are Receiving Relief

Standing is a jurisdictional requirement, and this Court "cannot proceed at all" unless plaintiffs establish the "irreducible constitutional minimum of standing," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 102 (1998) (citation omitted), "for each form of relief sought," *DaimlerChrysler Corp.*, 547 U.S. at 352 (citation omitted). Plaintiffs can only meet this burden by demonstrating that the challenged action causes them to suffer an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). Here, Plaintiffs' claimed injuries are based solely on the contention that they have been "deprived of a procedural right" to participate in notice-and-comment rulemaking in violation of the APA. *See* PI Br. at 11-12. Plaintiffs' allegations fail to establish standing for several reasons.

*First*, Plaintiffs' procedural notice-and-comment claim fails because the Secretary promulgated the challenged policy pursuant to his authority under the HEROES Act, which Congress expressly exempted from APA notice-and-comment procedures and the HEA's negotiated rulemaking requirements. *See* 20 U.S.C. § 1098bb(b)(1), (d); 5 U.S.C. § 559 (subsequently passed statutes may modify APA requirements, if explicit). Therefore Plaintiffs have no procedural right "granted by

statute" to either notice-and-comment or negotiated rulemaking, *Spokeo, Inc. v. Robins,* 578 U.S. 330, 342 (2016), and the Secretary's alleged failure to engage in the same cannot be a procedural violation that injured *anyone. See TransUnion, LLC v. Ramirez,* 141 S. Ct. 2190, 2200 (2021) ("No concrete harm, no standing."). Plaintiffs cannot establish harm based on the inability to opine on an agency decision that Congress did not subject to public comment in the first place. None of the cases Plaintiffs cite for the proposition that standing can be based on a deprivation of the right to notice and comment involved such a clear-cut *absence* of such right as is the case here. Plaintiffs' retort to § 1098bb(b)(1), (d) is simply that the HEROES Act does not apply, because it "does not authorize the Debt Forgiveness Program." But that bootstrapping does not negate the fact that notice and comment was not required here under the plain terms of the HEROES Act (and the argument fails on its merits, as discussed *infra.*)

*Second*, even if notice-and-comment procedures applied, it is well established that Plaintiffs "cannot satisfy the demands of Article III by alleging a bare procedural violation." *Spokeo, Inc.,* 578 U.S. at 342; *see also, e.g., Summers v. Earth Island Inst.,* 555 U.S. 488, 496 (2009) ("deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing"); *City of Hearne v. Johnson*, 929 F.3d 298, 301-02 (5th Cir. 2019) (same); *Morgan v. Huntington Ingalls, Inc.,* 879 F.3d 602, 606-07 (5th Cir. 2018) (same). Rather, Plaintiffs must show not just the mere existence of a procedural violation (which is non-existent here in any event), but also a concrete injury stemming from the procedural violation. *See, e.g., Shrimpers & Fishermen of RGV v. Texas Comm'n on Env't Quality*, 968 F.3d 419, 426 (5th Cir. 2020) (noting that a plaintiff "can have standing to enforce procedural rights only if 'the procedures in question are designed to protect some threatened concrete interest' that is 'the ultimate basis of his standing'" (quoting *Lujan*, 504 U.S. at 573 n.8 (1992))).

This they cannot do. To the extent Plaintiffs claim any concrete injury from the Department's policy—separate and apart from the contention that they wished to comment—it is that "Plaintiffs believe that their student loan debt should be forgiven too," PI Br. at 12. They claim "economic injuries" because Ms. Brown allegedly will not receive any student loan debt forgiveness under the

policy and because Mr. Taylor allegedly will receive $10,000 in forgiveness rather than the $20,000 available to Pell Grant recipients. *Id.* at 12-13. This claim of injury is highly suspect because elsewhere Plaintiffs argue vociferously that the very breadth of the loan forgiveness program makes it illegal. Plaintiffs do not explain how they are injured by their inability to submit a comment that would have apparently argued that a program they contend was too broad should have been expanded even further to benefit them.

But even if Plaintiffs' allegations could be credited, they still would lack standing because their allegations of a procedural violation are not accompanied by any concrete harm flowing therefrom. Plaintiffs have no entitlement to any amount of loan forgiveness—as they elsewhere recognize, they are generally required to repay their federal student loan obligations except in such circumstances as the Department determines to relieve them of that obligation under authority granted by Congress, *see, e.g.*, PI Br. at 4-5. Their entire case, then, reduces to unhappiness that some *other* borrowers are receiving a greater benefit than they are—*i.e.,* a complaint about the terms on which the Department has determined to exercise its statutory authority to confer a discretionary benefit on other federal student loan borrowers who are not parties to this lawsuit. That is not a concrete injury. "As a general proposition, a plaintiff who complains merely that a benefit has been [unlawfully] granted to others is asserting only a 'generalized grievance' that does not allow the plaintiff standing to obtain judicial relief for the alleged wrong in federal court." *Henderson v. Stalder*, 287 F.3d 374, 384 (5th Cir. 2002) (Jones, J., concurring). Plaintiffs may wish the Department had determined to provide them with the same relief that it determined, consistent with its HEROES Act authority, to grant other borrowers, but they have no legal entitlement to receive such relief and no concrete interest sufficient to challenge its provision to others.

Plaintiffs' reliance on *Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019), is misplaced. That case involved a challenge by the State of Texas to an agency guidance document that the Fifth Circuit determined "force[d] the plaintiff either to alter its conduct, or expose itself to potential liability." *Id.* at 446. Critically, the court found that Texas was "the object of the Guidance and has suffered multiple injuries as a result," including an "increased regulatory burden" and pressure, in its sovereign capacity,

10

to "change state law." *Id.* at 446 (citations omitted). While noting that Texas had also adequately "established … a procedural injury" based on its APA notice-and-comment claim, the court emphasized that the procedural violation "undercuts Texas's concrete interest, as a sovereign state, in maintaining compliance with its laws." *Id.* at 447. That type of concrete injury is missing here. *Cf. Texas v. United States*, 809 F.3d 134, 154-55 (5th Cir. 2015) (finding that Texas had standing to assert both substantive and procedural APA claims, after first finding that it was entitled to "'special solicitude' in the standing inquiry" in the particular circumstances of that case, because it "demonstrate[ed] that it would incur significant costs in issuing driver's licenses").

*Third*, Plaintiffs cannot show that their purported injury will "likely … be redressed by a favorable decision of the court." *Henderson*, 287 F.3d at 381 (citation omitted). While Plaintiffs rely on case law suggesting that the burden of showing redressability may be "lighter when the plaintiff asserts deprivation of a procedural right," *EEOC*, 933 F.3d at 447, they still must show that a favorable decision "will relieve a discrete injury to [themselves]." *Dep't of Texas, Veterans of Foreign Wars v. Texas Lottery Comm'n*, 760 F.3d 427, 432 (5th Cir. 2014). As discussed above, the actual concrete injury they attempt (but fail) to establish is in not receiving discretionary loan relief. That injury cannot be redressed by the relief Plaintiffs seek, *i.e.*, an order enjoining debt relief for tens of millions of lower-income Americans. Compl. at 14. That would do *nothing* to remedy the alleged harm stemming from Plaintiffs' belief that "their student loan debt should be forgiven too." PI Br. at 12. Plaintiff Myra Brown would still have the same amount of debt, and Plaintiff Alexander Taylor would actually owe $10,000 *more* in student loan debt than he would absent an injunction. Plaintiffs have no standing to seek judicial relief that would not redress their claimed injuries. *See Henderson*, 287 F.3d at 381 (finding lack of redressability where plaintiff's requested remedy "would merely function to prevent other" individuals from receiving a benefit to which plaintiff claimed she was entitled). Indeed, the only way those injuries could be redressed, under Plaintiffs' own theories, would be if the Department determined to award them loan relief pursuant to a different source of statutory authority. But the Court has no authority to provide that kind of redress, which Plaintiffs in any event are free to petition the Department at any time to grant, on a discretionary basis, without judicial intervention.

11

Plaintiffs' complaint should be dismissed for lack of standing because they simply have no concrete interest in forestalling debt relief for millions of Americans based on their own displeasure with the Secretary's chosen parameters.

## II.    Plaintiffs Cannot Show a Likelihood Of Success On The Merits

Not only do Plaintiffs lack standing for all the reasons set forth above, their sole count is meritless. Because the HEROES Act authorizes the Secretary to waive or modify relevant statutory and regulatory provisions without observing notice-and-comment procedures that might otherwise be required by the APA or HEA, and because the Secretary acted pursuant to the Act in granting the one-time discharge of student loan debts challenged here, Plaintiffs' notice-and-comment claim fails, *see* Compl. ¶¶ 62–73; PI Br. at 13–22, and they have not established a likelihood of success sufficient to warrant the extraordinary remedy they seek.

### A.    The HEROES Act Provides For An Expedited Process That Does Not Include Notice-and-Comment Procedures.

Plaintiffs challenge the one-time discharge of student-loan debts on only one ground: that the Secretary acted "without observance of procedure required by law," in violation of the APA. Compl. at 14. But on October 12, 2022, the Secretary provided public notice of the waivers and modifications issued in order to implement the discharges. *See* 2022 *Notice*, 87 Fed. Reg. at 61,514. That notice satisfies the only procedural requirement imposed by the HEROES Act because, as discussed above, the HEROES Act applies in emergencies when the need to act is paramount; Congress thus expressly chose to exempt waivers and modifications under the Act from APA notice-and-comment procedures and the HEA's negotiated rulemaking requirements. 20 U.S.C. § 1098bb(b)(1), (d). The Secretary has thus observed all the procedures required by law in this context, and Plaintiffs' claim to additional processes contrary to the emergency procedures established by the HEROES Act is baseless.

As explained above, the HEROES Act authorizes the Secretary in appropriate circumstances to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the Act." 20 U.S.C. § 1098bb(a)(1). The Act also specifies the procedures required to exercise that authority: The Secretary "shall, by notice in the Federal Register, publish the

waivers or modifications," "[n]otwithstanding" the rulemaking requirements of the APA and other general requirements for regulations issued under the HEA, including negotiated rulemaking. *Id.* § 1098bb(b)(1) (cross-referencing 20 U.S.C. § 1232 and 5 U.S.C. § 553), (d) (cross-referencing 20 U.S.C. § 1098a). That plain language provides that the Secretary shall follow a streamlined emergency procedure when acting pursuant to the Act, not the notice-and-comment requirements that might apply in other contexts.

Plaintiffs do not appear to dispute this and instead quibble with Congress's choice. They emphasize the virtues of notice-and-comment rulemaking, *see* Compl. ¶¶ 1–3, and survey the various circumstances under which the APA's notice-and-comment requirements generally apply, PI Br. at 13–14, but all of that is beside the point. Congress has determined here, as it has in other areas, *see, e.g.*, 5 U.S.C. § 553(b)(A)–(B), that notice-and-comment procedures need not be followed for purposes of selecting and implementing necessary waivers and modifications under the HEROES Act. *Cf.* 5 U.S.C. § 553(b)(B); § 559. Plaintiffs provide no basis for overriding that congressional determination, arguing instead that the HEROES Act simply "does not authorize the Debt Forgiveness Program." Pls.' Br. at 16. Because the Secretary acted pursuant to the HEROES Act, and because actions under that Act are expressly exempted from notice-and-comment rulemaking, Plaintiffs' notice-and-comment claim fails on its face.

### B. The HEROES Act Authorizes the Secretary's Provision of Targeted Debt Relief.

Plaintiffs rest their notice-and-comment claim on the contention that the HEROES Act does not authorize the one-time student-loan debt discharge. As Plaintiffs see it, since the Secretary lacked authority under the HEROES Act, the Department should have proceeded through normal rulemaking procedures. But the HEROES Act does authorize limited debt discharges in connection with the COVID-19 pandemic, dooming Plaintiffs' claim.[2]

---

[2] To the extent that Plaintiffs seek relief on the ground that the Secretary exceeded his statutory authority under the HEROES Act, they have not properly pleaded such a claim, and their effort to shoehorn such a claim under a notice-and-comment umbrella fails. *See* 5 U.S.C. § 706(2)(C)–(D).

13

1.  **The HEROES Act Authorizes the Secretary to Modify Provisions Regarding Loan Discharge.**

In the HEROES Act, Congress gave the Secretary broad authority to waive or modify student-loan obligations in response to a national emergency. The Act provides that, "[n]otwithstanding any other provision of law, unless enacted with specific reference to" Section 1098bb, the Secretary may "waive or modify *any* statutory or regulatory provision applicable to" the federal student loan programs. 20 U.S.C. § 1098bb(a)(1) (emphasis added); *see also United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" (quoting *Webster's Third New International Dictionary* 97 (1976))). Pursuant to that authority, the Secretary here has modified certain provisions that govern the discharge of student loan debts and the procedures for obtaining such discharges, *see* 2022 Notice at 61,514, an action that parallels earlier waivers and modifications made by the Secretary and his predecessor to implement the payment pause beginning in March 2020 and continuing today, *see* 2020 Notice at 79,857. Because none of those provisions contains a cross-reference to 20 U.S.C. § 1098bb, the Secretary may modify them under the circumstances specified by the Act.

Plaintiffs disagree. *See* PI Br. at 19–20. In their view, "waive" and "modify" are "modest words" that do not permit the Secretary to "cancel student loan debt." *Id.* But that view is difficult to square with the plain meaning of those words and impossible to reconcile with the surrounding statutory text authorizing waivers and modifications "[n]otwithstanding any other provision of law" save only for provisions "enacted with specific reference to this section." 20 U.S.C. § 1098bb(a)(1); *see also Modify*, Black's Law Dictionary ("modify" means "[t]o make somewhat different"); *Waive*, Black's Law Dictionary ("waive" means to "to give up (a right or claim) voluntarily," to "refrain from insisting on," or "to forgo").

Moreover, in contending that the HEROES Act cannot authorize any limited cancellation of outstanding debt because doing so "does not place these individuals back in the same position in relation to their debt before the" relevant emergency but instead "places them in a *better* position

---

(distinguishing between acts "in excess of statutory jurisdiction" and those taken "without observance of procedure required by law").

because their debts are gone," PI Br. at 20, Plaintiffs advance an inappropriately crabbed reading of the statutory text. For one thing, Plaintiffs' reading would permit relief only for individuals who are *already* delinquent on their loan payments, in default, or otherwise in a worse position with respect to their student loans. But limiting relief in this way would be inconsistent with the proactive and prospective language of the Act, which authorizes the Secretary "to *ensure* that … affected individuals *are not* placed in a worse position financially in relation to [their] financial assistance because of their status as affected individuals." 20 U.S.C. § 1098bb(a)(2) (emphasis added). That language authorizes the Secretary to protect affected individuals whose financial situation would deteriorate in the foreseeable future without regulatory action—not just individuals whose financial situation has already collapsed. *See Ensure*, MerriamWebster's Dictionary, https://www.merriam-webster.com/dictionary/ensure (defining "ensure" as meaning "to make … certain" or "guarantee").

Nothing in the HEROES Act supports Plaintiffs' contention that relief is allowed only if each affected individual would otherwise be worse off with respect to their student-loan obligations than before the relevant emergency. The Act contains no least-restrictive-means requirement, and instead authorizes the Secretary to provide such relief "as may be necessary to ensure" that the Act's objectives are achieved, 20 U.S.C. § 1098bb(a)(2), without any obligation to make case-by-case determinations, *see id.* § 1098bb(b)(3). By its very nature, the type of categorical relief Congress authorized anticipates that not every member of an affected group may be worse off with respect to their student loans absent relief. It is sufficient that the Secretary determines, as he has done here, that relief is necessary to ensure that the *group* of affected individuals do not suffer a deterioration in their financial position with respect to their loans. As such, the relief awarded by the Secretary here—as with past exercises of HEROES Act authority to pause payments, lower interest rates, and count months of non-payment toward loan forgiveness programs during the COVID-19 pandemic—is fully consistent with the text and purposes of the HEROES Act.

Plaintiffs' argument also ignores the Secretary's reasons for acting here. In setting the income caps for loan discharges under the HEROES Act, the Secretary relied upon data that shows affected individuals often become worse off in relation to their student loans after a period of forbearance

imposed during an emergency. *See* Supporting Analysis at 2. Indeed, an analysis of the Department's data following recent disasters showed that the rate of borrower defaults following forbearance increased over 21-fold. *See id.* Given those findings, and in light of his authority to act as to broad groups of borrowers without conducting a case-by-case analysis, *see* 20 U.S.C. § 1098bb(b)(3), the Secretary acted reasonably to provide debt discharge in addition to the payment pause, in order to ensure that affected individuals with the lowest incomes will not become worse off in relation to their student-loan obligations due to the pandemic once those loans enter repayment.

### 2. The Loan Discharges Apply to a Proper Subset of Affected Borrowers.

The HEROES Act also authorizes the Secretary to provide relief to the group of borrowers at issue here: federal student loan borrowers who have been affected by the COVID-19 pandemic and who, after the pandemic-induced payment pause ends, will be at highest risk of delinquency and default. The Secretary reasonably concluded that, given the profound depth and sweep of the COVID-19 pandemic, and "because the Federal Government has declared every State, the District of Columbia, and all five permanently populated United States territories to be disaster areas due to COVID-19," 2022 Notice at 61,513, any borrower who "resides or is employed in" one of those areas falls within the HEROES Act's definition of an "affected individual," 20 U.S.C. § 1098ee(2). The Secretary also reasonably concluded that borrowers qualify as "affected individual[s]" on the independent ground that they have "suffered direct economic hardship as a direct result of" the pandemic. *Id.* § 1098ee(2)(D) (providing that a finding of direct economic hardship from a national emergency is to be "determined by the Secretary"); *see also* 2022 Notice at 61,513 (making this determination). Indeed, as confirmed by the President's latest continuation of the national emergency concerning COVID-19, *see* 87 Fed. Reg. 10,289 (Feb. 18, 2022), the pandemic is an ongoing national emergency that, after more than two years, has left no aspect of daily life untouched.

Given that all parts of the United States have been declared to be disaster areas due to the COVID-19 pandemic, the President's proclamation that the pandemic constitutes a national emergency, and the well-established, widespread economic hardship stemming from that emergency,

the Secretary reasonably determined that all borrowers of federal student loans qualify as "affected individuals." *See* 2022 Notice at 61,513 ("[T]he 'affected individuals' for purposes of the waivers and modifications described in this document include any person with a Federal student loan under title IV of the HEA"). That determination is as appropriate now as every time the Secretary and his predecessor have invoked HEROES Act authority during the pandemic (including in providing the payment pauses that Plaintiffs do not challenge here). *See, e.g.*, 2020 Notice at 79,857 ("An 'affected borrower' is one whose Federal student loans provided under title IV are in repayment.").

At the same time, however, the Secretary has *not* granted loan discharges to all borrowers who qualify as "affected individuals" under the HEROES Act. Rather, the action that Plaintiffs challenge is much more tailored: The Secretary has limited discharges to loans held by a subgroup of affected individuals—those found to be at highest risk of delinquency and default on student loan obligations after the current payment pause ends. And he has done so only after finding such modifications "necessary to ensure that" members of that subgroup do not emerge from the pandemic "in a worse position financially with respect to their student loans because of" it. *See* 2022 Notice at 61,513; *see also* Decision Memo at 1; 20 U.S.C. § 1098bb(a)(2). That judgment was informed by a careful study of the Department's past experience in roughly analogous circumstances, of administrative data collected by the Department, and of other research published by federal agencies and independent experts in the areas of consumer debt and student financial aid. *See generally* Supporting Analysis. And it falls squarely within the letter and spirit of the HEROES Act.

Nevertheless, Plaintiffs contend that the Secretary has authorized relief for too broad a group of borrowers, complaining that "individuals who were living abroad during the pandemic are eligible for debt forgiveness," and that the Secretary "did not establish that those receiving debt cancellation 'suffered direct economic hardship as a direct result of'" the pandemic. PI Br. at 21. These complaints are difficult to square with Plaintiffs' theory of injury—that the debt relief was *not broad enough* because it did not encompass Ms. Brown's commercially held loans and did not extend the fullest measure of relief to Mr. Taylor. Moreover, the HEROES Act does not require perfect tailoring. Indeed, Congress anticipated—and rejected—Plaintiffs' overbreadth objections, expressly providing that "[t]he

17

Secretary is not required to exercise the waiver or modification authority [provided by the Act] on a case-by-case basis." 20 U.S.C. § 1098bb(b)(3). By authorizing the Secretary to utilize categorical rules, Congress accepted that there would be some degree of imprecision in the allocation of relief. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011). And so the fact that relief may not be "necessary" for every single recipient does not undermine the Secretary's decision, or suggest that his exercise of discretion was not guided by the ends enumerated in Section 1098bb(a)(2). To the contrary, by limiting the availability of loan discharges to particular amounts and to a defined subgroup of affected, at-risk borrowers for which further relief is necessary, the Secretary has exercised his congressionally granted discretion in a manner tailored to vindicate Congress's purposes. And even if the Secretary's action applies too broadly, that would not justify enjoining debt relief as to *all* recipients.

### 3. The Secretary Reasonably Determined That a Measure of Discharge Was Needed to Reduce Delinquency and Default Risk Among Lower-Income Borrowers.

It was also reasonable for the Secretary to determine that, in addition to other pandemic-related relief, the specific targeted loan discharges at issue here "may be necessary to ensure that" borrowers in the lowest income sets of affected individuals "are not placed in a worse position financially in relation to" their federal student loans "because of their status as affected individuals." Decision Memo; *see also* 20 U.S.C. § 1098bb(a)(2)(A). That judgment was informed by a careful study of the Department's past experience in roughly analogous circumstances, of administrative data collected by the Department, and of other research published by federal agencies and independent experts in the areas of consumer debt and student financial aid. *See generally* Supporting Analysis.

The Secretary considered evidence that borrowers face a heightened risk of delinquency and default as their loans are placed back into repayment following long periods of forbearance, and that this risk is particularly acute with respect to lower-income borrowers and Pell Grant recipients. *Id.* at 2. The Department has found that, historically, when borrowers affected by natural disasters have received payment pauses similar to the one currently in effect due to the COVID-19 pandemic, those borrowers' transitions back into repayment have been correlated with "documented spikes in student

loan defaults." *Id.* In particular, recent administrative data compiled following Hurricanes Maria, Harvey, and Irma and the northern California wildfires in late 2017 showed that borrowers involved in those disasters who had received a payment pause like the one provided during the COVID-19 pandemic were over 21 times more likely to default on their repayment obligations in the calendar year following the end of that forbearance than they had been in the calendar year before the regional disaster was declared. *Id.* The data also revealed that Pell Grant recipients were especially vulnerable following the end of forbearance. *Id.*

The Secretary also considered evidence concerning the current economic conditions facing borrowers as they prepare to enter repayment at the end of the year. *Id.* That evidence included survey data showing that higher percentages of lower-income borrowers expect to have greater difficulty making full payments after the pandemic than they had before it. *Id.* And though self-reported, those expectations were supported by the research findings of other government agencies. For example, researchers at the Consumer Financial Protection Bureau found that, even as most student loans have remained in forbearance throughout the pandemic and many borrowers have benefited from other pandemic-related economic support, delinquency on non-student loan debt among student loan borrowers has already returned to pre-pandemic levels. *Id.* at 3. Similarly, after comparing credit report data for student loan borrowers subject to the payment pause and those whose loans remained in repayment, researchers at the Federal Reserve Bank of New York concluded that, absent additional relief alongside the end of the payment pause, borrowers will likely experience delinquencies on federal student loan debt at higher levels than before the pandemic. *Id.* Finally, the Secretary evaluated evidence that recent pandemic-induced inflationary pressures have diminished the financial well-being of many households, particularly those with lower incomes. *Id.* Based on all the evidence presented to him, the Secretary reasonably found that, absent action to reduce the threat of delinquency and default, student loan borrowers at lower income levels face serious risks that, as they exit the pandemic and their loans go back into repayment, they will promptly be placed in a worse financial position with respect to their student loans—*i.e.*, face an immediate risk of delinquency of default that did not exist prior to the pandemic—than they would have been in the absence of the COVID-19 pandemic. *Id.*

In light of this, the Secretary reasonably concluded that discharging a limited measure of student loan debt for affected borrowers would mitigate the heightened risk of delinquency and default. The evidence reviewed by the Secretary revealed that targeted discharges would reduce borrowers' total liabilities and monthly payment burdens, contributing to increased rates of repayment success and to greater overall financial well-being. *Id.* at 4. And an analysis of the Department's administrative data showed that the specific proposal presented to the Secretary—providing a maximum benefit of $10,000 to borrowers below the individual and household income caps of $125,000 and $250,000, and a maximum of $20,000 to borrowers below those caps who previously received a Pell Grant—would be sufficient to reduce the median borrowers' monthly payments by 38%, permitting many of the most vulnerable borrowers to enter repayment with significantly reduced monthly payments. *Id.* at 6. The evidence before the Secretary supported his determination that setting certain discharge amounts would address the risk of heightened delinquency and default rates facing affected borrowers as a result of the pandemic. *Id.*

The Secretary's chosen income eligibility levels are supported by other considerations. As the Secretary recognized, "not all borrowers are equally at risk of" delinquency and default. *Id.* In particular, in the year before the pandemic, incomes above the $125,000 individual income cutoff that the Secretary adopted were correlated with a substantial reduction in the rate of inconsistent payments reported by borrowers as compared to incomes below the cutoff. *Id.* Reinforcing the reasonability of the Secretary's chosen cutoff, data considered by the Secretary shows that borrowers in the $100,000–$125,000 income bracket also experienced greater difficulty before the pandemic in repaying loans than did borrowers with incomes above $125,000. *Id.* at 9. Borrowers with incomes below $125,000 were substantially more likely to report financial insecurity, to have experienced a period of unemployment, to have suffered educational harms during the pandemic, and to otherwise have been disproportionately impacted over the course of the pandemic. *Id.* And as to Pell recipients, who are disproportionately low-income, generally come from families without significant wealth or resources, and already face substantially higher risks of default and delinquency than other student loan

borrowers, the Secretary's selection of the $125,000 cutoff was even more clearly supported: At that income level, 99% of Pell recipients would qualify for relief. *Id.* at 11.

In view of this substantial evidence that additional relief is needed to ensure that the most vulnerable subset of borrowers currently receiving the benefit of the payment pause are not at substantial risk of becoming delinquent or defaulting on their loan obligations when payments resume, the Secretary reasonably concluded that it was necessary and appropriate to order a limited, one-time discharge of student loan debt for those borrowers.

None of Plaintiffs' arguments undermine this conclusion. In criticizing the Secretary's determination of necessity, Plaintiffs again rely on the benefits of the payment pause. *See* PI Br. at 21. But as discussed above, data reviewed by the Secretary showed that many borrowers, particularly those earning individual incomes below $125,000, continue to be in more-precarious financial straits than they had been in before the pandemic, notwithstanding the ongoing payment pause. *See* Supporting Analysis at 6–12. And the data also showed that, without further action, substantial numbers of those borrowers would likely fall into delinquency or default when payments restart at the conclusion of the pandemic, wiping out the significant benefits of the payment pause for those borrowers. *See id.* at 2. Because that would leave many borrowers in a worse position with respect to their financial assistance following the pandemic, the Secretary reasonably determined that it was necessary to adopt additional measures, including limited loan discharges, that would smooth the transition into repayment for many lower-income individuals and families. And while Plaintiffs disparage the amount of debt cancellation as "arbitrary," with "no 'relation to'" any particular individual's amount of debt, PI Br. at 21, they do not grapple with the Secretary's findings that borrowers with incomes below $125,000, as a group, and borrowers who received Pell grants, as a group, face heightened risks of difficulty in repaying their student loans. Indeed, as the Department's analysis demonstrates, the Secretary chose a reasonable measure of debt relief in order to ensure that those currently benefiting from the payment pause would not suffer financial harm when payments resume.

### C. The Major Questions Doctrine Does Not Undermine the Clear Statutory Authorization Provided by the HEROES Act.

Perhaps recognizing that their argument finds no basis in the text of the HEROES Act, Plaintiffs invoke the major questions doctrine. *See* PI Br. at 17–19.[3] In a few extraordinary cases, the Supreme Court has required "clear congressional authorization" for sweeping agency action where, "under more 'ordinary' circumstances," a "merely plausible textual basis" for that action might suffice under standard principles of statutory interpretation. *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022); *see also Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) ("We expect Congress to speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'") (citation omitted). This is not such an extraordinary case.

That is not to deny that this is a case of economic and political significance, *cf.* PI Br. at 17–18; many cases challenging national policies are. But not every agency action of economic and political significance triggers the doctrine. Rather, the hallmark of a "major questions case" is a marked incongruence between the agency action at issue and the history, purpose, or context of the statute that purportedly authorizes it. Thus, the Supreme Court has invalidated agency action that advanced "novel reading[s]" of longstanding statutes, *West Virginia*, 142 S. Ct. at 2605, in order to claim "extravagant statutory power over the national economy," *id.* at 2609, and made "decisions of vast economic and political significance," *id.* at 2605 (citation omitted), without firm indication that Congress intended to grant that authority. *See also Utility Air*, 573 U.S. at 324 (requiring clear congressional authorization "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,'" and the challenged action would "bring about an enormous and transformative expansion in … regulatory authority").

This case bears none of these features. For one thing, the Secretary's action is consistent with and proportional to the clearly apparent purposes of the HEROES Act. The Act's central provision, Section 1098bb, is all about getting student-loan-related relief to affected borrowers in "response to

---

[3] Plaintiffs' reliance on the major questions doctrine conflicts with their purported desire to urge the Secretary to *expand* the debt-relief program's parameters. Plaintiffs' major-questions arguments would appear to apply with equal force had the Secretary acted under *any* statutory authority available to him, not just the HEROES Act.

military contingencies and national emergencies." 20 U.S.C. § 1098bb. It is unsurprising, then, that the Secretary relied on that provision to grant relief to federal student loan borrowers facing harm from the COVID-19 pandemic. *See* Decision Memo at 1. For another, this case involves the disbursement of a federal benefit to individuals, not the kind of expansive regulation of private parties that has previously triggered the doctrine. *Cf. Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (regulating landlords across at least 80% of the country). And it should come as no shock that the relief that the Secretary has ordered under the Act is substantial. The scope of the Secretary's action matches the scope of the COVID-19 emergency, and if it is broader in scope than pre-pandemic grants of relief under the HEROES Act, that difference simply reflects the vastly greater scope of the current national emergency and the economic devastation it has wrought, not any different understanding of the reach of the HEROES Act during its first 19 years of existence. *See Missouri v. Biden*, 142 S. Ct. 647, 653 (2022) (upholding agency action that went "further than what the Secretary has done in the past" to achieve statutory objective, in part because the agency "never had to address an infection problem of [the] scale and scope [of COVID-19] before").

Moreover, there is nothing "cryptic," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000), or "ancillary," *West Virginia*, 142 S. Ct. at 2605, about the Act's provisions, which operate together, through unambiguous language, to give the Secretary maximum flexibility to prevent affected borrowers from suffering financially with respect to their financial assistance as a result of an emergency. *See, e.g.*, 20 U.S.C. § 1098bb(a)(1) (providing waiver and modification authority "[n]otwithstanding any other provision of law, unless enacted with specific reference to this section"); *id.* §§ 1098bb(b)(1), (d) (waiving certain procedural requirements); *id.* § 1098bb(b)(3) (clarifying that the Secretary need not exercise waiver or modification authority "on a case-by-case basis"). Moreover, prior student-debt relief measures provided under the Act, particularly the payment pause, were among the first interventions made following the March 2020 outbreak of the novel coronavirus, and their legality has never been questioned.

All of that distinguishes this case from *West Virginia*. The Court found there that the agency action at issue involved the use of what the Court described as a "little-used backwater" provision of

the Clean Air Act to impose a 10% energy rate hike, permanently shut down many power plants, inflict a $1 trillion loss to GDP, and require a complete reorganization of American energy infrastructure. 142 S. Ct. at 2604, 2613. In that context, the Court concluded that some "skepticism" of the agency's position might have been warranted. *Id.* at 2614. But nothing of the sort is justified here, where the Secretary has granted a limited measure of debt relief to certain borrowers affected by the COVID-19 pandemic pursuant to the central provision of a statute whose purpose is the provision of substantial loan-related relief to borrowers during a war or national emergency.

Sometimes, the Supreme Court also looks to whether the challenged action is within the agency's traditional field of expertise in determining whether the major questions doctrine applies. *See West Virginia*, 142 S. Ct. at 2612–13 ("When an agency has no comparative expertise in making certain policy judgments, we have said, Congress presumably would not task it with doing so.") (internal quotation omitted). Here again, this factor shows that the doctrine does not apply. The Secretary of Education is in the business of administering the federal student financial aid programs and, in myriad circumstances, providing appropriate relief from federal student loan repayment obligations. And the Secretary's action is limited to providing relief within the confines of the programs he administers— he has not purported to use HEROES Act authority in a manner that would expand the jurisdiction of his Department. This too distinguishes this case from major questions cases where agencies exercised authority in unaccustomed areas. *See, e.g., Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 ("The moratorium intrudes into an area that is the particular domain of state law: the landlord- tenant relationship."); *Brown & Williamson*, 529 U.S. at 159-60 ("Congress has … squarely rejected proposals to give the FDA jurisdiction over tobacco.").

Finally, the Secretary's use of HEROES Act authority to discharge some measure of student loan debt in appropriate cases cannot fairly be characterized as an "unheralded power," PI Br. at 18, or a delegation that Congress "never could have fathomed," *id.* at 19. Congress has vested the Secretary with extensive authority to reduce or eliminate borrowers' debt obligations under the federal student loan programs. This authority, which dates back nearly six decades to the enactment of the HEA in 1965, is foundational to the Secretary's power to administer the federal student loan programs. The

24

statute granted the Secretary the fundamental legal power to "compromise, waive, or release" any "right, title, claim, lien, or demand" acquired in the Secretary's performance of his vested "functions, powers, and duties" to administer federal student loans. 20 U.S.C. § 1082(a)(6); *see also, e.g., id.* § 1087dd(g)(1). Pursuant to this broad authority, the Secretary regularly "releases" student loan debts owed to the Department by federal student loan borrowers on terms that he determines, and he may do so at substantial amounts. *See* 34 C.F.R. § 30.70 (a)(2); *id.* Part 682, App. D (waiving right to refuse to pay claims to guaranty agencies and lenders where they violated certain regulations and would not qualify for payment); *Education Department Approves $5.8 Billion Group Discharge to Cancel all Remaining Loans for 560,000 Borrowers Who Attended Corinthian* (June 1, 2022), https://perma.cc/MTW6-XABV; *Secretary DeVos Cancels Student Loans, Resets Pell Eligibility, and Extends Closed School Discharge Period for Students Impacted by Dream Center School Closures* (Nov. 8, 2019), https://perma.cc/FRT6-WAWS. That Congress long ago granted the Secretary this discharge authority, together with the unambiguous language of the HEROES Act, undermines Plaintiffs' claim that Congress withheld authority to modify loan discharge provisions under the HEROES Act. *See* PI Br. at 19.[4]

In any event, the text of the HEROES Act shows that Congress anticipated that the Secretary might have to use his authority broadly. In granting the Secretary wide discretion to waive or modify provisions of the legal regime governing federal student loan programs, Congress did not "use oblique

---

[4] In suggesting that Congress cannot have intended to delegate broad-based authority to discharge loans under the HEROES Act, Plaintiffs point to the failure of certain legislative proposals involving loan forgiveness. *See* PI Br. at 18. But the failure of those proposals, which would have offered greater amounts of forgiveness to different groups of borrowers, says nothing about whether the Secretary's action here was authorized. *See, e.g., Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980) (recognizing that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one"(citation omitted)). If anything, recent legislation introduced to amend the HEROES Act to prevent loan discharges would seem to show that at least some understand the Act to permit such relief currently. *See, e.g.,* S. 4094, 117th Cong. § 4(d)(1) (introduced Apr. 27, 2022) (proposing amendment to specify that "[n]otwithstanding any other provisions of law, the President or the Secretary of Education may not cancel the outstanding balances, or a portion of the balances, on covered loans due to the COVID-19 national emergency or any other national emergency"); H.R. 7656, § 4(d)(1) (introduced May 3, 2022) (same); *see also* H.R. 7058, 117th Cong. 27, 2022) (proposing amendment stating "[n]otwithstanding any other provisions of law, the President or the Secretary of Education may not cancel the outstanding balances, or a portion of the balances, on covered loans due to the COVID-19 national emergency or any other national emergency").

or elliptical language," nor provide a potentially broad delegation "through 'modest words,' 'vague terms,' or 'subtle devices.'" *West Virginia*, 142 S. Ct. at 2609 (citation omitted). Indeed, it would have been hard for Congress to more clearly express its intent to provide the Secretary, during a national emergency, with maximum flexibility to provide appropriate relief to student loan borrowers facing extraordinary and unforeseen circumstances. If there could have been any question whether Congress in fact meant to empower the Secretary to waive or modify *any* statutory or regulatory provision applicable to federal student loan programs, Congress eliminated all doubt by granting that authority "[n]otwithstanding any other provision of law, unless enacted with specific reference to" the HEROES Act. 20 U.S.C. § 1098bb(a)(1). And it cannot be said that Congress could not have foreseen that the Secretary might discharge student loans under the HEROES Act: In apparent anticipation of that outcome, it created a "Special Rule for Discharges in 2021 Through 2025," making student loan discharges tax-free in pandemic-related relief legislation. *See* American Rescue Plan Act of 2021, Pub. L. No. 117-2 § 9675, *codified at* 26 U.S.C. § 108.

The analysis of an agency's statutory authority "begins with the statutory text"—and, when the text is clear, it "ends there as well." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 631 (2018) (citation omitted). Courts may not "impos[e] limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020). Because the Secretary here can point to "'clear congressional authorization' for the power [he] claims," his exercise of that authority survives whatever degree of "skepticism" may be counseled by the major questions doctrine. *West Virginia*, 142 S. Ct. at 2609.

## III. Plaintiffs Have Failed to Establish Any Legally Cognizable Interest, Let Alone Irreparable Harm.

As demonstrated above, Plaintiffs suffer *no* harm whatsoever when other borrowers receive a targeted measure of debt relief—a conclusion unchanged by Plaintiffs' strategic choice to repackage their challenge to the Secretary's statutory authority as a purported procedural violation. In any event, Plaintiffs' insistence that they will suffer irreparable harm as soon as loan discharges begin is baseless. "Injunctive relief is an extraordinary and drastic remedy, not to be granted routinely, but only when

the movant, by a clear showing, carries the burden of persuasion." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). "The key word in this consideration is *irreparable* … The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

First and foremost, Plaintiffs' reliance on a purported procedural violation, standing alone, cannot carry their burden because they have failed to submit "sufficient evidence of … injury" flowing from a violation and because an "unproven procedural violation cannot establish irreparable harm." *Optimus Steel, LLC v. U.S. Army Corps of Engr's*, 492 F. Supp. 3d 701, 726 (E.D. Tex. 2020). Because Plaintiffs cannot show any procedural violation (since Congress explicitly chose not to subject actions taken under the HEROES Act to notice and comment), Plaintiffs cannot show irreparable harm. Furthermore, *even if* targeted debt cancellation were subject to the APA's notice-and-comment process and *even if* Plaintiffs could show some concrete injury flowing from their inability to comment in advance, any such harm still would not be irreparable because the Secretary could simply call for notice and comment on the parameters of debt relief at a later time. That would fully address any injury Plaintiffs might claim to have suffered, even if other individuals' loans had been forgiven in the interim. And an injunction against *other* individuals receiving debt relief would do nothing to redress any injury Plaintiffs might claim to have suffered by *not* receiving relief.

In other words, Plaintiffs' complaints that the program "will provide only 'one-time' debt cancellation," PI Br. at 23, are meaningless because nothing would prevent the Secretary from subjecting the parameters of the program to notice and comment if ordered to do so, or from broadening the scope of the program as Plaintiffs purportedly would prefer if that action were appropriate and supported by the administrative record. But that possibility surely cannot justify an injunction against *others* receiving debt relief when Plaintiffs claim to prefer that the program be *broadened* to include them. Even if Plaintiffs could establish any legally cognizable harm by their loans falling outside the full scope of this particular exercise of discretionary debt relief—and they assuredly cannot, since there is no entitlement to loan forgiveness—that still would not support an injunction

here, since the scope of debt forgiveness could be expanded to encompass additional borrowers, and "[a]n injury is 'irreparable' only if it cannot be undone through monetary remedies." *N.E. Fl. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). What Plaintiffs claim to be seeking here is plainly a form of "monetary remedies" (*i.e.*, additional debt forgiveness), which is per se not irreparable. After all, if supported by appropriate factual circumstances, the Secretary could initiate (or Plaintiffs could petition for the Secretary to undertake) a different debt-forgiveness rulemaking, which establishes that enjoining this invocation of HEROES Act authority doesn't redress any irreparable injury.

The fact that neither named Plaintiff can demonstrate irreparable injury is a sufficient basis on which to deny Plaintiffs' emergency motions. This Court should decline to forestall important debt relief for millions of needy Americans based on nothing more than two individuals' envious dissatisfaction with the program's reach.

## IV.    The Balance of the Equities and Public Interest Weigh Against Injunctive Relief.

The balance of the equities and the public interest—factors that merge when the government is the opposing party—weigh strongly in the Government's favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). In times of national emergencies, Congress determined that it is in the public interest for the Secretary to act swiftly and without notice-and-comment rulemaking to protect student loan borrowers, and Plaintiffs have no countervailing interest in altering Congress's decision.

The Secretary's decision to help millions of student loan borrowers smoothly exit the COVID-19 pandemic pause and to guard against the associated concrete and imminent risks of default and delinquency is in the public interest. It also reflects Congress's judgment that the Secretary should be able to react nimbly to protect student loan borrowers in times of national emergency. *See* 20 U.S.C. § 1098bb(a)-(b), (d) (enabling the Secretary to "waive or modify" any federal student loan provision without notice-and-comment rulemaking or case-by-case determinations); *see also Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1126-27 (9th Cir. 2008) (concluding that "our consideration of the public interest is constrained in this case, for … responsible public officials … have already considered that interest"); *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008) ("There

28

is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency develop.").

Moreover, while Plaintiffs may wish to benefit more fully from the Secretary's debt relief program, their desire should not tip the scales against the millions of remaining student loan borrowers, who, economic researchers and the Secretary conclude, will be at increased risk of default on their student loans when repayment restarts. Some of the most prominent consequences of such default include wage garnishment, credit report damage, and the withholding of federal benefits. FSA, *Student Loan Delinquency and Default*, https://perma.cc/9T5Y-7Q9L.[5] Accordingly, the Secretary concluded that aiding these specific borrowers is in the public interest, and Congress, through the HEROES Act, concluded it is in the public interest to move swiftly towards that goal, without notice-and-comment rulemaking. A preliminary injunction enjoining the Secretary from doing so harms the public interests identified by the Secretary and by Congress.

## V.   Any Relief Should Be Appropriately Limited.

If the Court were to disagree with Defendants' arguments, any relief ordered should be no broader than necessary to remedy any demonstrated irreparable harm to the two Plaintiffs in this action. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). Plaintiffs' requested nationwide relief is inconsistent with this principle and inappropriate here. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring) (noting that nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch"); *Georgia v. President of the United States*, 46 F.4th 1283, 1303 (11th Cir. 2022) (noting "nationwide injunctions push against the boundaries of judicial power, and very often impede the proper functioning of our federal court

---

[5] Plaintiffs do not attempt to argue that their financial interests outweigh those of the borrowers.

system"). Because the challenged policy here is "an issue of great significance currently being litigated" in other district courts across the country, the Court should "limit[] the scope of [any] injunction" to award relief only to a Plaintiff in this case who is able to demonstrate irreparable harm. *See Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021) (narrowing nationwide injunction entered by district court).

## CONCLUSION

For the reasons stated herein, this Court should deny Plaintiffs' request for extraordinary relief and dismiss this case for lack of standing.


Dated: October 19, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Kate Talmor*
KATE TALMOR (Md. Bar)
R. CHARLIE MERRITT
CODY T. KNAPP
SAMUEL REBO
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(202) 305-5267
kate.talmor@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

     I hereby certify that all counsel of record are CM/ECF participants and service of this filing will be accomplished through filing on the public docket.


                                     */s/ Kate Talmor*
                                       KATE TALMOR (Md. Bar)