**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| MYRA BROWN and ALEXANDER TAYLOR, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION and MIGUEL CARDONA, in his official capacity as Secretary of Education, <br><br> Defendants. | Civil Action No. 4:22-cv-00908-P |

**APPENDIX TO DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# CONTENTS

| Description | Bates Number |
|---|---|
| Declaration of Under Secretary James Richard Kvaal | 1 |
| Memo from Under Secretary James Richard Kvaal to Secretary Cardona | 6 |
| Rationale for Pandemic-Connected Loan Discharge Program | 8 |
| Memo from Secretary Cardona to Chief Operating Officer Cordray | 22 |
| Memo from Secretary Cardona to Assistant Secretary Paydar and Chief Operating Officer Cordray | 25 |

Dated: October 19, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Kate Talmor*
KATE TALMOR (Md. Bar)
R. CHARLIE MERRITT
CODY T. KNAPP
SAMUEL REBO
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(202) 305-5267
kate.talmor@usdoj.gov

*Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

MYRA BROWN,

&

ALEXANDER TAYLOR,

        Plaintiffs,

  v.

U.S. DEPARTMENT OF EDUCATION,
*et al.,*

        Defendants.

No. 4:22-cv-00908-O

## DECLARATION OF JAMES RICHARD KVAAL

I, James Richard Kvaal, do declare under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and accurate to the best of my information and belief:

1.    I am the Under Secretary of Education at the United States Department of Education (Department). My nomination for this position was confirmed by the United States Senate on September 14, 2021, and I was sworn in on September 15, 2021. I am a duly authorized Custodian of Records, or other qualified witness for the Department, located in Washington, District of Columbia. As such, I am fully competent to make the statements contained in this Declaration and I have authority to certify the attached records. I make this declaration based on my personal knowledge and based on information provided to me in my official capacity.

2.    As the Under Secretary of Education, my responsibilities include the coordination of major policies, programs, and activities related to Postsecondary Education and Federal Student Aid for the Department. This includes, but is not limited to, the development of policies,

procedures, and directives related to the August 24, 2022, decision of the Secretary of Education (Secretary) to provide one-time student loan debt relief under the Higher Education Relief Opportunities for Students Act of 2003 (HEROES Act).

3.      In execution of my responsibilities, I have under my custody and control documents related to the decision of the Secretary to provide one-time student loan debt relief. These documents are: (A) an August 24, 2022, memorandum from myself to the Secretary recommending the Secretary exercise his discretion under the HEROES Act to issue waivers and modifications necessary to effectuate one-time student loan debt relief, including an August 24, 2022, document titled "Rationale for Pandemic-Connected Loan Discharge Program" that was attached to my memorandum, (B) an August 24, 2022, memorandum from the Secretary to Federal Student Aid Chief Operating Officer Richard Cordray and signed by the Secretary reflecting his determination to issue waivers and modifications necessary to effectuate the one-time student loan debt relief program, and (C) a September 27, 2022, memorandum from the Secretary to the Chief Operating Officer and Assistant Secretary for Postsecondary Education Nasser Paydar, issuing the specific waivers and modifications and directing their implementation and publication in the *Federal Register*. These documents are attached as exhibits A, B, and C, respectively.

4.      I certify that each of the attached records: (1) is the original or a duplicate of the original record in the custody of the Department; (2) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters; (3) was kept in the course of the Department's regularly conducted activity; and (4) was made in the course of the regular conduct of the Department.  These documents will all be part of the Administrative Record in this case.  I am providing them now as part of the Department's opposition to Plaintiffs' motion for a preliminary injunction, which were filed contemporaneously

**2**

with Plaintiffs' complaint (i.e., before the compilation and certification of an administrative record).

Executed on this 19 th day of October, 2022.

James Richard Kvaal

**4**

# Exhibit A

*DELIBERATIVE / PRE-DECISIONAL / CONFIDENTIAL*



UNITED STATES DEPARTMENT OF EDUCATION

THE UNDER SECRETARY

DATE:                          August 24, 2022

TO:                            Miguel A. Cardona, Ed.D.
                               Secretary of Education

FROM:                          James Kvaal
                               Under Secretary of Education

SUBJECT:                       Pandemic-Connected Loan Cancellation

In March 2020, Congress determined that, in light of the COVID-19 pandemic, it was necessary to provide relief to student loan borrowers by suspending certain payments and collections activity, and temporarily setting certain interest rates to zero percent. Under the authority granted to the Secretary of Education by the Higher Education Relief Opportunities for Students Act of 2003 ("HEROES Act"), you previously extended this relief through August 31, 2022.

This payment pause has delivered substantial relief to millions of loan borrowers, seeking to ensure that they are not in a worse position financially due to the pandemic. However, when loan payments resume, many borrowers will be at heightened risk of loan delinquency and default that could offset the benefits provided by the pause and leave borrowers worse off than they were before the pandemic. As outlined in the attached analysis prepared by your advisors, many borrowers will experience challenges in the transition back to repayment. Additional steps are needed to address these challenges and reduce the likelihood of delinquency and default to ensure that borrowers are not in a worse position financially due to the pandemic with regard to their ability to repay their loans.

In order to ensure that borrowers subject to the payment pause are not placed in a worse position financially by the COVID-19 national emergency as they restart payments, I recommend that you exercise your discretion under the HEROES Act to issue waivers and modifications necessary to effectuate the following actions:

- Discharge $10,000 of federal student loan balances for borrowers with individual incomes of under $125,000 or household incomes of under $250,000 during tax years 2020 or 2021. These discharges would be limited to loans that were originally outstanding as of June 30, 2022, and that are currently subject to the payment pause, including Direct Loans, Federal Family Education Loans held by the Department or by guaranty agencies, and Federal Perkins Loans held by the Department.

- Discharge an additional $10,000 in federal student debt for borrowers who meet these requirements and who also received a Pell Grant at some point in the past.

**6**

*DELIBERATIVE / PRE-DECISIONAL / CONFIDENTIAL*

Page 2

- Take the administrative steps needed to implement this discharge initiative, including the collection, maintenance, use, and dissemination of borrower information necessary to establish eligibility for the discharge under the relevant criteria and provide benefits under the initiative automatically to as many borrowers as possible utilizing income information available to the Department in compliance with applicable law.

- Develop a simple process for borrowers to attest to their incomes and for FSA to verify the income of a sample of those borrowers.

Based on current economic and public health conditions, and to provide time to successfully implement these measures needed to ensure that borrowers are not placed in a worse position financially due to the pandemic, I also recommend that you extend those waivers and modifications specified in the December 11, 2020, *Federal Register* notice (85 Fed. Reg. 79856), that relate to the payment and collection of, and accumulation of interest on, federal student loans, and also extend the corresponding pause for Federal Family Education Loan Program loans held by guaranty agencies, as discussed in Dear Colleague Letter GEN-21-03 through December 31, 2022. Because this extension is expected to be the final extension of the payment pause, I further recommend that you direct FSA to take all necessary steps to restart loan payments after December 31, 2022.

**If you approve these recommendations, please sign the attached memorandum to the Chief Operating Officer of Federal Student Aid.**

Attachments:

1. Rationale for Pandemic-Connected Loan Cancellation Program

2. Memorandum to Chief Operating Officer Cordray prepared for your signature

*DELIBERATIVE / PRE-DECISIONAL / CONFIDENTIAL*

**Rationale for Pandemic-Connected Loan Discharge Program**
**August 24, 2022**

### I.   Background

In March 2020, Congress determined that, in light of the COVID-19 pandemic, it was necessary to provide relief to student loan borrowers by suspending certain payments and collections activity, and temporarily setting certain interest rates to zero percent. Under the authority granted to the Secretary of Education by the Higher Education Relief Opportunities for Students Act of 2003 ("HEROES Act"), the Secretary previously extended this relief through August 31, 2022.

This payment pause has delivered substantial relief to millions of loan borrowers, seeking to ensure that they are not in a worse position financially due to the pandemic. However, when loan payments resume, many borrowers will be at heightened risk of loan delinquency and default that could offset the benefits provided by the pause and leave borrowers worse off than they were before the pandemic. Many borrowers will experience challenges in the transition back to repayment. Additional steps are needed to address these challenges and reduce the likelihood of delinquency and default to ensure that borrowers are not in a worse position financially due to the pandemic regarding their ability to repay their loans. As detailed below, the Department of Education could mitigate these consequences by taking the following steps:

- Discharging $10,000 of federal student loan balances for borrowers with individual incomes of under $125,000 or household incomes of under $250,000 during tax years 2020 or 2021. These discharges would be limited to loans that were originally outstanding as of June 30, 2022, and that are currently subject to the payment pause, including Direct Loans, Federal Family Education Loans held by the Department or by guaranty agencies, and Federal Perkins Loans held by the Department.

- Discharging an additional $10,000 in federal student debt for borrowers who meet these requirements and who also received a Pell Grant at some point in the past.

This paper summarizes the basis for and key design elements of this proposal and presents relevant considerations and evidence. It is not an exhaustive list of all the decisions required to operationalize a pandemic-connected loan discharge program, nor is it a complete inventory of all pieces of supporting evidence the Department considered.

### II.   Analysis

#### A.   Potential Harm to Borrowers from the Pandemic as Payments Restart

The student loan payment pause, initiated at the outset of the pandemic, protected borrowers from financial harm by allowing them to forgo payments, preventing any interest accrual on their debts, and halting all collections on student loans. Despite these measures, many student loan borrowers remain at risk of being placed in a worse position financially as a result of the COVID-19 pandemic and its associated economic effects. Historical evidence suggests that loans are at heightened risk of delinquency and default as they exit forbearance. Economic conditions and surveys of borrowers suggest that, absent additional relief, the harmful effects of the pandemic may make repayment more difficult for student loan borrowers than it was before the pandemic, especially for lower income borrowers.

**8**

*DELIBERATIVE / PRE-DECISIONAL / CONFIDENTIAL*

### 1.  Risk of Delinquency and Default Following Long Periods of Forbearance

Past experience with student loan borrowers transitioning back into repayment after long periods of forbearance raise concerns about the potential for elevated risk of delinquency and default. Although there is no exact analogue for the circumstances surrounding the current payment pause, the Department has previously provided borrowers experiencing local and regional natural disasters, such as hurricanes, earthquakes, or wildfires, with access to forbearances with similar provisions. When borrowers accessing natural disaster forbearances transitioned back into repayment, there were documented spikes in student loan defaults.[1]

Analysis of the outcomes of borrowers placed in mandatory administrative forbearances triggered by Hurricanes Maria, Harvey, and Irma and the northern California wildfires in late 2017 show that, compared to the calendar year before the disaster declaration, the incidence of default increases substantially six quarters later. Specifically, only 0.3 percent of borrowers entered default in the calendar year before the declaration, while 6.5 percent of borrowers entered default in the calendar year after they exited mandatory administrative forbearance.[2]

Furthermore, Pell Grant recipients affected by these events experienced larger increases in default compared to non-recipients after exiting mandatory administrative forbearance. While Pell Grant recipients and non-recipients had similar probabilities of entering default in the calendar year prior to the disaster declaration, 7 percent of Pell borrowers enter default in the calendar year after exiting mandatory administrative forbearance compared to 5 percent of non-recipients.[3]

### 2.  Current Economic Conditions Facing Borrowers

Borrowers themselves report that they will be less likely to keep up with repayments on their student loan debt when payments resume, despite benefiting from the repayment pause and stimulus support during the course of the pandemic. Among borrowers with income below $125,000 who had also been making payments in 2019, a substantially higher number anticipate having trouble making full payments in the future than reported not making regular payments before the pandemic. For example, of those with income under $40,000. only 26 percent reported never or occasionally making full payments in 2019, but 51 percent in this group expect to have difficulty making full or even any payments in the future. Of those with income between $40,000 and $75,000, 18 percent were unable to make full payments in 2019, but 36 percent expect to be unable to cover their monthly payments in the future. Similarly, for borrowers with income between $75,000 and $125,000, 18 percent reported making occasional or no payments prior to the pandemic, but 24 percent expect to make less than full payment when the pandemic forbearance ends.[4]

Because borrowers expect increased payment difficulties, even after accounting for the benefits they received from the repayment pause and stimulus, it is likely that the net effect of the pandemic—absent

---

[1] Kaufman, Ben. "New Data Show Student Loan Defaults Spiked in 2019-A Warning to Industry and DeVos Amid Economic Fallout," Student Borrower Prot. Ctr., Mar. 13, 2020.
[2] Department of Education analysis of administrative data. These analyses are based on borrowers who had at least one active Department of Education-held loan, were placed in mandatory administrative forbearance for at least one day in the period spanning a week prior to the disaster start date and 90 days after this date, and who had an address in a state (and county, when relevant) that was a federally declared disaster area.
[3] Ibid. Information on income is not available for most borrowers placed in mandatory administrative forbearance following these federally declared major disasters, thus a similar analysis exploring default rates among borrowers with different incomes was not feasible.
[4] Akana, Tom, and Dubravka Ritter. "Expectations of Student Loan Repayment, Forbearance, and Cancellation: Insights from Recent Survey Data." Federal Reserve Bank of Philadelphia, 2022, Table 1.

**9**

*DELIBERATIVE / PRE-DECISIONAL / CONFIDENTIAL*

other compensatory actions—would be to increase delinquency rates further. If borrowers' recollections of past repayment success and expectations for future repayment capacity translate directly into their future repayment success, borrowers' delinquency rates will be higher than pre-pandemic levels when those compensatory actions end, absent additional relief.

Research by the Consumer Financial Protection Bureau using credit bureau data provides evidence from the balance sheets of student loan borrowers that substantiates the concerns reported by borrowers in the above survey. While delinquencies on non-student debt among student loan borrowers dipped during 2020, delinquencies rose in the second half of 2021, and have since returned to pre-pandemic levels, despite the fact that most student loans remained in forbearance.[5] The authors suggest that non-student debt delinquencies rose as pandemic interventions were retired. Borrowers who have defaulted on their student loans are also more likely to be under water on other types of debt.[6]

For lower-income student loan borrowers, delinquency rates on non-student loan debt were higher in February 2022 than in March 2020 before the start of the pandemic.[7] These rising delinquency rates suggests that these borrowers' student loan delinquency rates also would have risen, had repayments not been paused. In fact, we would expect difficulties keeping up with debt payments to be even higher if individuals had not received the benefit of the repayment pause and other stimulus support. These findings also suggest that, absent additional relief, when the student loan repayment pause ends, student loan delinquency rates will follow a similar trajectory as other debt delinquency rates and increase.

Analyses of credit report data by the Federal Reserve Bank of New York comparing federally owned loans (which benefitted from the pause) to federally guaranteed loans and private student loans (which did not) concluded that borrowers with commercially held FFEL loans who were not protected by the payment pause saw their delinquency rates return to pre-pandemic levels, despite other forms of economic support.[8] These borrowers' delinquency rates would likely have been higher if not for this support. The study concluded that, absent further relief, when payments resume, borrowers will likely experience increased delinquencies on federal student loans and other types of debt beyond pre-pandemic levels.[9]

The rise of inflation to levels not seen in 40 years also creates significant pressures on family budgets and thus raises the risk of delinquency and default. Initially, COVID-induced supply-chain disruptions in tandem with strong demand for consumer goods led inflation to begin to accelerate in the spring of 2021, although other factors (such as Russia's invasion of Ukraine) have also contributed recently.[10] Research also suggests that inflationary pressures are most acute for those with lower incomes, particularly as prices are rising quickly for basic necessities, including energy, food, and shelter costs.[11]

---

[5] Conkling, Thomas S., Christa Gibbs, and Vanessa Jimenez-Read. "Student Loan Borrowers Potentially At-Risk When Payment Suspension Ends." Consumer Financial Protection Bureau Office of Research, forthcoming.
[6] Blagg, Kristin. "Underwater on Student Debt: Understanding Consumer Credit and Student Loan Default." Urban Institute, 2018.
[7] Conkling, Thomas S., Christa Gibbs, and Vanessa Jimenez-Read. "Student Loan Borrowers Potentially At-Risk When Payment Suspension Ends." Consumer Financial Protection Bureau Office of Research, forthcoming.
[8] Goss, Jacob, Daniel Mangrum, and Joelle Scally. "Student Loan Repayment during the Pandemic Forbearance," No. 20220322. Federal Reserve Bank of New York, 2022.
[9] Ibid.
[10] LaBelle, Jesse, and Ana Maria Santacreu. "Global supply chain disruptions and inflation during the COVID-19 pandemic." *Federal Reserve Bank of St. Louis Review* (2022).
[11] Argente, David, and Munseob Lee. "Cost of Living Inequality During the Great Recession." *Journal of the European Economic Association*, 19.2, 2021, pp. 913-952. Also see, Larsen, Daryl, and Raven S. Molloy. "Differences in Rent Growth by Income 1985-2019 and Implications for Real Income Inequality." No. 2021-11-05-3, Board of Governors of the Federal Reserve System (US), 2021.

*DELIBERATIVE / PRE-DECISIONAL / CONFIDENTIAL*

Borrowers who go delinquent or default on their student loans suffer substantial negative penalties. The Department reports loans more than 90 days delinquent or in default to the major national credit bureaus, which has been shown to be correlated with a 50-to-90-point drop in borrowers' credit scores.[12] These notations can remain on borrowers reports for up to seven years, making insurance, rent, and other financial products less affordable and hinder borrowers' ability to get a job.[13] Borrowers who default lose access to affordable repayment options and flexibilities at the same time their balances become due immediately. Additionally, their accounts are subject to collection feeds and involuntary collections like wage garnishment, Treasury offset, and litigation.

### B.  Pandemic-Connected Loan Discharge Will Reduce These Harms

#### 1.   Discharges Are Likely to Reduce Delinquency and Default Rates

An immediate discharge of loan balances would mitigate the financial harm caused by the pandemic for millions of borrowers by eliminating debt entirely or reducing the monthly payment burden. Balance elimination or reduction is likely to reduce delinquency and default and increase short- and long-term repayment success.

Reducing student loan balances can improve borrowers' ability to repay remaining debts. In a study of the effects of private student loan discharges provided to borrowers in default, researchers found that following debt discharges of approximately $8,000, borrowers reduced their total liabilities (excluding student loans) by more than $4,500.[14] Additionally, borrowers were less likely to be delinquent on other accounts, file for bankruptcy, be subject to foreclosure, or default on mortgages or medical bills following debt relief.[15]

Studies of mortgage modifications have shown that reducing monthly payments can have a significant ameliorative effect on delinquency and foreclosure: lenders have found that payment reductions of between about 20 percent and 30 percent were effective in reducing defaults.[16] A study of the JPMorgan Chase Institute's short-term payment reduction program found that every 1 percent of payment reduction reduced default rates by about 1 percent.[17]

Loan discharges can reduce delinquency and default risks even though borrowers have other options to reduce monthly payments, like income-driven repayment (IDR) plans. Many borrowers who are eligible for IDR plans are not yet enrolled. Recent research from the JPMorgan Chase Institute, for instance, showed that 22 percent of their sample were eligible for IDR but not enrolled.[18] The Federal Reserve Bank of Philadelphia's survey study notes that lower-income individuals were much less likely to expect

---

[12]  Blagg, Kristin. "Underwater on Student Debt: Understanding Consumer Credit and Student Loan Default." Urban Institute, 2018.
[13] Elliott, Diana and Ricki Granetz Lowitz. "What Is the Cost of Poor Credit?." Urban Institute, 2018; Corbae, Dean, Andrew Glover, and Daphne Chen. "Can Employer Credit Checks Create Poverty Traps?" *2013 Meeting Papers*, No. 875, Society for Economic Dynamics, 2013.
[14] Di Maggio, Marco, Ankit Kalda, and Vincent Yao. "Second Chance: Life Without Student Debt." No. w25810, National Bureau of Economic Research, 2019.
[15] Ibid.
[16] An, Xudong, et al. "Inequality in the Time of COVID-19: Evidence from Mortgage Delinquency and Forbearance." No. 21-09, Federal Reserve Bank of Philadelphia, 2021.
[17] Ganong, Peter, and Pascal Noel. "Liquidity versus wealth in household debt obligations: Evidence from housing policy in the great recession." *American Economic Review*, 110.10, 2020, pp. 3100-3138.
[18] Greig, Fiona and Daniel M. Sullivan. "Income Driven Repayment: Who Needs Student Loan Payment Relief?", JP Morgan Chace Institute, June 2022.

**11**

*DELIBERATIVE / PRE-DECISIONAL / CONFIDENTIAL*

to make full payments notwithstanding the existence of IDR plans.[19] The visibility of a student loan discharge program, combined with the clear benefit to borrowers, will likely attract these borrowers to apply in numbers that FSA's efforts to increase enrollment in IDR have not.

Loan discharge may also indirectly reduce delinquency and default rates. The Department intends to use the attention generated by loan discharges, and the likely applications filed by millions of borrowers, to encourage borrowers to take advantage of other federal repayment benefits and protections like IDR. Borrowers using income-driven repayment plans have significantly lower rates of default and delinquency than borrowers who do not use those plans.[20] The loan cancellation process will also require borrowers to provide updated contact information that will improve targeted communications and interventions toward borrowers at risk delinquency and default. An Urban Institute scholar recently recommended a similar approach, making loan cancellation contingent on borrowers restarting payments, for similar reasons.[21]

### 2. Amount of Debt to Discharge

Given the Department's goals, it should discharge an amount of debt necessary to significantly decrease the rates of delinquency and default. Although discharging the entire loan amount would permanently avoid this harm, lesser discharge amounts will mitigate the risk that delinquency and default rates will rise above pre-pandemic levels.

If the Department forgave up to $20,000 in debt, the Department estimates that if all borrowers claimed the relief they were entitled to, approximately 20 million borrowers would have their loan eliminated entirely.[22]  Borrowers with low balances tend to have lower incomes and higher default rates.[23] Thus, low-balance borrowers are at particular risk of being in a worse financial position because of the pandemic absent further relief.

Department estimates suggest that, if all borrowers claimed the benefits to which they are entitled, an additional 23 million borrowers would see their balances reduced, with median debt falling from $29,400 to $13,600.[24] The Department would reamortize borrowers' remaining balances to reduce monthly payments after applying the discharge.

The Department estimates the payment pause has saved the average borrower in repayment approximately $233 a month.[25] Among vulnerable borrowers, a similar $200 to $300 reduction in monthly payments could be achieved by the proposal. As a result, for many borrowers, the balance reduction provided by discharge would reduce monthly payments at similar levels to the relief provided during the pause. For example, for a hypothetical borrower midway through loan repayment, the

---

[19] Akana, Tom, and Dubravka, Ritter. "Expectations of Student Loan Repayment, Forbearance, and Cancellation: Insights from Recent Survey Data." Federal Reserve Bank of Philadelphia, 2022, Table 1.

[20] Conkling, Thomas S., and Christa Gibbs. "Borrower experiences on income-driven repayment." *Consumer Financial Protection Bureau Office of Research Reports Series,* 19-10, 2019.

[21] Chingos, Matthew. "How Forgiveness Could Support the Student Loan Restart." Urban Institute, 2022.

[22] Department of Education estimates using administrative federal student aid data and imputed income from Census data.

[23] Scott-Clayton, Judith. "The looming student loan default crisis is worse than we thought*." Brookings Institution Evidence Speaks Reports*, Vol. 2, #34, 2018; Looney, Adam, and Constantine Yannelis. "A crisis in student loans?: How changes in the characteristics of borrowers and in the institutions they attended contributed to rising loan defaults." *Brookings Papers on Economic Activity*, 2015, no. 2, 2015, pp. 1-89.

[24] Department of Education estimates using administrative federal student aid data and imputed income from Census data.

[25] Department of Education estimates using administrative federal student aid data.

*DELIBERATIVE / PRE-DECISIONAL / CONFIDENTIAL*

estimated reduction in median balances from $29,400 to $13,600 would result in an approximately $300 reduction in monthly payments.[26]

Studies of mortgage modification programs have shown that payment reductions of between 20 and 30 percent are effective at reducing the rate of delinquency.[27] Using administrative data, the Department estimates that if all borrowers claimed the benefits to which they were entitled, among borrowers who do not receive full forgiveness, a maximum benefit of $10,000 in cancellation would lead to a median reduction in payments of 31 percent, while a maximum benefit of $20,000 in cancellation (where the additional relief is only available to Pell recipients) would lead to a median reduction in payments of 38 percent.[28]

### C. Borrower and Loan Eligibility

### 3. Borrower Income Threshold

Many borrowers have been harmed by the pandemic and may be at greater risk of delinquency or default than they were before the pandemic. However, not all borrowers are equally at risk of these outcomes. Research shows that student loan repayment is correlated with income, and lower income borrowers are more likely to experience delinquency and default.[29]

Borrowers who are either individuals with incomes under $125,000 or belong to households with incomes under $250,000 are more likely than individuals above those thresholds to experience financial hardship in making payments on their loans when payments resume.

---

[26] Specifically, a borrower on the standard 10-year plan with an original balance of $29,400, a 5 percent interest rate, and five years of payments remaining would see these benefits

[27] An, Xudong, et al. "Inequality in the Time of COVID-19: Evidence from Mortgage Delinquency and Forbearance." No. 21-09, Federal Reserve Bank of Philadelphia, 2021; Ganong, Peter, and Pascal Noel. "Liquidity versus wealth in household debt obligations: Evidence from housing policy in the great recession." *American Economic Review*, 110.10, 2020, pp. 3100-3138.

[28] These estimates would apply to a borrower who receives forgiveness but does not have their balance fully discharged and who has made their scheduled payments on the 10-year standard repayment plan since entering repayment.

[29] Looney, Adam, and Constantine Yannelis. "A crisis in student loans?: How changes in the characteristics of borrowers and in the institutions they attended contributed to rising loan defaults." *Brookings Papers on Economic Activity*, 2015, no. 2, 2015, pp. 1-89.

**13**

*DELIBERATIVE / PRE-DECISIONAL / CONFIDENTIAL*

*Inconsistent Payments*

Evidence from the Federal Reserve Bank of Philadelphia's *Consumer Finance Institute COVID-19 Survey of Consumers* establishes the $125,000 income mark as a reasonable ceiling for discharge eligibility. As would be expected, borrowers with lower incomes have a lesser ability to make consistent payments on their loans. The survey shows that borrowers with incomes between $100,000 and $124,000 have rates of payment inconsistency – that is, the percentage of respondents who reported making no or "occasional" payments for their loans in 2019 – that are nearly double what they are for those with incomes between $125,000 and $149,000 (see Figure 1).



**Figure 1. Inconsistent Payment Rates (Occasional or No Payments Made in 2019), By Income**

*Source: Federal Reserve Bank of Philadelphia CFI COVID-19 Survey of Consumers*

Rates of regular repayment for borrowers earning $125,000 or above are roughly 14 percentage points (or 20%) above what they are for those earning between $100,000-$124,000.[30] This suggests that the average borrower earning above $125,000 entered the pandemic on firmer financial footing with regards to loan payments, relative to those earning below the eligibility ceiling (see Figure 2).

---

[30] Analyses based on unpublished data provided by the Federal Reserve Bank of Philadelphia.

**14**

*DELIBERATIVE / PRE-DECISIONAL / CONFIDENTIAL*



*Future Payment Capacity*

Lower-income borrowers are less likely to report being able to repay future loans, an indicator of risk of delinquency or default. There is a break in repayment capacity at around $125,000. After forbearance, nearly 20 percent of borrowers earning between $100,000 and $124,000 expect to experience difficulty repaying loans, compared to 14 percent of those earning above $125,000 (see Figure 3).

*DELIBERATIVE / PRE-DECISIONAL / CONFIDENTIAL*



**Figure 3. Payment Capacity After Forbearance - "Partial" and "No Payments", By Income**

*Source: Federal Reserve Bank of Philadelphia CFI COVID-19 Survey of Consumers*

*Financial Security*

The financial insecurity of those with student loans falls as income rises, declining particularly steeply above $125,000.  Financial insecurity rates for borrowers with incomes between $100,000 and $124,000 are more than double those for borrowers with incomes between $125,000 and $149,000. Education loan holders with incomes exceeding the discharge eligibility ceiling report more positive sentiments concerning their financial security: only about 10 percent of borrowers with incomes greater than $125,000 report financial insecurity (see Figure 4).[31]

---

[31] Ibid.

*DELIBERATIVE / PRE-DECISIONAL / CONFIDENTIAL*



**Figure 4. Financial Insecurity Relative to Pre-Pandemic Education, By Income**

*Source: Federal Reserve Bank of Philadelphia CFI COVID-19 Survey of Consumers*

*Income and the Pandemic*

Survey data indicates that lower-income workers were disproportionately likely to become unemployed in the beginning of the pandemic.[32] In the summer of 2021, a Brookings analysis found that low-wage earners were overrepresented among "displaced" workers (workers on "permanent" layoff, meaning they lost their jobs and were not called back).[33] A rich economic literature indicates that such unemployment can have long-term scarring effects.[34] Students who left school in 2020 and 2021 are also projected to experience significant reductions in lifetime earnings.[35]

Because of this pattern of job loss, lower-income households also experienced greater material hardship due to the pandemic.[36] Compared with adults whose family employment was unaffected by the pandemic, they were twice as likely to report food insecurity, nearly three times as likely to report problems paying utility bills, and nearly four times as likely to report problems paying the rent or mortgage.

---

[32] Adams-Prassl, Abi, et al. "Inequality in the Impact of the Coronavirus Shock: Evidence from Real Time Surveys." *Journal of Public Economics*, 189, 104245, 2020; Despard, Mathieu, et al. "Covid-19 Job and Income Loss Leading to More Hunger and Financial Hardship." Brookings, 9 Mar. 2022.

[33] Bateman, Nicole, and Martha Ross. "The pandemic hurt low-wage workers the most and so far, the recovery has helped them the least." Brookings, 2021.

[34] Mroz, Thomas A., and Timothy H. Savage. "The Long-term Effects of Youth Unemployment." *Journal of Human Resources*, 41.2, 2006, pp. 259-293; Kahn, Lisa B. "The long-term labor market consequences of graduating from college in a bad economy." *Labour economics*, 17.2, 2010, pp. 303-316; Schwandt, Hannes, and Till Von Wachter. "Unlucky cohorts: Estimating the long-term effects of entering the labor market in a recession in large cross-sectional data sets." *Journal of Labor Economics*, 37.S1, 2019, pp. S161-S198.

[35] Friedman, John. "Lifetime Earnings Effects of the COVID-19 Recession for Students." Opportunity Insights Economic Tracker (2021).

[36] Karpman, Michael, and Stephen Zuckerman. "Average Decline in Material Hardship During the Pandemic Conceals Unequal Circumstances." Urban Institute, 2021.

A literature review from the Department of Health and Human Services highlighted the disproportionate job losses for low-wage workers and the wide-reaching impacts of job loss on material hardship and food insecurity.[37] The review emphasizes that among low-wage workers, women and people of color were disproportionately impacted. The review notes that many COVID-19 relief measures initially missed, or were insufficient for, low-income families.

### 4. Past Pell Receipt

A disproportionate number of Pell Grant borrowers are low-income. An analysis of Pell Grant borrowers for whom the Department has income information (from a FAFSA application or an IDR application) suggests that 99 percent of Pell Grant recipients have incomes below $125,000.[38]

Borrowers' status as former Pell recipients provides independent and valuable measures of their risk of delinquency and default, even in addition to current income. Rather than evaluating a borrower's current income, Pell Grant eligibility is based upon a broader set of data intended to be a more complete measure of family financial resources at the time of application. Because Pell Grant eligibility is determined on the basis of financial need, recipients typically have lower wealth and familial monetary resources at the time of receiving the grant.



**Figure 5: Difference in Default Rates Between Pell Grant Recipients and Non-Pell Grant Recipients as of 12/2021, by Imputed Income among borrowers who have been in repayment between 6-10 years**

*Source: Department of Education*

---

[37] US Department of Health and Human Services, "The Impact of the First Year of the COVID-19 Pandemic and Recession on Families with Low Incomes." 2021.

[38] Department estimates using administrative data on Pell Grant borrowers who submitted a FAFSA or IDR application with 2020 or 2021 income information.

Borrowers who received a Pell Grant in the past are at greater risk of delinquency and default, regardless of current income. Forty-two percent of Pell recipients default on their loans at least once, compared to just 18 percent of borrowers who never received a Pell Grant – a 24 percentage point difference. The relationship holds even when controlling for a borrower's imputed income. Indeed, at every band of imputed income, Pell Grant recipients are roughly *twice* as likely to default on their loans as non-Pell students.[39]

Moreover, the default rates for Pell Grant recipients with lower imputed income are especially high, with at least one in three Pell recipients in every imputed income band below $125,000 defaulting at least once. For borrowers with imputed incomes between $100,000 and $125,000, 32 percent of Pell Grant recipients default at least once, compared to 13 percent of non-Pell Grant recipients.[40]

Among enrolled students, Pell Grant recipients were disproportionately likely to be financially harmed by the pandemic. One recent study found that enrolled Pell Grant recipients were 20 percent more likely to lose a job during the pandemic, 17 percent more likely to see a drop in earnings, and 65 percent more likely to report facing food and housing insecurity than students who never received a Pell grant.[41]

Past experience suggests that past Pell recipients also struggle with their student loans at higher rates than their peers. A study that focused on borrowers who entered repayment before and after the Great Recession showed that Pell Grant recipients saw larger declines in repayment rates than non-Pell recipients.[42] As noted above, Pell Grant recipients also saw larger increases in default rates following recent natural disaster forbearances.

### 5.   Parental Income for Dependent Students

The federal government has long considered parents' resources in allocating financial aid for enrolled dependent students. For example, under the Higher Education Act, parental income is a factor in dependent student borrowers' eligibility for financial aid, including student loans. Congress has long varied the origination terms of certain loans based upon families' ability to repay by providing subsidized student loans.

While current income is an effective indicator of former students' capacity to repay, it is not adequate to assess current students' ability to repay because most current students have low incomes. In this context, the Higher Education Act has long recognized that family income is a better indicator of capacity to repay because it is strongly correlated with children's expected income.

Each year, between 4 and 5 million borrowers enter repayment for the first time.[43] The pandemic has also caused additional borrowers to separate from school and enter repayment.[44] In fact, hundreds of thousands of borrowers leave mid-way through the semester or do not re-enroll the next semester. Additionally, around 300,000 borrowers make payments on their loans while they are in school.[45] Altogether, there is a

---

[39] Department of Education estimates using administrative federal student aid data and imputed income from Census data.
[40] Ibid.
[41] Rodríguez-Planas, Núria. "Hitting Where It Hurts Most: COVID-19 and Low-Income Urban College Students." *Economics of Education Review*, 87, 102233,  2022.
[42] Blagg, Kristin and Erica Blom. "Student debt repayment fell during the Great Recession. Borrowers from low-income backgrounds saw the steepest decline." Urban Institute, 2018.
[43] US Department of Education, "Digest of Education Statistics 2021." 2021, Table 332.50.
[44] Saul, Stephanie. "College Enrollment Drops, Even as the Pandemic's Effects Ebb." *The New York Times*, 26 May 2022.
[45] Based on analysis of 2019 FSA student loan data.

*DELIBERATIVE / PRE-DECISIONAL / CONFIDENTIAL*

significant population of borrowers who were enrolled last year but will nonetheless be impacted by resumption of payments.

### 6. Limitation to Existing Loans

The proposal would apply to loans that were outstanding on June 30, 2022, the end of the 2022-23 academic year. The terms of financial aid policies – such as the interest rate on new student loans and the maximum Pell grant – typically change each July 1. Moreover, extending eligibility into the new academic year risks generating incentives to borrow additional loans in anticipation of cancellation. It would also create arbitrary results based upon a school's academic schedule, the efficiency of its financial aid office, and the order in which it processed a particular student's financial aid awards.

# Exhibit B

*CONFIDENTIAL*



THE SECRETARY OF EDUCATION
WASHINGTON, DC 20202

DATE:                          August 24, 2022

MEMORANDUM TO:                 Richard Cordray
                               Chief Operating Officer
                               Federal Student Aid

FROM:                          Miguel A. Cardona, Ed.D.
                               Secretary of Education

SUBJECT:                       Pandemic-Connected General Loan Discharge and Payment Pause

In March 2020, Congress determined that, in light of the COVID-19 pandemic, it was necessary to provide relief to student loan borrowers by suspending certain payments and collections activity, and temporarily setting certain interest rates to zero percent. Under the authority granted to the Secretary of Education by the Higher Education Relief Opportunities for Students Act of 2003 ("HEROES Act"), I previously extended this relief through August 31, 2022.

This payment pause has delivered substantial relief to millions of loan borrowers, seeking to ensure that they are not in a worse position financially due to the pandemic. However, when loan payments resume, many borrowers will be at heightened risk of loan delinquency and default that could offset the benefits provided by the pause and leave borrowers worse off than they were before the pandemic. Many borrowers will experience challenges in the transition back to repayment. Additional steps are needed to address these challenges and reduce the likelihood of delinquency and default to ensure that borrowers are not in a worse position financially due to the pandemic with regard to their ability to repay their loans.

In order to ensure that borrowers subject to the payment pause are not placed in a worse position financially by the COVID-19 national emergency as they restart payments, I have determined to exercise my discretion under the HEROES Act to issue waivers and modifications necessary to effectuate the following actions:

- Discharge $10,000 of federal student loan balances for borrowers with individual incomes of under $125,000 or household incomes of under $250,000 during tax years 2020 or 2021. These discharges would be limited to loans that were originally outstanding as of June 30, 2022, and that are currently subject to the payment pause, including Direct Loans, Federal Family Education Loans held by the Department or by guaranty agencies, and Federal Perkins Loans held by the Department.

- Discharge an additional $10,000 in federal student debt for borrowers who meet these requirements and who also received a Pell Grant at some point in the past.

Page 2 *CONFIDENTIAL*

- Take the administrative steps needed to implement this discharge initiative, including the collection, maintenance, use, and dissemination of borrower information necessary to establish eligibility for the discharge under the relevant criteria and provide benefits under the initiative automatically to as many borrowers as possible utilizing income information available to the Department in compliance with applicable law.

- Develop a simple process for borrowers to attest to their incomes and for FSA to verify the income of a sample of those borrowers.

Based on current economic and public health conditions, and to provide time to successfully implement these measures needed to ensure that borrowers are not placed in a worse position financially due to the pandemic, I have also determined to extend those waivers and modifications specified in the December 11, 2020, *Federal Register* notice (85 Fed. Reg. 79856), that relate to the payment and collection of, and accumulation of interest on, federal student loans, and also extend the corresponding pause for Federal Family Education Loan Program loans held by guaranty agencies, as discussed in Dear Colleague Letter GEN-21-03 through December 31, 2022. Because I expect this extension to be the final extension of the payment pause, I further direct FSA to take all necessary steps to restart loan payments after December 31, 2022.

Miguel A. Cardona
U.S. Secretary of Education

8/24/22   9:25am
Date & Time

**23**

# Exhibit C

THE SECRETARY OF EDUCATION

WASHINGTON, DC 20202

DATE:                          September 27, 2022

MEMORANDUM TO:                 Dr. Nasser Paydar
                               Assistant Secretary for Postsecondary Education

                               Richard Cordray
                               Chief Operating Officer
                               Federal Student Aid

FROM:                          Miguel A. Cardona, Ed.D.
                               Secretary of Education

SUBJECT:                       Waivers Relating to Pandemic-Connected General Loan Discharge

On August 24, 2022, I notified Richard Cordray, Chief Operating Officer of Federal Student Aid, that I had determined to exercise my discretion under the HEROES Act to issue waivers and modifications necessary to (1) discharge up to $20,000 in federal student loan balances for borrowers who meet certain conditions and (2) take all administrative steps necessary to implement that determination.

In the interim, the Department has developed a comprehensive strategy to implement that determination. As such, today I am issuing waivers and modifications to the provisions of 20 U.S.C. 1087, which applies to the Direct Loan Program under 20 U.S.C. 1087a and 1087e; 20 U.S.C. 1087dd(g); and 34 CFR part 674, subpart D, §§ 682.402 and 685.212 to provide that, notwithstanding any other statutory or regulatory provision, the Department will discharge the balance of a borrower's loans up to a maximum of: (a) $20,000 for borrowers who qualified for Pell Grants at the time they received the loans and had an Adjusted Gross Income ("AGI") below $125,000 for an individual taxpayer or $250,000 for borrowers filing jointly or as a Head of Household for the 2020 or 2021 Federal tax years; or (b) up to a maximum of $10,000 for borrowers who are eligible under those income thresholds but did not qualify for a Pell Grant at the time they received the loans. This waiver is applicable to borrowers with outstanding Direct Loans, FFEL loans held by the Department or subject to collection by a guaranty agency, and Perkins Loans held by the Department prior to July 1, 2022, and who are determined to be eligible by the Department.

Please take all necessary actions to implement these waivers and modifications and to provide notice of these waivers and modifications in the Federal Register.