**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| MYRA BROWN and ALEXANDER TAYLOR,<br><br>_Plaintiffs_,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as the Secretary of Education,<br><br>_Defendants._ | C<small>IVIL</small> A<small>CTION</small> N<small>O.</small> 4:22-cv-908 |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR A
PRELIMINARY INJUNCTION AND OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ...................................................................................................................... 1

ARGUMENT .............................................................................................................................. 2

    I.    Plaintiffs are likely to prevail on the merits ................................................................ 2

        A.    Plaintiffs have standing. ...................................................................................... 2

        B.    The Department violated the APA by adopting the Program without following the proper rulemaking procedures. ........................................................ 5

    II.    Plaintiffs are likely to suffer irreparable harm without a preliminary injunction. ................ 12

    III.    The balance of harms and public interest weigh in favor of a preliminary injunction. ....... 13

    IV.    The Plaintiffs' requested injunction is proper. ......................................................... 13

    V.    At a minimum, the Court should issue an administrative stay to preserve its ability to afford effective relief. ................................................................................... 14

CONCLUSION ........................................................................................................................ 15

CERTIFICATE OF SERVICE ................................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**

*A.B.-B. v. Morgan*,
  548 F. Supp. 3d 209 (D.D.C. 2020).................................................................................. 15

*Ala. Ass'n of Realtors v. HHS*,
  141 S. Ct. 2485 (2021) .......................................................................................................... 8

*Animal Legal Def. Fund v. USDA*,
  789 F.3d 1206 (11th Cir. 2015) ........................................................................................ 10

*Ass'n of Cmty. Cancer Centers v. Azar*,
  509 F. Supp. 3d 482 (D. Md. 2020)............................................................................ 13, 14

*Bauer v. DeVos*,
  325 F. Supp. 3d 74 (D.D.C. 2018) ..................................................................................... 6

*Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*,
  685 F.3d 917 (10th Cir. 2012) .......................................................................................... 11

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
  2018 WL 6252409 (W.D. Tex. Nov. 6, 2018)................................................................. 15

*Dialysis Patient Citizens v. Burwell*,
  2017 WL 365271 (E.D. Tex. Jan. 25, 2017) ................................................................... 14

*Ecosystem Inv. Partners v. Crosby Dredging, LLC*,
  729 F. App'x 287 (5th Cir. 2018)................................................................................... 2, 3

*Eli Lilly & Co. v. Cochran*,
  526 F. Supp. 3d 393 (S.D. Ind. 2021)............................................................................. 12

*Georgia v. President of the U.S.*,
  46 F.4th 1283 (11th Cir. 2022) ........................................................................................... 9

*In re Deepwater Horizon*,
  732 F.3d 326 (5th Cir. 2013).............................................................................................. 13

*Int'l Union v. MSHA*,
  407 F.3d 1250 (D.C. Cir. 2005)........................................................................................... 9

*Kentucky v. Biden*,
  23 F.4th 585 (6th Cir. 2022) ................................................................................................ 9

*Massachusetts v. EPA*,
  549 U.S. 497 (2007)...................................................................................................... 2, 3, 5

*Matter of Lopez*,
  897 F.3d 663 (5th Cir. 2018).............................................................................................. 7

*Nebraska v. Biden*,
  No. 4:22-cv-1040-HEA (E.D. Mo.) ................................................................................. 14

*Paulsen v. Daniels*,
  413 F.3d 999 (9th Cir. 2005)............................................................................................... 3

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ................................................................................................ 5

*Sugar Cane Growers Co-op. of Fla. v. Veneman,*
    289 F.3d 89 (D.C. Cir. 2002) ............................................................................... 12

*Tex. Democratic Party v. Abbott,*
    2020 WL 2616080 (5th Cir. May 20, 2020) ........................................................ 15

*Tex. Democratic Party v. Abbott,*
    961 F.3d 389 (5th Cir. 2020) ............................................................................... 15

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) ........................................................................... 2, 3

*Texas v. United States,*
    — F.4th —, 2022 WL 5135501 (5th Cir. 2022) .................................................. 14

*Texas v. United States,*
    40 F.4th 205 (5th Cir. 2022) ................................................................................. 6

*Texas v. United States,*
    555 F. Supp. 3d 351 (S.D. Tex. 2021) ........................................................... 13, 14

*Texas v. United States,*
    787 F.3d 733 (5th Cir. 2015) ............................................................................ 3, 4

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ........................................................................ 2, 8, 14

*U.S. Steel Corp. v. EPA,*
    595 F.2d 207 (5th Cir. 1979) ......................................................................... 12, 14

*United States v. Johnson,*
    632 F.3d 912 (5th Cir. 2011) ................................................................................. 6

*W. Virginia v. EPA,*
    142 S. Ct. 2587 (2022) .................................................................................. 7, 8, 9

*Wages & White Lion Invest. v. FDA,*
    16 F.4th 1130 (5th Cir. 2021) .............................................................................. 13

## STATUTES

20 U.S.C. §1098a ........................................................................................................ 6

20 U.S.C. §1098bb ............................................................................................... *passim*

20 U.S.C. §1098ee ................................................................................................ 10, 11

20 U.S.C. §1232 ........................................................................................................ 14

5 U.S.C. §705 ........................................................................................................... 15

American Rescue Plan Act of 2021, PL 117-2, 135 Stat. 4 (Mar. 11, 2021) ............... 8

## OTHER AUTHORITIES

149 Cong. Rec. H2522-26 (Apr. 1, 2003) .................................................................... 8

A. Gangitano, *White House Says 8 Million Americans Have Applied for Student Loan Debt Forgiveness*, The Hill (Oct. 17, 2022), https://bit.ly/3VDAJg0 ..................................................... 14

*Consular Affairs by the Numbers*,
U.S. Dep't of State (Jan. 2020), https://bit.ly/3ENOTFr ........................................................ 11

*Fact Sheet: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*,
The White House (Aug. 24, 2022), https://bit.ly/3dATj7p .................................................... 10

H.R. 2034, 117th Cong. §2 (2021) .......................................................................................... 7

H.R. 6800, 116th Cong. §150117 (2020) ................................................................................ 7

*Household Income Percentile Calculator for the United States*,
DQYDJ, https://bit.ly/3TvOMTd .......................................................................................... 10

John Patrick Hunt, *Jubilee Under Textualism*,
48 J. Legis. 31 (2021) ............................................................................................................. 4

Luke Herrine, *The Law and Political Economy of a Student Debt Jubilee*,
68 Buff. L. Rev. 281 (2020) .................................................................................................... 4

R. Safier, *Student Loan Discharge: Options to Cancel Your Federal Student Loans*,
Student Loan Hero (Aug. 19, 2021), https://bit.ly/3TbBQBY ............................................... 8

S. 2235, 116th Cong. §101 (2019) .......................................................................................... 7

Scalia & Garner, *Reading Law* (2012) .................................................................................. 10

*The Negotiated Rulemaking Process for Title IV Regulations*,
U.S. Dep't of Educ., https://bit.ly/3SCFqFf .......................................................................... 6

*Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans*,
Off. of Legal Counsel, 2022 WL 3975075 (Aug. 23, 2022) ................................................. 4

## INTRODUCTION

The Department's arguments defy common sense. According to the Department, Congress authorized the agency to cancel nearly half a *trillion* dollars in student loan debt through the HEROES Act—a three-page bill that passed Congress by voice vote and was aimed primarily at deferring loan payments for soldiers fighting abroad. Moreover, the Department believes, Congress wanted one person—the Secretary of Education—to unilaterally craft a massive debt forgiveness program without *any* public involvement. Congress never would have silently ceded such extraordinary authority to the Secretary nor so casually discarded longstanding rulemaking requirements. The Department's far-fetched theory of executive power is precisely what the major questions doctrine is designed to stop.

The Department's argument for why it can avoid the normal rulemaking process is equally specious. The Department claims that it can disregard negotiated rulemaking and notice and comment simply by saying that it is acting pursuant to the HEROES Act. In other words, the Department believes it can avoid its rulemaking obligations even if the Program is not authorized by the HEROES Act. That is plainly wrong. If the HEROES Act does not authorize the Program, then the Department has no excuse for disregarding negotiated rulemaking and notice and comment.

The Department's reflexive argument that Plaintiffs lack standing fails. Plaintiffs suffered an injury-in-fact because they were denied their procedural rights to protect their concrete interests in obtaining debt forgiveness; the Department's actions caused these injuries; and there is "some possibility" that an injunction will cause the Department to reconsider its decision not to provide debt forgiveness to Plaintiffs. Moreover, Plaintiffs will suffer irreparable harm without an injunction because they will forever lose their procedural rights and their ability to qualify for debt forgiveness. And there is no public interest in the perpetuation of unlawful agency action.

The Court should enter a preliminary injunction expeditiously. At a minimum, because the Department appears ready to cancel tens of billions of dollars of debt this Sunday, the Court should

issue an administrative stay before October 23 prohibiting the Department from cancelling debts pending the resolution of Plaintiffs' motion.

## ARGUMENT

### I.     Plaintiffs are likely to prevail on the merits.

#### A.     Plaintiffs have standing.

The Department argues that Plaintiffs suffered no procedural injuries because it can adopt the Program under the HEROES Act without going through notice and comment or negotiated rulemaking. Opp. 8-9. That argument fails, as explained below. But it is also a *merits* argument and thus irrelevant for standing. The Court must "assume, for purposes of the standing analysis, that [Plaintiffs are] correct on the merits of [their] claim that the [Program] was promulgated in violation of the APA." *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019).

The Department contends that Plaintiffs are not injured because they "have no entitlement to any amount of loan forgiveness." Opp. 10. But Plaintiffs need not make that showing. A plaintiff suffers a cognizable injury if he has been deprived of "a procedural right to protect [his] concrete interests." *EEOC*, 933 F.3d at 447. Here, Plaintiffs have a "concrete interest" in having their debts forgiven. And "'[w]hen a litigant is vested with a procedural right, that litigant has standing if there is *some possibility* that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.'" *Texas v. United States*, 809 F.3d 134, 150-51 (5th Cir. 2015) (emphasis added) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)).

The Department has no response to *Ecosystem Investment Partners v. Crosby Dredging, LLC*, which is directly on point. 729 F. App'x 287 (5th Cir. 2018). There, a company that sold environmental-mitigation credits sued the Army Corps of Engineers when the agency authorized a new project without considering whether to purchase the company's credits. *Id.* at 289. The Fifth Circuit held that the company had standing because it had a "'concrete interest that [was] affected by the deprivation'" of its procedural right. *Id.* at 292. Specifically, the agency's procedural errors deprived the company of

a "non-illusory opportunity to pursue a benefit"—*i.e.*, the chance to sell its credits. *Id.* The company's injury was caused by the procedural violation because its "lost chance to unload its credits flowed directly" from the procedural violation. *Id.* at 293. And the "relaxed standard for redressability" was satisfied because, even though a different decision was "not likely," there was "at least 'some possibility' that enjoining the agency action would prompt the Corps to reconsider its decision not to use EIP's credits." *Id.* (cleaned up) (quoting *Massachusetts*, 549 U.S. at 518). The company had standing even though it had "no legal entitlement," Opp. 10, to sell its environmental-mitigation credits.

That reasoning is on all fours here. Plaintiffs have a "concrete interest" in having their debts forgiven, and the Department's procedural errors deprived them of "a non-illusory opportunity to pursue [the] benefit" of debt forgiveness. *Ecosystem Inv. Partners*, 729 F. App'x at 292. Plaintiffs' injuries are traceable to the Department's actions because their "lost chance" to obtain debt forgiveness flows directly from the Program's eligibility requirements. *Id.* at 293. And there is at least "some possibility" that enjoining the Program would "'prompt the [agency] to reconsider [its] decision'" not to provide debt forgiveness to Plaintiffs. *Id.*; *see also Paulsen v. Daniels*, 413 F.3d 999, 1005 (9th Cir. 2005) (prisoners deprived of rights to notice and comment had standing to challenge a rule that "made them ineligible for a sentence reduction").

The Department asserts that Plaintiffs' injuries are not redressable because an order enjoining the implementation of the Program would not force the Department to forgive Plaintiffs' debts. Opp. 11. Again, that is not the proper test for standing. The question is whether there is "some possibility" that "[e]njoining the implementation of [the Program] until it undergoes notice and comment could prompt [the Department] to reconsider its decision." *Texas v. United States*, 787 F.3d 733, 748, 753-54 (5th Cir. 2015). That "is all [Plaintiffs] must show when asserting a procedural right." *Id.*

Plaintiffs clearly satisfy this "lighter" obligation. *EEOC*, 933 F.3d at 447. True, the Department has no authority under the HEROES Act to adopt the Program. Br. 16-22. But the Department

3

repeatedly claims that it has the authority to forgive student loan debts on a wide scale under the Higher Education Act of 1965. *See* Opp. 24-25 (the HEA grants the Department "broad authority" to "reduce or eliminate borrowers' debt obligations under the federal student loan programs); *see also id.* at 1, 3 (same). Multiple commentators have argued this as well. *See, e.g.*, Luke Herrine, *The Law and Political Economy of a Student Debt Jubilee*, 68 Buff. L. Rev. 281, 341-42 (2020) ("[T]he Executive Branch already has the power to cancel student debt. The Higher Education Act (HEA) gives the Secretary of Education broad discretionary authority to 'modify' or 'compromise, waive, or release' DOE's claims against student debtors."); John Patrick Hunt, *Jubilee Under Textualism*, 48 J. Legis. 31, 33, 37-39 (2021) (same). Thus, if the Program were enjoined, the Department almost certainly would invoke its HEA authority to adopt a new program to forgive student loan debts on a nationwide scale.[1]

For good reason, the Department never disputes that there is "some possibility" that the Department could "reconsider its decision[s]" regarding eligibility for loan forgiveness. *Texas*, 787 F.3d at 748, 753-54. For Ms. Brown, there is a strong possibility that a different program would cover her commercially held loans. The Department has repeatedly expressed interest in "expand[ing] eligibility to borrowers with privately owned federal student loans, including FFEL and Perkins Loans." App. 15; *see also Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans*, Off. of Legal Counsel, 2022 WL 3975075, at *8 n.2 (Aug. 23, 2022) (noting that the Department believes it can "nullify any contractual requirement for repayment stemming from the borrowers' loan agreements because those agreements expressly state that they are subject to the HEA and its implementing regulations"). And until just weeks ago, the Department encouraged "borrowers with privately held federal student loans, such as through the FFEL, Perkins, and HEAL programs, [to]

---

[1] The Department presumably avoided invoking this authority *precisely because* it would require negotiated rulemaking and notice and comment, and the Department did not want to take the time to follow those procedures. *See* Br. 5-7 (describing the Administration's deliberations over the summer).

receive this relief by consolidating these loans into the Direct Loan Program." App. 15. The Department apparently eliminated that avenue solely because of threatened litigation. Br. 9. Similarly, for Mr. Taylor, one could easily envision the Department adopting a different program that would increase his level of debt forgiveness. For reasons the Department has still not fully explained, it chose to base eligibility for the $20,000 in debt forgiveness not on an individual's current income or employment status, but on whether the individual received a Pell Grant in college. Mr. Taylor makes less than $25,000 a year, but individuals in households making more than *10 times* that amount will receive twice the debt relief as Mr. Taylor if they received a Pell Grant in college. Br. 10-11. The Department's arbitrary line-drawing could easily be changed after the Department weighs the evidence during rulemaking proceedings.

The Department thus mischaracterizes Plaintiffs' injuries as merely "'complain[ing] . . . that a benefit has been . . . granted to others.'" Opp. 10. Plaintiffs' concrete interests are directly at stake. Nor are Plaintiffs' injuries a "generalized grievance" simply because "tens of millions of borrowers" are also being injured by the Department's failure to follow proper rulemaking proceedings. Opp. 1; *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 n.7 (2016) ("The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance. The victims' injuries from a mass tort, for example, are widely shared, to be sure, but each individual suffers a particularized harm."); *Massachusetts*, 549 U.S. at 526 n.24 ("'To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody.'"). Plaintiffs have standing.

**B.    The Department violated the APA by adopting the Program without following the proper rulemaking procedures.**

**1.** The Department argues that it can avoid its rulemaking obligations as long as it says it is "acting pursuant to the [HEROES] Act." Opp. 12. In other words, the Department appears to believe that it can disregard negotiated rulemaking and notice and comment even if the Debt Forgiveness

Program is *not actually authorized* by the HEROES Act. *See* Opp. 12-13. That is a bizarre argument. The Department does not dispute that the Program is a "rule" under the APA that "must be subject to notice-and-comment rulemaking unless" an exception applies. *Texas v. United States*, 40 F.4th 205, 228 (5th Cir. 2022); Br. 13-14. Nor does the Department dispute that the Program "pertain[s]" to Title IV of the HEA and thus "negotiated rulemaking" presumptively applies. Br. 15; *see also* Opp. 3 (admitting that notice-and-comment and negotiated rulemaking are "otherwise applicable procedural requirements"). The Department's *only* justification for ignoring these rulemaking procedures is its contention that the Debt Forgiveness Program is authorized by the HEROES Act. But if the Act does not apply, then of course the Department cannot invoke it to avoid its rulemaking obligations. Courts presume that Congress does not create loopholes to the rulemaking process. *See United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011) (exceptions to notice-and-comment rulemaking must be "'read narrowly in order to avoid providing agencies with an 'escape clause' from the requirements Congress prescribed'"); *Bauer v. DeVos*, 325 F. Supp. 3d 74, 97 (D.D.C. 2018) (exceptions to negotiated rulemaking are "'to be narrowly construed and only reluctantly countenanced'").

Strikingly absent from the Department's argument is any focus on the text of the HEROES Act. The Department uncritically relies on Section 1098bb(d) of the HEROES Act as excusing the Department from negotiated rulemaking. Opp. 12. But that provision excuses negotiated rulemaking for "waivers and modifications *authorized* or *required* by [the HEROES Act]." 20 U.S.C. §1098bb(d) (emphasis added). So if the Program is not "authorized" or "required" by the HEROES Act, then negotiated rulemaking is required. And that process allows individuals like Plaintiffs to participate both in formulating the rule and in the subsequent notice-and-comment process. *See id.* §1098a(a)(1); *see also The Negotiated Rulemaking Process for Title IV Regulations*, U.S. Dep't of Educ., https://bit.ly/3SCFqFf (in negotiated rulemaking, the Department "obtain[s] advice and recommendations on the issues to be negotiated from the public" and "request[s] . . . public

comments" on the rule that is proposed). Section 1098bb(b) is the only other relevant provision, but it too applies only when the waivers or modifications are "authorized" under Section 1098bb(a). *See Matter of Lopez*, 897 F.3d 663, 670 n.5 (5th Cir. 2018) ("[W]e ought to 'consider the entire text, in view of its structure and of the physical and logical relation of its many parts.'").

Simply put, nothing in the HEROES Act even remotely suggests that the Department can avoid its longstanding rulemaking obligations merely by saying that it is "acting pursuant to the HEROES Act." Opp. 13. If the Debt Forgiveness Program is not authorized by the HEROES Act, then the Department must go through the ordinary rulemaking process.

**2.** Though it tries, the Department cannot avoid application of the major questions doctrine. The Department wisely recognizes that the Program is "a case of economic and political significance." Opp. 22. That puts it mildly. The Program will cost more than 400 *billion* dollars and is enormously controversial. Br. 18. The Department also does not dispute that Congress has "conspicuously and repeatedly declined to enact" similar legislation. *W. Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022); *see, e.g.*, H.R. 6800, 116th Cong. §150117 (2020) (cancelling up to $10,000 of student loan debt for economically distressed borrowers); S. 2235, 116th Cong. §101 (2019) (cancelling up to $50,000 of student loan debt for those who make under $100,000); H.R. 2034, 117th Cong. §2 (2021) (cancelling the outstanding balance on loans for all borrowers under a certain income cap). These facts alone justify applying the major questions doctrine because courts "presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" *W. Virginia*, 142 S. Ct. at 2613.

Contra the Department, Congress's actions postdating the statute at issue are highly relevant under the major questions doctrine. *See, e.g.*, *W. Virginia*, 142 S. Ct. at 2610 (that Congress "conspicuously and repeatedly declined" to adopt a similar regulatory program showed that the Agency had no authority under the Clean Air Act of 1970); *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021) (finding no authority in the Public Health Service Act of 1944 based on recent

failures of Congress to act). Nor did Congress foresee "that the Secretary might discharge student loans under the HEROES Act" through the American Rescue Plan Act of 2021. Opp. 26. That provision of ARPA exempted a broad category of debt discharges from taxation, *see* R. Safier, *Student Loan Discharge: Options to Cancel Your Federal Student Loans*, Student Loan Hero (Aug. 19, 2021), https://bit.ly/3TbBQBY, and makes no reference whatsoever to the HEROES Act, *see* Pub. L. 117-2, §9675, 135 Stat. 4, 186 (Mar. 11, 2021). And legislation seeking to *stop* the Department from acting unlawfully under the HEROES Act obviously does not "show that at least some understand the Act to permit such relief currently." Opp. 25 n.4.

The Department's primary argument is that the major questions doctrine requires a "marked incongruence" between the agency action at issue and "the history, purpose, or context of the statute that purportedly authorizes it." Opp. 22. The Department has no citation for that assertion because that is not the standard. *See W. Virginia*, 142 S. Ct. at 2608; Br. 17-18. Yet the Program satisfies the Department's made-up test in any event. The HEROES Act forms a tiny corner of the Higher Education Act's broad statutory framework. In passing it twice by virtually unanimous voice vote, Congress thought it was doing little more than letting the Secretary relieve active duty military from making student loan payments for a period of time while they are away. Br. 19; *see, e.g.*, 149 Cong. Rec. H2522-26 (Apr. 1, 2003). Despite the September 11 attacks and multiple wars, the Department has *never* used the HEROES Act to cancel a single student's loan debt. And the Department identifies not one legislator who believed that the HEROES Act authorized the Department to do so—yet alone to cancel nearly half a trillion dollars in debt for millions of borrowers. The Department also can point to no other context in which an agency has lawfully adopted a program of similar size, scale, and importance without notice and comment. *Cf. Texas*, 809 F.3d at 146 (affirming preliminary injunction forbidding implementation of DAPA for failing to conduct notice and comment). That is because the baseline presumption is that important and consequential agency actions should be "tested via

exposure to diverse public comment." *Int'l Union v. MSHA*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). Finally, the Department is wrong to claim that the major questions doctrine applies only to "regulation[s] of private parties." Opp. 23; *see, e.g.*, *Kentucky v. Biden*, 23 F.4th 585, 606-08 (6th Cir. 2022) (applying the major questions doctrine to vaccine mandate for employees of federal contractors); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1295-96 (11th Cir. 2022) (same).

**3.** Because the major questions doctrine applies, the Department needed "clear congressional authorization" for the Program. *W. Virginia*, 142 S. Ct. at 2609. The Department cannot come close to meeting this standard. Br. 19-22. Yet the HEROES Act does not authorize the Program even without the major questions doctrine. The Department points to its authority under §1098bb(a)(1) to "waive or modify any statutory or regulatory provision." But the Department downplays a crucial limitation on that power: The Department can act only when necessary to ensure that individuals "are not placed in a worse position financially in relation to [their] financial assistance." 20 U.S.C. §1098bb(a)(2)(A). Here, debt cancellation places individuals in a *better* position. Br. 20. The Department insists that there are some borrowers who will be in a "worse position" because they "face an immediate risk of delinquency or default that did not exist prior to the pandemic." Opp. 19. But this argument renders superfluous the phrase "in relation to that financial assistance." The most natural reading of that provision is that the Department can waive or modify provisions only to ensure that affected individuals' loan balances do not increase, *e.g.*, by deferring loan payments for those individuals affected by a war or national emergency. But the Department cannot *lower* or *eliminate* individuals' loan balances. That interpretation coincides with the legislative history too. Br. 19.

Moreover, the Department has no response to the fact that Congress has adopted multiple laws explicitly authorizing the Department to cancel student loan debt in other circumstances, *see* Br. 20 (listing examples), but it chose not to do so in the HEROES Act. "Where Congress knows how to say something but chooses not to, its silence is controlling." *Animal Legal Def. Fund v. USDA*, 789

F.3d 1206, 1217 (11th Cir. 2015); *see* Scalia & Garner, *Reading Law* 181-82 (2012) ("The familiar 'easy-to-say-so-if-that-is-what-was-meant' rule of statutory interpretation has full force here. The silence of Congress is strident."). If Congress wanted to authorize the Department to cancel student loan debt, it easily could have. Its decision not to speaks volumes.

**4.** Even if the HEROES Act allows some form of debt cancellation—which it does not—the Act still does not authorize the Debt Forgiveness Program. The Program's scope is far too broad and untailored to fit within the HEROES Act. The HEROES Act imposes key limitations on the Department's authority to issue emergency relief. For example, the Department can waive or modify provisions only when "necessary" to ensure that affected individuals "are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." 20 U.S.C. §1098bb(a)(2)(A). And "affected individuals" must "suffer[] *direct* economic hardship as a *direct* result of a national emergency." *Id.* §1098ee(2)(D) (emphasis added). The Program obeys none of these statutory limits. The Department's primary argument is that there are "economically vulnerable borrowers [who] face a high risk of delinquency and default as a result of the pandemic." Opp. 2. But the Program is not remotely tailored to those borrowers. For example, individuals with household income up to $250,000—about 93% of the country—are eligible for loan forgiveness. *See Household Income Percentile Calculator for the United States*, DQYDJ, https://bit.ly/3TvOMTd; *see also Fact Sheet: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*, The White House (Aug. 24, 2022), https://bit.ly/3dATj7p (asserting that all eligible borrowers except those "in the top 5% of incomes . . . will benefit from this action"). And individuals are eligible regardless of their employment status or any other extenuating circumstances. App. 24. Moreover, the Department provides no evidence that its chosen level of debt relief is "necessary" to prevent most eligible individuals—rather than those most at risk—from defaulting on their loans. *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 923 (10th Cir. 2012) (Gorsuch,

J.) ("The word ['necessary'] implies more than something merely helpful or conducive. It suggests instead something 'indispensable,' 'essential,' something that 'cannot be done without.'").

In a last attempt to fit the Program within its HEROES Act authority, the Department points to §1098ee(2)(C), Opp. 16-17, and asserts that most borrowers qualify as "affected individuals" because they "reside[] or [are] employed in an area that is declared a disaster area," 20 U.S.C. §1098ee(2)(C)-(D). As an initial matter, given the context of September 11, the phrase "disaster area" clearly refers to physical destruction within a specific area. Regardless, this provision fails by the Department's own admission because the Program impermissibly extends debt forgiveness to borrowers living abroad during the pandemic. Although the Department ignores this incongruence, about nine million U.S. citizens were living abroad before the pandemic. *Consular Affairs by the Numbers*, U.S. Dep't of State (Jan. 2020), https://bit.ly/3ENOTFr. That is no minor "imprecision." Opp. 18. Instead, it shows that the Department made no serious attempt in crafting the Debt Forgiveness Program to comply with HEROES Act's express limitations.

To be sure, the Department need not exercise its authority "on a case-by-case basis." 20 U.S.C. §1098bb(b)(3). But that does not license the Department to ignore the Act's constraints and issue sweeping debt forgiveness to those not covered by the Act. The Department has no explanation for its failure to tailor the Program to fit the Act's requirements.

Finally, the Department's "evidence" justifying the Program merely exemplifies the absurdity of the Department's process. According to the Department, the Secretary's "judgment was informed by a careful study" of a 13-page memorandum. Opp. 18; *see* Defs' App. 6-20. But this memorandum is dated August 24, *see* Defs' App. 6, and the Secretary's "determin[ation] to exercise [his] discretion under the HEROES Act" was signed at 9:25 am on August 24—the *same morning* he received the memorandum, *id.* at 23. Yet even assuming the Secretary "carefully studied" this memorandum that morning, this document is the thinnest of reeds on which to base a half-trillion dollar debt relief

program. If the Department had gone through the proper rulemaking process, it likely would have received tens of thousands of comments analyzing its proposal and evidence, and the resulting rule likely would have been hundreds of pages long. Congress never would have authorized the Secretary to cancel the debts of tens of millions of borrowers based on an untested, 13-page memorandum.

## II.    Plaintiffs are likely to suffer irreparable harm without a preliminary injunction.

The Department contends that Plaintiffs face no irreparable harm because the Program does not harm them at all. Opp. 26-27. That is wrong, as explained above. *Supra* 2-5. The Department also asserts that Plaintiffs' procedural injuries are not irreparable because "the Secretary could simply call for notice and comment on the parameters of debt relief at a later time." Opp. 27. But Plaintiffs have a right to comment "at an early stage, when the agency is more likely to give real consideration to alternative ideas." *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979). That is why "'many courts have found that a preliminary injunction may be issued solely on the grounds that a regulation was promulgated in a procedurally defective manner,'" *Eli Lilly & Co. v. Cochran*, 526 F. Supp. 3d 393, 408 (S.D. Ind. 2021) (listing cases), a line of cases the Department ignores entirely, *see* Br. 22-23.

Contra the Department, enjoining the Program is the only way to prevent Plaintiffs' injuries. The Department has promised to do nationwide debt forgiveness only "one time." App. 21. If Plaintiffs are not included in the Program, they will be left out by the Department's own admission. Moreover, as with any government program, the Department's capacity for debt forgiveness is surely limited. After nearly half a trillion dollars in student loan debts are cancelled, the odds of Plaintiffs being treated fairly after "[t]he egg has been scrambled" are slim to none. *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002). Restarting the process for everyone is the only way

to remedy the violation of Plaintiffs' procedural rights. Only then can Plaintiffs—and millions of other affected borrowers—express their views at a stage where the agency will fairly consider them.[2]

## III.   The balance of harms and public interest weigh in favor of a preliminary injunction.

As explained, the public would benefit from a preliminary injunction because it will preserve the rights of countless individuals, universities, companies, governments, and others to participate in the rulemaking process, and it will prevent the chaos that will follow if tens of millions are wrongly told that their debts have been lawfully cancelled. Br. 24-25. The Department's only response is that the public interest supports cancelling borrowers' debts "swiftly and without notice-and-comment rulemaking." Opp. 28. But there is "no public interest in the perpetuation of unlawful agency action." *Wages & White Lion Invest. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021). And other borrowers' interests are "outweighed by the potential loss" to Plaintiffs and others who might qualify for forgiveness under a program that was lawfully created. *In re Deepwater Horizon*, 732 F.3d 326, 345 (5th Cir. 2013).

## IV.   The Plaintiffs' requested injunction is proper.

The Department asks this Court to make its order "no broader than necessary to remedy any demonstrated irreparable harm to the two Plaintiffs in this action." Opp. 29. But an injunction limited to just the Plaintiffs would provide no relief whatsoever. The Department would forgive the debts of tens of millions of individuals and then shut down the Program. The Department would never conduct new rulemaking proceedings to determine whether two individuals should have their loans forgiven. That the Court's preliminary injunction would affect other borrowers "misses the point." *Texas v. United States*, 555 F. Supp. 3d 351, 439 (S.D. Tex. 2021). "In determining the appropriate scope of an injunction, the Court's task is to fashion a remedy that prevents the plaintiffs *in this case* from

---

[2] Plaintiffs are not seeking "monetary remedies." Opp. 28. They seek to remedy procedural violations. *See Ass'n of Cmty. Cancer Centers v. Azar*, 509 F. Supp. 3d 482, 500 (D. Md. 2020) ("'A procedural violation can give rise to irreparable harm justifying injunctive relief because lack of process cannot be remedied with monetary damages or post-hoc relief by the court.'").

13

suffering irreparable harm." *Id.* And only an injunction against the entire Program will ensure that Plaintiffs—as well as the millions of others who will be affected by the Program—will "have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas." *U.S. Steel Corp.*, 595 F.2d at 214; *see also Texas*, 809 F.3d at 768-69 (affirming nationwide preliminary injunction based on a notice-and-comment violation); *Dialysis Patient Citizens v. Burwell*, 2017 WL 365271, at *1-6 (E.D. Tex. Jan. 25, 2017) (same); *Ass'n of Cmty. Cancer Centers*, 509 F. Supp. 3d at 504 (same).

Even if a more limited injunction were possible, this relief would "detract from the integrated scheme of regulation created by Congress." *Texas v. United States*, — F.4th —, 2022 WL 5135501, at *19 (5th Cir. 2022). Congress explicitly instructed that the Secretary's "regulations shall be uniformly applied and enforced throughout the 50 States." 20 U.S.C. §1232(c). Broad relief thus is "appropriate to ensure uniformity and consistency" throughout the country. *Texas*, 2022 WL 5135501, at *19.

## V.    At a minimum, the Court should issue an administrative stay to preserve its ability to afford effective relief.

In recent days, the speed with which the Department intends to cancel student loan debts has become clear. The Department has indicated that it will start cancelling student loan debt starting this Sunday, October 23. App. 39.[3] As of Monday, October 17, more than eight million borrowers have applied for debt forgiveness, according to the Department. *See* A. Gangitano, *White House Says 8 Million Americans Have Applied for Student Loan Debt Forgiveness*, The Hill (Oct. 17, 2022), https://bit.ly/3VDAJg0. And that number has surely grown since then. On Monday, the Secretary promised to "mov[e] as quickly as possible to provide relief to as many as possible." *Id.* Thus, the Department could cancel, at a minimum, between $80 billion and $160 billion in student loans as soon

---

[3] The Department previously stated that it would not discharge any student loan debt under the Program before October 17, 2022. *See Nebraska v. Biden*, No. 4:22-cv-1040-HEA, Dkt. 14 at 1 (E.D. Mo. Sept. 30, 2022). The Department then moved that date back to October 23. App. 39.

as this Sunday. App. 23. In addition, the Department has promised to cancel student loan debts for about eight million individuals automatically, without these individuals applying for debt forgiveness. App. 32-33. These cancellations would amount to an additional $80 to $160 billion in debt forgiveness.

In their motion, Plaintiffs requested that the Court invoke its power to "'issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.'" Br. 11 (quoting 5 U.S.C. §705). The Court has "recognize[d] the importance of this case" and indicated its "desire[] to resolve the dispute in an expeditious manner." Dkt. 19. The Court has also scheduled a hearing for Tuesday, October 25.

To preserve this Court's ability to provide effective relief, the Court should issue an administrative stay by Saturday, October 22, before cancellation begins on Sunday, ordering Defendants not to forgive any student loan debt under the Program pending the Court's ruling on Plaintiffs' motion for a preliminary injunction. Such an order is not uncommon. *See, e.g.*, *A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 216 (D.D.C. 2020) (district court granted "an administrative stay to preserve the status quo pending [the Court's] ruling on plaintiffs' forthcoming motion for a preliminary injunction"); *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 396 (5th Cir. 2020) (Fifth Circuit "granted a temporary administrative stay to consider carefully the motion for stay pending appeal") (citing *id.*, 2020 WL 2616080 (5th Cir. May 20, 2020)); *see also Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 2018 WL 6252409, at *1 (W.D. Tex. Nov. 6, 2018) ("[T]he court concludes that to prevent irreparable injury a stay of the Rule's current compliance date of August 19, 2019, is appropriate." (citing 5 U.S.C. §705.)). Such relief would preserve the Court's ability to award full relief, be minimally disruptive, and provide the Court with sufficient time to weigh these important issues.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

Dated: October 20, 2022

*/s/ J. Michael Connolly*

J. Michael Connolly (VA Bar No. 77632)
James F. Hasson (TX Bar No. 24109982)
Matthew Pociask* (IL Bar No. 6336568)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Tel: (703) 243-9423
Fax: (703) 243-9423
mike@consovoymccarthy.com
james@consovoymccarthy.com
matt@consovoymccarthy.com

Steven C. Begakis (VA Bar No. 95172)
CONSOVOY MCCARTHY PLLC
Fort Worth, TX
Tel: (703) 243-9423
Fax: (703) 243-9423
steven@consovoymccarthy.com

*Admitted in Illinois, but not Virginia.
Supervised by principals at firm.*

*Counsel for Plaintiffs*

16

## CERTIFICATE OF SERVICE

I certify that on October 20, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System and will serve a copy on each of the Defendants according to the Federal Rules of Civil Procedure.

*/s/ J. Michael Connolly*
J. Michael Connolly