```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF TEXAS

 3                     FORT WORTH DIVISION

 4  MYRA BROWN AND              )    CASE NO. 4:22-CV-00908-P
    ALEXANDER TAYLOR            )
 5                             )
                               )    FORT WORTH, TEXAS
 6  vs.                         )
                               )    OCTOBER 25, 2022
 7  U.S. DEPARTMENT OF          )
    EDUCATION, ET AL            )    9:03 A.M.
 8                        VOLUME 1
 9            TRANSCRIPT OF TEMPORARY INJUNCTION
             BEFORE THE HONORABLE MARK T. PITTMAN
10            UNITED STATES DISTRICT COURT JUDGE

11  A P P E A R A N C E S:

12
    FOR THE PLAINTIFFS:    J. MICHAEL CONNOLLY
13                         MATT POCIASK
                           STEVEN CHRISTOPHER BEGAKIS
14                         Consovoy McCarthy, PLLC
                           1600 Wilson Blvd.
15                         Suite 700
                           Arlington, Virginia  22209
16                         Telephone:  703.243.9423

17  FOR THE DEFENDANTS:    BRIAN DAVID NETTER
                           KATE TALMOR
18                         SAMUEL REBO
                           U.S. Department of Justice
19                         Civil Division
                           950 Pennsylvania Avenue NW
20                         Washington, D.C.  20530
                           Telephone:  202.514.2000
21
    COURT REPORTER:        MONICA WILLENBURG GUZMAN, CSR, RPR
22                         501 W. 10th Street, Room 310
                           Fort Worth, Texas  76102
23                         Telephone:  817.850.6681
                           E-Mail:  mguzman.csr@yahoo.com
24
    Proceedings reported by mechanical stenography, transcript
25  produced by computer.
```

1                              <u>**INDEX**</u>

2                                        PAGE   VOL.

3

4     Appearances ................................3      1

5

6     Argument by Mr. Connolly ...................8      1

7

8     Response by Mr. Netter .....................49     1

9

10    Rebuttal by Mr. Connolly ...................91     1

11

12    Court's Ruling Withheld ....................99     1

13

14    Proceedings Adjourned .....................100     1

15

16    Reporter's Certificate ....................101     1

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

*(October 25, 2022, 9:03 a.m.)*

1    *THE COURT:*  We're here in Civil Action Number
2  4:22-CV-908, Myra Brown and Alexander Taylor vs. the United
3  States Department of Education and Miguel Cardona as Secretary
4  of Education.

5        This matter comes today on a couple of different
6  things.  We have a motion for preliminary injunction that the
7  plaintiffs have filed.  We also have a motion to dismiss for
8  lack of jurisdiction filed on behalf of the United States
9  entities.

10        I know that my order did not specify that we are
11  going to be hearing the jurisdictional motion, but I think it
12  would be very helpful to me if we could hear argument on the
13  standing issue.

14        Does anyone have an objection with going forward on
15  that?

16    *MR. CONNOLLY:*  No, Your Honor.

17    *THE COURT:*  All right.

18    Is the Government prepared?

19    *MR. NETTER:*  Yes.

20    *THE COURT:*  Okay.  Then let's make some appearances
21  on the record, and then we'll go from there.  Beginning with
22  counsel for the plaintiffs, who do we have?

23    *MR. CONNOLLY:*  Good morning, Your Honor.  Michael

1    Connolly for the plaintiffs.  With me is Matt Pociask and

2    Steven Begakis.

3            *THE COURT:*  Thank you, gentlemen.

4            And for the Government?

5            *MR. NETTER:*  Good morning, Your Honor.  Brian Netter

6    for the defendant.  I'm joined by Kate Talmor and Samuel Rebo.

7            *THE COURT:*  One more time, I was writing.

8            Mr. Netter, who are the other attorneys?

9            *MR. NETTER:*  This is Kate Talmor.

10           *THE COURT:*  Okay.

11           *MR. NETTER:*  And Samuel Rebo.

12           *THE COURT:*  Is this going to be all legal argument

13   today or are we expecting any witnesses?

14           *MR. NETTER:*  No witnesses from the United States.

15           *MR. CONNOLLY:*  No witnesses from us either.

16           *THE COURT:*  Okay.  And that's good, because I

17   probably didn't have time to hear a lot from witnesses today.

18   And I do apologize for sending out the order, not only

19   requiring the quick responses from the United States, but also

20   issuing time deadlines.  We are extremely busy.  I don't think

21   I have a date where I'm not in court between now and

22   Christmas, between trials and hearings.

23           We have the -- at least anecdotally, we have the

24   busiest division in the entire country with only two active

25   judges, based on population.  And it's only getting busier and

1  busier, unfortunately.  And it's very hard sometimes to keep

2  up.  So, I do have to enforce strict time deadlines.  But I'm

3  assuming that we're not going to be here for five hours today.

4      MR. NETTER:  *(Shakes head)*

5      THE COURT:  Well, that's good.

6      Some questions that I want you to bear in mind while

7  we make our argument today.  Some of the things that I'm

8  concerned about as a judge are, number one, what's the status

9  of some of the other cases that are out there challenging the

10  student loan forgiveness program.  Obviously I'm familiar with

11  the Eighth Circuit case.  I'd like for you-all to address that

12  and tell me what the status is.  At least, from what I've been

13  able to determine, briefing has been submitted.

14      I know there are a few other cases out there, I

15  don't know what the status of those are.  It's my

16  understanding that this may be the only case that doesn't

17  involve some governmental entity suing a Federal Government

18  entity.  I'd like for you-all to be able to enlighten me on

19  that.

20      And finally, I think one of the things that I do

21  have a lot of questions with that would be helpful for me, I

22  know you have your arguments organized, but the -- the

23  standing issue and whether the two individuals we have here,

24  Ms. Brown and Mr. Taylor, with regards to obtaining a loan

25  from a private entity, in the case of Ms. Brown, is enough to

1    get you there, as far as standing and whether or not

2    qualifying for the Pell Grant gets you there, in the case of

3    Mr. Taylor.  I may have those confused.  But that's going to

4    be an area that I would like for you to pay some particular

5    focus on.

6            And then, obviously, we have the legal issues

7    related to the HEROES Act and the factors under the

8    preliminary injunction.  But those are some of the things that

9    are bouncing around in my head.

10           Finally, I think I would like to know what sort of

11   time crunch or time deadline that I am on to get out a

12   decision one way or another.  My understanding, and I don't

13   know this to be true, this is also purely anecdotal, is that

14   although the time deadline has passed to sign up for the loan

15   forgiveness program, the United States does not intend on

16   acting on any of those applications until sometime in

17   November, or maybe December, but I don't know.  This is just

18   me trying to do my own research and that's never very good.

19           How would you-all like to organize it?  Should I

20   begin with plaintiffs or should I begin with the United States

21   to address the jurisdictional motion that it filed?

22           In my mind, I sort of think that it's best for the

23   plaintiffs to go first to address both of those, but I'll --

24   if you-all are able to talk and get along, we can separate it.

25   We have plenty of time today, and you can address it how you

1    want.

2           Counsel, I know you want to speak.  Go ahead,

3    Mr. Connolly.

4           MR. CONNOLLY:  That is fine with us, for the

5    plaintiffs to go first.

6           THE COURT:  What's the thoughts of the United

7    States?

8           MR. NETTER:  We're fine with that, Your Honor.

9           THE COURT:  Okay.  Well, then, I'll begin with you,

10   Mr. Connolly.  And I will do my best not to interrupt with too

11   many questions.

12          MR. CONNOLLY:  And I'm happy -- happy to answer

13   anything, any questions you may have.

14          THE COURT:  And I'll just warn you, this is a very,

15   very old courtroom and we have terrible acoustics.  If you

16   can't hear me, just waive.  And Monica will be sure and

17   admonish you if she can't hear.  So, be sure to speak into

18   your microphone.

19          MR. CONNOLLY:  Thank you.  I'll make sure to do

20   that.

21          THE COURT:  All right.  Go ahead.

22          MR. CONNOLLY:  And I'll make sure to address, during

23   this argument, the four -- the four points that you raised.

24          THE COURT:  All right.

25          And you can weave it in and out of your argument in

1   no particular order.  But those -- it behooves me to give you

2   some of the things that I'm thinking of and trying to work out

3   in my mind.

4           MR. CONNOLLY:  Excellent.

5           THE COURT:  Go ahead.

6           MR. CONNOLLY:  Thank you.

7           May it please the Court.  Michael Connolly for the

8   plaintiffs, Myra Brown and Alexander Taylor.

9           The Department of Education is asking this Court to

10  make two truly extraordinary findings.  First, the Department

11  wants this Court to believe that Congress authorized the

12  Secretary of Education to cancel $400 billion in student loan

13  debt through the HEROES Act, which was a tiny and

14  uncontroversial piece of legislation that was designed

15  primarily to help soldiers defer their loan payments while

16  fighting abroad.

17          Second, the Department tells this Court that

18  Congress not only gave the Department this extraordinary

19  power, but it wanted one person, the Secretary of Education,

20  to create this debt forgiveness program with no public

21  involvement at all.

22          These two arguments contradict everything the

23  Supreme Court has told us about the separation of powers and

24  about agency authority.  Under the major questions doctrine,

25  agencies can take these types of extraordinary actions --

1  cannot take these types of extraordinary actions without clear

2  Congressional authorization.  Moreover, the baseline

3  presumption is that agency action, especially those with

4  enormous significance, must go through the notice and comment

5  process so that the public can be involved in these important

6  decisions.

7          The Court should grant our motion for a preliminary

8  injunction and stop this enormous abuse of executive

9  authority.

10         Now, I'd like to start first with standing.  What

11  Fifth Circuit and Supreme Court precedent tells us is that

12  there are two requirements here.  First, when the plaintiff is

13  alleging a procedural violation, it has to show that it has --

14  that the plaintiff has concrete interest at stake.  And

15  second, the plaintiff needs to show that if he receives the

16  relief from the Court that he is asking for, that there is

17  some possibility that the agency will change its decision.

18         The Fifth Circuit, in *Texas vs. EEOC*, explicitly

19  called these, lighter requirements, in the standing context,

20  when it comes to procedural injuries.  Here we meet both of

21  those requirements.

22         First, on the concrete interest.  The Department of

23  Education is pursuing a program of debt forgiveness.  My

24  clients both have student loans and they are being -- their

25  student debt is not being forgiven under the program.  So they

1    have concrete interests at stake.  These are not individuals,

2    you know, a random person from the public who is upset with

3    what the Department is doing.  These are individuals who have

4    student loans, and so they have concrete interests at stake.

5         This is no different from, for example, the Fifth

6    Circuit's decision in *Ecosystem*, where a company was denied,

7    because of procedural violation, the opportunity to pursue a

8    benefit.  It's very similar to *Paulsen* in the Ninth Circuit,

9    which is when -- because of a procedural violation, prisoners

10   were ineligible to receive early release.  So, in both of

11   those cases, just like here, the plaintiffs had concrete

12   interests and they were made ineligible because of the --

13   because of the -- because of the agency's actions.

14        And what the Supreme Court also tells us, is the

15   fact that lots of others have this err -- or sorry, have this

16   injury, because there are millions of others like Ms. Brown,

17   for example, who has private loans that are not being

18   forgiven.  That is not a relevant inquiry for standing,

19   because, as the Supreme Court said in *Massachusetts* and it

20   said in *Spokeo*, if that were the case, the fact that others

21   have this injury, then that would mean that Government actions

22   that are unlawful could never be challenged in court because

23   it affects lots of other people.

24        So, on the first part, the concrete interest, we

25   have standing.  My clients have student debt relief -- or have

1    student debts that are not being forgiven.

2           Second, on the second inquiry.  Is there some

3    possibility, and it's -- that's a super low standard, as the

4    Fifth Circuit would say, is there some possibility that the

5    Department of Education will change its decision if this -- if

6    they go through notice and comment.  And there unquestionably

7    is.  And, in fact, in their opposition, the Department of

8    Education does not even make an argument that there is not any

9    possibility that they will change their decision.  And they --

10   they don't make that argument for good reason.

11          *THE COURT:*  There seems to be a line of cases, and

12   an *EEOC* case out of the Fifth Circuit, you mentioned this,

13   seems to suggest that when it comes to standing analysis for

14   preliminary injunctive relief, like we have here, it's

15   incumbent on the Court to assume that it has jurisdiction and

16   assume that the claim that the plaintiff is bringing on the

17   merits is correct.  Is that -- am I correctly stating the law?

18          *MR. CONNOLLY:*  That is correct.  The Court -- the

19   Court should assume that we are correct on the merits that our

20   procedural rights were violated.

21          *THE COURT:*  All right.  Go ahead.

22          *MR. CONNOLLY:*  So, there is, unquestionably, some

23   possibility that if this goes through notice and comment, that

24   the Department will change its decision and adopt a program

25   that actually helps my clients.

1          *THE COURT:*  Well, let me ask you a question.  And

2     please don't state anything that you think might -- I don't

3     know, are you-all representing any of the other groups?

4          *MR. CONNOLLY:*  No.

5          *THE COURT:*  Okay.  What would be the difference in

6     your clients versus, let's say, a state attorney general.  And

7     we've seen a plethora of cases coming out recently saying that

8     state actors don't have standing to bring these types of

9     claims.  What makes your clients unique?

10          Wouldn't the argument be, they don't have Federal

11     student loans, therefore, they don't have a dog in the hunt?

12          *MR. CONNOLLY:*  Yeah.  What you would have to look

13     at, is you'd have to look at the case that the states brought

14     and see if they have any concrete interests at stake.  And,

15     you know, my understanding from the states' opinion -- the

16     states' action that was filed in the Eastern District of

17     Missouri and is on appeal in the Eighth Circuit, is that they

18     found that they have no standing, the states have no injury.

19          This is different.  Our plaintiffs have concrete

20     interests at stake.  They are individuals who are being left

21     out of the loan forgiveness process.  And so, they clearly

22     have concrete interests at stake.  And you don't have -- this

23     Court doesn't have to reach all of the complicated issues that

24     were going on in *Nebraska vs. Biden*, those are -- those are

25     different.  Here we have -- we have -- we do have concrete

1    interests at stake, because they have student loans that are

2    not being forgiven under -- under the program the Department

3    has adopted.

4           And on -- on whether there's some possibility that

5    the Department will change its mind, there's -- not only is

6    there some possibility, there's a strong possibility.  First,

7    the Department clearly believes, and it says this in its

8    brief, that it has the authority under the Higher Education

9    Act to do this program.

10          The only reason it didn't rely on that authority is

11   because it didn't want to go through negotiated rulemaking and

12   it didn't want to go through the notice and comment process.

13   So, if this Court finds that they don't have the authority

14   under the HEROES Act, there is a strong, strong possibility

15   that they are going to use their authority under the Higher

16   Education Act to -- to start the debt forgiveness program

17   through that authority.

18          And not only do they believe it, but there are

19   multiple commentators that we filed, law review articles, that

20   said that they have this authority as well.  The only reason

21   they didn't do it, they didn't rely on that authority, was

22   because they wanted to avoid their rulemaking obligations.

23          So, there's -- if we receive the relief we want,

24   they will do this, they will almost certainly go through the

25   rulemaking process to start over the debt forgiveness program.

1   And there is some possibility that my clients will have --

2   that their decision will change.

3          On the private loan, for more than a month, the

4   Department of Education was telling individuals with private

5   loans that you can obtain debt relief simply by consolidating

6   the loans.  And it appears that -- and they changed that

7   requirement on the eve of when the state filed.  And it

8   appears that the only reason they did that was to make sure

9   that the states didn't have standing in their challenge as to

10  the loan forgiveness program.

11         So, under a different scenario, where this goes

12  through notice and comment, there is clearly a chance that

13  they could bring that program back and cover my client's,

14  Ms. Brown's, private loans through a debt forgiveness program.

15         For Mr. Taylor, he -- he has been left out of the

16  $20,000 in forgiveness.  And that is based -- their

17  eligibility requirements are based on the most arbitrary

18  reasons.  They have held -- or they are doing this based on

19  the fact that when Mr. Taylor was in high school, his parents'

20  family income did not qualify him for a Pell Grant.

21         As we talked about in other briefs, you know,

22  Mr. Taylor makes less than $25,000 a year.  You could easily,

23  easily envision a program, if that goes through notice and

24  comment and where the Department says, All right, we're going

25  to decide debt forgiveness based on, for example, the amount

1    of income you make.  And so, you could easily envision a

2    program where Mr. Taylor's debt is being forgiven, where it

3    isn't now.

4              And if you look at cases like *Ecosystem* and the

5    Texas case, the courts talk about what a low, low standard

6    this is.  And I believe in *Ecosystem* the Fifth Circuit said,

7    you know, it's not even likely that the Court -- that the

8    agency will change its mind, but it's still possible.  And the

9    Fifth Circuit said that's enough for standing in the

10   procedural context.

11             So -- so, you know, I know standing has been an

12   issue in other cases.  We have a very straightforward and easy

13   to resolve way of proving -- of proving our standing.

14             So, if there aren't any other questions on standing,

15   I'll move to the -- to our APA claim.

16             *THE COURT:*  That's fine.  Go ahead.

17             *MR. CONNOLLY:*  There are a few things that are

18   undisputed here.  But for the HEROES Act, the Department never

19   disputes that the program that they have adopted is a rule,

20   it's a legislative rule.  And that's because it grants rights,

21   it imposes legal obligations, it's obviously a legislative

22   rule.  It also plainly conflicts with their current

23   regulations.  And that's another reason why, under case law,

24   it's a legislative rule.

25             The Department also doesn't dispute that, but for

1  the HEROES Act, they would have been required to go through

2  negotiated rulemaking.  And that is because the -- the

3  substance of what they were doing pertains --

4       *THE COURT:*  Let's go ahead and talk about the

5  elephant in the room, and that's the HEROES Act.  I mean, I

6  don't -- at least I don't expect the United States to come up

7  to the podium and try to argue that the HEROES Act, based on

8  its plain language and intent, was anything other than an act

9  that was directed at service people during the time of war and

10  national emergencies.

11       I'm not sure that the language in the HEROES Act or

12  the intent behind it gets you there when it comes to any and

13  every American.  So, that's one of the things that I'd like

14  for you-all to concentrate on when we make the argument today.

15       I mean, am I correct?  Is that your understanding,

16  the reason why Congress passed the HEROES Act, in light of the

17  September 11th and the Iraq and Afghanistan wars?

18  Specifically, we had situations where we had servicemen and

19  women that were reserve-type situations who were called upon

20  to do their duty for their country and may have been in

21  situations where they needed some economic relief.  Am I

22  correctly stating, in general, what a layman would say the Act

23  was passed for?

24       *MR. CONNOLLY:*  That is absolutely correct, Your

25  Honor.  The legislative history we cite, that's all over the

1    legislative history.  It's what Congressmen -- it's what

2    legislatures were thinking.

3            THE COURT:  And, obviously, legislative history is

4    not always the best indicator as to why the Act was passed.

5            But just, if I was to ask someone in a high school

6    civics class the purpose of the HEROES Act, I'm thinking they

7    would give a definition along the lines that I just gave.

8            MR. CONNOLLY:  I think that's right, Your Honor.

9            And not only the legislative history, which confirms

10   it, but if you just -- if you read the findings.  The findings

11   in the statute of why they're doing it.

12           THE COURT:  Yeah.

13           MR. CONNOLLY:  Congress says our men and women are

14   fighting overseas, we'll do everything we can for our

15   military, and they're -- they're put in straits when they're

16   asked to -- to continue -- they've left their jobs, they've

17   left their homes and they're put in dire straits when they're

18   off fighting abroad and they're asked to continue paying --

19   making loan payments; and therefore, we're going -- we're

20   doing something to make sure that they can have their -- their

21   loan payments deferred while they're off fighting abroad.  So,

22   you're 100% accurate, correct, about the purpose behind the

23   HEROES Act.

24           And before I quite get to the meaning of the HEROES

25   Act and why it doesn't apply, I want to make sure to knock out

1   one argument that I think that they make, and it's really a

2   curious argument.  The way I read their brief, I read them to

3   be saying, even if the HEROES Act does not apply, as long as

4   we say that we are acting under the HEROES Act, then we can

5   waive notice and comment and we can waive negotiated

6   rulemaking.  And that makes absolutely no sense at all.

7   Congress never would have drafted such a loophole to the

8   negotiated rulemaking process and the notice and comment.

9           There are a litany of cases --

10          THE COURT:  If that's true, that certainly would

11  seem to give the executive branch unfettered legislative

12  authority that I'm not sure the Constitution contemplates.

13          But anyway, go ahead.

14          MR. CONNOLLY:  Yes, I agree.

15          And -- and there are cases that say, over and over,

16  from the Fifth Circuit and elsewhere, that say, we -- you

17  know, we are very hesitant to trust the agency's assertions

18  that it can avoid notice and comment.  The case *Azar vs.*

19  *Allina Health* from the Supreme Court, it says you don't look

20  at the labels of what an agency says to avoid notice and

21  comment, you look at the substance.

22          And not only that, just as a matter of common sense,

23  there's nothing in the text of the HEROES Act that allows them

24  just to say that they're acting under the HEROES Act, and then

25  to avoid their rulemaking obligations.  So, for example, 1098,

1  paragraph D, it says, The negotiated rulemaking process does

2  not apply for waivers and modifications that are authorized or

3  required by the HEROES Act.  And so, if the program is not

4  authorized or required by the HEROES Act, then they,

5  obviously, can't move or they can't avoid their rulemaking

6  obligations.

7          And so -- and negotiated rulemaking necessarily

8  requires notice and comment.  And so, really, when this comes

9  down to it, is the main question here is sort of the one we

10  began with.  The Department has adopted a broad program of

11  debt forgiveness.  And they didn't go through rulemaking --

12  they didn't go through notice and comment, they didn't go

13  through the negotiated rulemaking process.

14          THE COURT:  Let's go off the record momentarily.  I

15  need to look at this order.  I apologize for interrupting.

16              (Brief pause)

17          THE COURT:  Go ahead, Mr. Connolly.  You were

18  telling us about the HEROES Act and what authority this gives

19  the Secretary of Education.

20          MR. CONNOLLY:  Yes.  So, what we have here is the

21  Department has adopted a program of loan forgiveness.  It's

22  clearly a rule and they clearly did not follow the negotiated

23  rulemaking process.  So, what it comes down to, the real

24  question here is, Can they fit this program within their

25  authority under the HEROES Act?

1            THE COURT:  All right.

2            So, the HEROES Act gives the Secretary of Education

3    the authority to modify any provision of Title 7; is that

4    correct?

5            MR. CONNOLLY:  It gives --

6            THE COURT:  I'm sorry.  Title 4, right?

7            MR. CONNOLLY:  Yes.  To issue waivers and

8    modifications.

9            THE COURT:  To issue waivers, modifications, go

10   without notice and comment.  What -- what provision in this

11   case is the Government contending that the Secretary is

12   modifying under Title 4?

13           That was something that I had a question about.  I

14   guess that's probably a better question for the Government.

15           MR. CONNOLLY:  Yes.  I -- I believe that what they

16   are saying, there are regulations that make it clear that --

17   that individuals have to pay back their loans.

18           THE COURT:  Yeah.

19           MR. CONNOLLY:  And so, I believe the Government's

20   argument is --

21           THE COURT:  Okay.  So, here's a question for you,

22   How does the Federal Claims Collection Act come into play?

23           MR. CONNOLLY:  I'm sorry?

24           THE COURT:  How does the Federal Claims Collection

25   Act come into play?  Does that have any role in this decision

1    by the Administration?

2              *MR. CONNOLLY:*  Yeah.  So, in the -- in the

3    Department of Education's regulations, they adopted -- they

4    incorporated those -- they incorporated those standards into

5    their regulations right now.  So, under our reading, they

6    cannot -- they cannot engage in a -- a program of debt relief

7    until they adopt a new regulation to get rid of those -- of

8    those regulations.  So, that incorporates the FCC Act there.

9              So, and I think -- I think the big -- the big

10   picture here that we have -- that we have to think of first,

11   is -- and this is how the Supreme Court instructed us recently

12   to look at it in *West Virginia*, is, Does the major questions

13   doctrine apply?  And the Supreme Court has said this is a

14   critical method of statutory interpretation, because it

15   preserves the separation of powers.  And what it says is that

16   it is the legislature's job, it's the people's job, to come up

17   with these types of really important bills or agency actions

18   or programs.  That role relies -- under our system of

19   Government, lies with Congress.

20             And so, the Department -- the Department of

21   Education -- the Department tries to say that the major

22   questions doctrine does not apply, and it's really not even a

23   close call for a number of reasons.  First, this is a program

24   of unbelievable economic significance.  It will cost nearly

25   half a trillion dollars.  That is an enormous amount of money

1    for one agency to be -- to be dealing with.

2          Second, this is a case of enormous political

3    significance.  If you pick up any paper in the country or

4    watch -- or any hotly contested election, this is an issue

5    right now that is hotly debated all over the country.  And

6    what the Supreme Court says is that these issues of political

7    significance should be resolved by Congress, not by an agency.

8          *THE COURT:*  So, being the devil's advocate, why

9    wouldn't you also argue that you shouldn't come to the guy in

10   the black robe and -- because this is a political issue in

11   election time and, you know, judges are all too often used to

12   resolve political debates.  It's a shame that we've gotten to

13   this situation in our country.  I don't know who to blame,

14   whether it's the guys in the black robe, whether it's social

15   media, whether it's media, whether it's the contentiousness

16   that we have in our country in general.

17         Could you make an argument that maybe the Judge

18   shouldn't get involved here?

19         *MR. CONNOLLY:*  What the Supreme Court has told us in

20   cases like *West Virginia* and some of the vaccine mandates and

21   what were really -- really thoughtfully and eloquently put in

22   some of the concurrences by Justice Gorsuch, is the major

23   questions doctrine is a way of preserving this.  It is a way

24   of preserving the separation of powers and making sure that it

25   does lie with the people.

1          So, the Supreme Court has made it very clear that

2     this, for better for worse, is a role of the courts.  The

3     courts have to get involved when the unelected agencies try to

4     capture what rightfully belongs to Congress and do these

5     agency actions of enormous political and economic

6     significance.  The Supreme Court in *West Virginia* this summer

7     made that absolutely clear that -- that courts cannot shy away

8     from this -- this duty.

9          My third point is for why the major questions

10    doctrine applies.  Congress failed -- has failed to do this.

11    COVID 19 has been going on for more than 2 1/2 years.  This is

12    an issue everybody is aware about.  Multiple bills have

13    passed -- have failed to pass.  Which the Supreme Court, in

14    the major questions doctrine cases, says is a relevant factor

15    in deciding whether to apply the major questions doctrine.

16         So, Congress knows that this is an issue and it has

17    decided not to act.  And so the agency cannot now take it upon

18    itself to do what Congress has decided not to do.

19         Fourth, in the history -- in the entire history of

20    the HEROES Act, there is not a single instance, not one, of

21    the Department of Education using its power to cancel student

22    loan debt.  Again, the Supreme Court has said you look to the

23    history of agency actions here when deciding whether the major

24    questions doctrine applies.

25         Fifth, again, what I would say is the legislative

1    history again is -- is entirely on -- on point here.  They

2    don't have a single legislator saying that -- even remotely

3    suggesting that this type of thing would be possible under the

4    HEROES Act.

5           And finally, the context.  I -- we could not think

6    of one, the Department has not cited one.  There's not a

7    single rule of such unbelievable importance where -- of

8    similar unbelievable importance where Congress said, Yeah, one

9    person, without any public involvement, can go ahead and pass

10   a program this size.  It's -- it's -- it doesn't happen.

11          So, when you look at all six of those factors, it's

12   clear that the major questions doctrine applies.  And when the

13   major questions doctrine applies, this Court's role or task

14   becomes pretty simple.  It looks at the HEROES Act and says,

15   Do I see clear Congressional authorization for this -- for the

16   debt forgiveness program?  And there is, without a doubt, not

17   clear Congressional authorization.

18          But even if the major questions doctrine didn't

19   apply, and we obviously believe it did, there's still nothing

20   in the HEROES Act that justifies the debt forgiveness program.

21          *THE COURT:*  All right.  Let me prod you a little

22   bit.  We have President Trump declare COVID-19 to be an

23   emergency.  So, if we have a presidential declaration saying

24   that we're in an emergency, why can that not be used as a

25   prong under the HEROES Act to do -- forgive the debt?

1          *MR. CONNOLLY:*  So --

2          *THE COURT:*  Does the emergency declaration have to

3    be rescinded?

4          *MR. CONNOLLY:*  No.  So, you know, that is -- that

5    is -- it's sort of a -- that's more of a tricky argument, to

6    be sure.  Because the HEROES Act does say -- does reflect

7    the -- you know, whether a presidential -- when the President

8    has declared a national emergency.

9          The point we would make is that you look, again, at

10   the context of this statute.  That in the nature of the

11   September 11th attacks, when they're referring to a disaster,

12   Congress clearly had in mind --

13         *THE COURT:*  No, I get it.

14         *MR. CONNOLLY:*  Yeah.

15         *THE COURT:*  But let's say that the HEROES Act does

16   apply.  I know you're saying that it doesn't, it only applies

17   to servicemen and women.  Let's say that it -- I make a

18   finding that it does apply and it does govern this situation

19   and we have at least a declaration from three years ago that

20   COVID-19 was a national emergency.  I think it's worth adding

21   that we also have President Biden saying that the pandemic has

22   ended, several months ago.

23         Tell me why -- if I make a finding that the HEROES

24   Act does apply and we have a declaration saying COVID-19 is a

25   national emergency, how come you still win?

1          *MR. CONNOLLY:*  The reason we still win is that that

2     is only one of a host of other -- of multiple factors that the

3     Department has to satisfy.  So, on that national -- on that

4     disaster area point, they haven't limited this to just the

5     disaster area, to just the United States.  They've included

6     every single person with student loans.

7          *THE COURT:*  So, if you're a foreign national with a

8     student loan from the United States, you don't have to pay

9     that back.

10          *MR. CONNOLLY:*  I'm -- I'm -- I'm not sure.

11          *THE COURT:*  I don't know enough about how the

12     student loan program works.  It's been a long time since I've

13     had one.

14          *MR. CONNOLLY:*  Yeah, I'm not sure about that.  What

15     I would say is, if there were individuals who had student

16     loans and then went abroad during the pandemic -- and we cited

17     in our papers there were about nine million individuals who

18     were living -- who were living abroad -- they were not in a

19     disaster area under the statute.  And yet the Department of

20     Education is forgiving their loans.

21          And that just -- it shows a broader point of what's

22     happening.  What's happening is they -- they're reverse

23     engineering this.  They created the debt forgiveness program

24     that they wanted to do.  It applies to 95% of the country.

25     The -- only the top 5% of income represented in this country.

1    And so it applies to everybody.  It applies whether or not you

2    are living in the country at the time.  And now they are

3    trying to fit it within their HEROES Act authority.  And it

4    just doesn't work.

5         And so, the parameters, even if you assume that they

6    have the power to cancel debt, the parameters of what they

7    have done is so broad and it's so untailored that it doesn't

8    fit within their authority in the HEROES Act.  But I would go

9    a step further and say, they don't even have the power to

10   cancel student loan debt.  And under the --

11        *THE COURT:*  Well, couldn't I use the argument and

12   the justification the Government is making, for instance, if

13   the Administration woke up tomorrow and said, We want to

14   forgive all loans given pursuant to the various Federal

15   agricultural programs to American farmers, we can do that

16   under the HEROES Act because there was a national emergency,

17   without notice and comment?

18        *MR. CONNOLLY:*  I don't believe they could do that,

19   because it would not fall --

20        *THE COURT:*  No, I'm saying, could you use the same

21   justification the Government is using to do that?

22        *MR. CONNOLLY:*  I might not be following your

23   question.

24        *THE COURT:*  I'm concerned about some of the same

25   things that you brought up.

1          *MR. CONNOLLY:*  Okay.

2          *THE COURT:*  You can stretch the HEROES Act to where

3     it's such a rubber band that it either breaks or it stretches

4     so far it's meaningless.

5          *MR. CONNOLLY:*  Yes.

6          *THE COURT:*  And could I extrapolate using the

7     Government's reasoning and justification under the HEROES Act

8     or Student Loan Forgiveness Program to apply to other

9     government loan systems, such as the various programs that we

10    have for farmers under the Department of Agriculture?  Because

11    there was a national emergency, any loan received by a farmer

12    during the period of the COVID-19 pandemic can be forgiven

13    under -- using the HEROES Act as justification.

14         *MR. CONNOLLY:*  Right, right.

15         *THE COURT:*  And that's just an example.

16         *MR. CONNOLLY:*  Yeah, and I agree.

17         What they have done is they have -- their argument

18    is that as long as -- as long as they can pick out, you know,

19    some people here and there, where maybe they would have

20    authority under the HEROES Act, to -- to do something to help

21    them, then they can be as broad as they want.  And they can --

22    they can pass this debt forgiveness program for 95% of the

23    country.  And that -- that just -- you cannot square that with

24    how the HEROES Act is drafted and how it's defined.

25         And the last point I'll make on this is, you know,

1   we cited provisions in -- various provisions of the Higher

2   Education Act in our brief where Congress explicitly gave the

3   Department the power to cancel debt.  And when they do it,

4   they're explicit, they don't hide the ball.  They use words

5   like, forgive debt and cancel debt.  And Congress did not do

6   that here.  And that silence really speaks volumes here.

7            So, you know, in sum, I think we're -- I think

8   there's a strong, strong likelihood that we're going to

9   prevail on the merits here.  It's because they were obligated

10  to go through the negotiated rulemaking process, to go through

11  notice and comment and they failed to do that and their only

12  justification, the HEROES Act, gives them absolutely no leg to

13  stand on to avoid their long, long-standing of rulemaking

14  obligations.

15           On irreparable harm, we -- the case law is rock

16  solid for us.  We prevail for two reasons.  First, the case

17  law is clear that when you are denied your procedural rights

18  to participate in a rulemaking for notice and comment, for

19  example, that is irreparable harm when they go ahead --

20           *THE COURT:*  So, when you're denied the meaningful

21  opportunity to give notice and comment under the APA, that

22  qualifies under the case law as irreparable harm; is that

23  correct?

24           *MR. CONNOLLY:*  Correct.

25           *THE COURT:*  What's your best case for that

1    provision?

2         *MR. CONNOLLY:*  The cases I would refer you to are:

3    *Eli Lilly vs. Cochran*, 526 F.3d 393 *(sic)*, says, That many

4    courts have found that a preliminary injunction may be issued

5    solely on the grounds that a regulation was promulgated in a

6    procedurally defective manner.  And that lists -- that lists a

7    number of cases.  And that says, That is because the purpose

8    of the notice and comment requirement is to permit regulated

9    entities to influence rulemaking at the beginning of the

10   process and not simply after rules are already in place, at

11   which point the agency is far less likely to be receptive to

12   comment.

13        So, we have *Eli Lilly*, *Northern Mariana Island*s,

14   that's 686 F.Supp.2d 7, out of the D.D.C.  And the other case

15   that is great for us on this is *Association of Community*

16   *Cancer*, 509 F.3d *(sic)* at 501.  All of those cases, what they

17   say is that -- it's a common-sense inquiry -- is that if you

18   allow -- the Court allows this program to go forward and to be

19   already in operation, we will never have an equivalent

20   opportunity to comment and provide our comments at the

21   decision point, at the early stage when -- when the agency is

22   actually deciding whether or not to do something.

23        And so, those -- those procedural rights will be

24   forever lost.  And the way the D.C. Circuit put it is, the egg

25   is scrambled.

1    *THE COURT:*  All right.  Let me try to unscramble it

2    momentarily.

3            So, if -- and I'm sorry, I'm just giving you some

4    hypotheticals.  Don't take this as an indication that I'm

5    thinking one thing or another.  You're making the argument

6    there's no authority to do this, period, at least under the

7    HEROES Act; is that correct?  So, if there is no authority to

8    do so, how are you damaged by not having notice and comment?

9            *MR. CONNOLLY:*  Because they believe they have the

10   authority to do it under the Higher Education Act.  So,

11   they -- they have another source of authority that they

12   believe they can do this under.

13           *THE COURT:*  Okay.

14           *MR. CONNOLLY:*  And so, when this Court makes a

15   ruling that the agency does not have the authority to pass the

16   program under the HEROES Act, there's not a doubt in the world

17   they're going to start up a negotiated rulemaking process

18   under their authority under the Higher Education Act.

19           *THE COURT:*  So, if I understand you correctly, there

20   is no clear Congressional authorization, period, under any act

21   by Congress that would give the Administration the authority

22   to do what they're doing?

23           *MR. CONNOLLY:*  My argument is not that broad.  My

24   argument is that the -- there is no authority under the HEROES

25   Act for them to do what they are doing, and that's the source

1   of authority that they rely on.  And so, that's where we say

2   their justification for ignoring notice and comment and

3   ignoring negotiated rulemaking is the HEROES Act, which does

4   not apply.

5          But, you know, kind of going back to the standing

6   inquiry, what we need to prove, both for standing and for

7   irreparable harm, is there some possibility that the agency

8   will change its decision?  And the reason there is some

9   possibility is this is not the only provision they are relying

10  on.  They have cited the Higher Education Act.  And I have

11  the -- the statute somewhere I can cite to you, but they have

12  cited a provision of the Higher Education Act that they

13  believe, they said, "It gives us broad authority to do this

14  type of program."

15         And so, that is how our procedural injuries will be

16  remedied, is because they will go -- they will -- there is

17  some possibility, in fact, it's strongly likely, that they

18  will go and do what they should have done in the first place

19  and go through the negotiated rulemaking process and through

20  notice and comment.

21         On the second reason why we prevail or why we have

22  shown irreparable harm, is that this is not just any -- any

23  normal rule.  I mean, the cases I cited to you, they found

24  irreparable harm just when a rule is going to be out there and

25  in practice and in effect.  This is a program that is time

1    limited.  They're going to -- they're going to give -- cancel

2    debts as quickly as possible.  And they have -- in their own

3    words, they have said, This is happening one time.

4          And so, if we wait for, you know, for summary

5    judgment and we go through the merits on this case and we

6    ultimately prevail on the merits, this case is over, because

7    we'll never get our procedural rights back.  Because they will

8    finish the program, they will have handed out $400 billion

9    dollars in student loan forgiveness and that will be that.

10   They'll never actually go back through the process and do what

11   they are supposed to do, because why would they?  They will

12   have finished the process.

13         So, this case is even a stronger showing than the

14   other cases I cited for why we have irreparable harm.

15         *THE COURT:*  Can I put aside the agency action and

16   not issue the injunction?

17         *MR. CONNOLLY:*  I'm sorry?

18         *THE COURT:*  Can I set aside the agency action and

19   not issue the preliminary injunction?

20         What if I find that there was no authority here and

21   I set aside the agency action?  Can I do that at this stage

22   without issuing a preliminary injunction?

23         *MR. CONNOLLY:*  I think you probably could.  You have

24   the right -- you have the inherit authority to grant summary

25   judgment sua sponte.

1          *THE COURT:*  I would have to give notice, I'm

2    assuming, before I did that.

3          *MR. CONNOLLY:*  I believe so.  I'd have to check the

4    case law.  But, yes, you -- you have the authority to enter

5    summary judgment sua sponte, these are legal issues and you

6    could grant the relief there as well.

7          My -- my concern -- and I guess I'll get to one of

8    your points here as well, is that there is -- there is extreme

9    emergency here.  Because as of last Friday, the President

10   announced that 22 million individuals have signed up for loan

11   forgiveness.  That's more than half of what the Department has

12   said -- has estimated are eligible.  On top of that, there's

13   another 8 million individuals where the Department said they

14   are going to forgive their debts automatically.

15         Finally, the Secretary of Education has publicly

16   said, and we quote this in our briefs, that we're going to

17   forgive debts as quickly as possible.  And so, there is a

18   strong, strong chance that the second the Eighth Circuit's

19   stay is lifted, that they're going to push a button and all of

20   these debts are going to be forgiven.  And so, that is why we

21   need injunctive relief as quickly as possible.  Because, as I

22   mentioned before, once this program is completed, the

23   irreparable harm is done.  And that's why we need -- we need

24   an injunction stopping this from happening right now.

25         *THE COURT:*  A nationwide injunction, correct?

1          *MR. CONNOLLY:*  Correct.

2          Because the way that would work is -- and I can get

3     to this, I can -- I can skip ahead as well.

4          *THE COURT:*  We'll go off the record momentarily.

5               *(Brief pause)*

6          *THE COURT:*  All right.  Go ahead, sir.

7          *MR. CONNOLLY:*  Sure.  Yes, and I'll skip ahead to

8     that because I think it's important.

9          *THE COURT:*  No, I want you to make your record.  And

10    again, to the extent I ask these questions, please don't think

11    it's indicative of what my ruling may be.  I just -- I think

12    these are important issues to probe and to have on the record,

13    because I'm assuming, no matter which way I rule on this, it's

14    going to go to someone else, the group of lawyers and judges

15    that are much more competent than I am, to make these types of

16    decisions.  So, let's -- let's give them a full and robust

17    record.

18         So, don't let me preclude you from making any type

19    of argument.  Same thing goes for the Government, I want you

20    to get everything that you think you need to get it past this

21    poor country lawyer in Fort Worth.

22         So, go ahead, counsel.

23         *MR. CONNOLLY:*  I appreciate that, Your Honor.

24         Well, I will -- then I'll -- I'll stay focused on

25    irreparable harm and just -- and just mention that -- just

1    conclude by saying that that is -- the irreparable harm that

2    will happen for my clients will be forever left -- they will

3    be forever denied their procedural rights.

4              And they have -- they have Federal student loan

5    debt.  Ms. Brown has $17,000 in Federal student debt and

6    Mr. Taylor has $35,000 in Federal student debt.  And if the

7    Government is going to be pursuing a program of debt

8    forgiveness, they will be left out of the program process, and

9    it's because they were denied their procedural rights to -- to

10   comment on this incredibly important program.

11             On the balance of harms, I think this is pretty

12   straightforward.  There's an enormous, enormous public

13   interest in allowing the public to comment on this incredibly

14   important program.  I mean, and think about the people that

15   are involved.  It's -- it's taxpayers who might -- who will

16   ultimately have to pay for this.  It's the individuals, like

17   my clients, who are being left out of the process.  It's

18   Universities.  It's student -- it's loan servicers, it's

19   companies, it's Government.  The list goes on and on and on.

20   And so many people across this country, so many people and so

21   many entities have a right -- have a right to, under the APA

22   and the negotiated rulemaking requirements, to tell their

23   Government what they think about this.  And that's an enormous

24   public interest.

25             The only -- the only countervailing interest they

1    can come up with is getting loan forgiveness out the door

2    fast.  But that pales in comparison to the interests -- well,

3    it doesn't even pale, it cannot overcome illegal agency

4    action.  The Fifth Circuit has said there is absolutely no

5    public interest in allowing illegal agency action to stand.

6    And so, I think we prevail on the balance of the harms as

7    well.

8            Finally, on the scope of the injunction.  They --

9    the Department asks this Court to narrow its injunction to

10   only our two plaintiffs.  And that just makes -- it makes no

11   sense at all.  Because it doesn't afford us any relief

12   whatsoever, because there's no chance that the Department

13   would actually go back and conduct notice and comment

14   rulemaking to see if two individuals should have their debts

15   forgiven.

16           What -- and I know there's debate back and forth

17   about nationwide injunctions.  But what's undisputed, even for

18   those who have raised concerns, is that the Court's obligation

19   is to afford complete relief to the plaintiffs that are before

20   this Court.  Those are my clients.  And the only way to afford

21   them relief is to enjoin the Department from carrying out the

22   debt forgiveness program.  Because when you enjoin the Court

23   -- the Department for carrying out the debt forgiveness

24   program, that is the only way to force them to go back to the

25   table to do negotiated rulemaking, to do the notice and

1 comment, to comply with all of their procedural obligations.

2 So, that is the only way to afford my clients the relief that

3 they are entitled to.

4    *THE COURT:*  I hope that there's not a judge in the

5 United States that desires to enter nationwide injunctions.

6     They really -- let me tell you a story, something

7 that happened here in this courthouse in 1948.  Downstairs in

8 the second floor courtroom was a famous challenge.  You-all

9 read the Robert Caro books about Lyndon Johnson, I bet.

10    Well, the famous 1948 election fight for the United

11 States Senate between Coke Stevenson and Lyndon Johnson played

12 out downstairs.  And you can go down there and you can see a

13 photo of Lyndon and Lady Bird walking through the

14 leather-bound doors down there coming into the courtroom.

15 President Johnson is smiling, so I'm assuming he just found

16 out something good.  But he ultimately did lose at this level,

17 but ultimately won.

18    And he went on to become one of the greatest

19 presidents for being able to pass legislation and getting

20 consensus.  Obviously, Mr. Caro sold millions and millions of

21 books describing Johnson's prowess at getting fellow members

22 of Congress, when he was president and also when he was in the

23 Senate, to agree and to come together.  His famous quote was,

24 Come now, let us reason together.

25    For whatever reason, we're not in that part of our

1    history anymore.  I question sometimes whether one side or the

2    other can agree that the sun is shining today.  Boy, do I long

3    for the days of President Johnson.  I hope we get back to that

4    situation, because I'm sure if President Johnson was to come

5    to the court today and see the way the courts across the

6    country are issuing nationwide injunctions in almost every

7    type of case, he would be as equally disturbed as I am.

8            But I think he also would be disturbed at the way

9    that we have unilateral, in many cases, executive action,

10   Government by executive fiat, not Government by agreement by

11   the peoples' representatives, and then ultimately decisions to

12   be executed and laws to be executed by the executive branch.

13           I'm not sure where we are now in our history is

14   where any of our founding fathers would have envisioned any of

15   the three branches of government to be, here almost 250 years

16   after we were founded.

17           So, let me ask you this question with regards to

18   nationwide injunctions, here recently it was the *Louisiana vs.*

19   *Becerra* case out of the Fifth Circuit.  The Fifth Circuit

20   reversed a nationwide injunction that came out of that

21   decision, stating that nationwide injunctions should be

22   reversed -- or reverse should not be issued while the ultimate

23   resolution will benefit from the airing of competing views in

24   the sister circuit.

25           So, there's a school of thought there that says -- I

1   believe Justice Thomas has talked about this, these decisions

2   need to percolate through the system.  Just as the President

3   doesn't rule by fiat, neither does the judge.

4          The Court in that case also relied on a quote by

5   Justice Gorsuch warning against nationwide injunctions, and

6   held in that case that the injunction should only be applied

7   to the states who brought the case.

8          Doesn't the Government have a good argument that the

9   injunctive relief, if any, that I decide to grant or not to

10  grant in this case, should only be applied to those two

11  individuals who brought the case?

12          *MR. CONNOLLY:*  So I disagree, respectfully, for a

13  few reasons.

14          First, the *Louisiana vs. Becerra* case, the Fifth

15  Circuit case, the Court did not say that nationwide

16  injunctions are never appropriate.  It said it depends on the

17  circumstances.

18          And if you look at other cases from the Fifth

19  Circuit, *Texas vs. United States* was a nationwide injunction

20  based on a notice and comment violation.  And you had -- you

21  had the two things that are exactly at issue here.  One, there

22  was no way to provide full and complete relief to the

23  plaintiffs without a nationwide injunction.  And two, you

24  needed -- they wanted uniformity or they cite -- they cited

25  uniformity of the Immigration Code.  And it's the same thing

1    here, we've cited -- there's a Congressional command that

2    education regulations should be uniform throughout the states.

3           So, I say all that to say, there are plenty and

4    plenty of examples of nationwide injunctions.  And the Fifth

5    Circuit's recent decision was not to say they're never

6    appropriate, it was just to say, Hey, you know, be careful

7    before you do it.  And there's -- there's a big difference

8    between cases like *Louisiana* and the concerns that Justice

9    Thomas raised in his concurrence.

10          I think Justice Thomas would agree with us on this

11    point.  Because in Justice Thomas's concurrence, what he talks

12    about in the *Trump v. Hawaii* case, what he talks about the

13    problem is -- is when somebody comes into the courthouse and

14    says, for example, you know -- I'm just doing a

15    hypothetical -- I want to carry a firearm and I don't want the

16    agency applying this rule to me.  And then the individual

17    says, Oh, and you know what, you -- you should make sure that

18    everyone across the whole country has the same protection that

19    I do.  That is totally different from what we have here.

20          In the hypothetical I gave, that individual can

21    receive complete relief without a nationwide injunction.

22    Here, if you crafted a nation -- if you tried to craft an

23    injunction that somehow applied only to my two clients, it

24    wouldn't provide any relief at all.  Because the whole point

25    of what we need to happen in order for my clients to be made

1    whole, is the -- the agency needs to go back to square one and

2    it needs to redo this whole program through negotiated

3    rulemaking and notice and comment.

4            And in Justice Thomas's concurrence, he cites an

5    example of -- of how -- how injunctions can be appropriate.

6    And what -- he used the example of the public nuisance

7    example.  And what he said is, Listen, sometimes you can have

8    injunctions that benefit lots of people, for example, an

9    injunction about a public nuisance.  That does not make the

10   injunction wrong, because what you're doing is you are

11   enjoining a public nuisance because that's the only way to

12   afford relief to the individual who brought -- who brought the

13   claim.

14           And so, I think Justice Gorsuch, Justice Thomas, I

15   think they would be on all -- would be right in line with what

16   we're doing here and what we're asking for.  Because they

17   would say -- they would say is -- they would say, The Court

18   needs to remedy the injuries of the plaintiffs before it.  And

19   the only way to do that is to provide this sort of -- this

20   injunction that we are asking for.

21           And the other thing I'll mention, is that this is --

22   it's not -- the type of injunction we're asking for is also

23   not like the hypothetical I gave, where you're instructing an

24   agency not to apply -- not to do this for all these

25   individuals.  This is -- this is more like a -- the typical

1    remedy for when you -- if this case went to the merits, where

2    you vacate the rule.  You vacate the rule and it -- it doesn't

3    apply to everyone.

4         So, what we need is a -- an injunction that stops

5    the Department from implementing the debt forgiveness program,

6    because that is the only way to force them to go back to the

7    table, go through the negotiated rulemaking, go through notice

8    and comment, so that my clients that have student debt can put

9    forth -- can participate in the process and give their reasons

10   for why their debt should be forgiven, just like every other

11   person who is being wrapped up in this program.  And that's

12   the only way to make sure that they get -- that they get

13   effective relief.

14        And so -- and I guess looking at your last

15   questions, I think -- I think the -- or the issues you raised

16   at the beginning, I think the Government would probably be in

17   a better position than I am to -- to talk about some of the

18   various cases that they're involved in.

19        *THE COURT:*  Let me ask you, in general, there's --

20   you can make an argument that judicial restraint would be

21   incumbent on the Court to find out what the Eighth Circuit

22   decides to do before I make a ruling.  I'm assuming you

23   disagree with that.

24        *MR. CONNOLLY:*  I do, Your Honor.

25        Your Court, their Court, their Federal courts,

1    they -- the concern here is, they have -- all they've put in

2    is an administrative stay, which --

3           *THE COURT:*  Am I correct, that even if they lifted

4    the stay, it would still go back to the trial court to make

5    the appropriate findings with regards to whether an injunction

6    would be appropriate?  The lower courts never even considered

7    any of the injunctive prongs; is that right?

8           It has to go back.  The Eighth Circuit is only

9    looking at the standing issue; is that correct?

10          *MR. CONNOLLY:*  I don't believe so.  So --

11          *THE COURT:*  Okay.  I don't -- I don't know.

12          *MR. CONNOLLY:*  Yeah.  So, the District Court in

13    Missouri dismissed the states' case for lack of standing.

14    When the states went up to the Eighth Circuit, they asked for

15    two things.  They asked, one, for an injunction pending

16    appeal.  And two, they asked for an administrative stay.  The

17    -- I'm sorry, an administrative stay while the Court -- while

18    the Eighth Circuit reviewed their motion for an injunction

19    pending appeal.

20           The Eighth Circuit granted their administrative

21    stay, so that they can review -- so that the Eighth Circuit

22    has time to decide whether to grant an injunction pending

23    appeal.  The administrative stay -- they ordered the

24    Government and they ordered -- they ordered extremely fast

25    briefing.  So, they ordered the Government to respond

1  yesterday, they ordered the states to respond, I believe,

2  today by the end of the day.

3     *THE COURT:*  Any indication the Court is going to

4  have oral argument or do we think they'll rule on the papers?

5     *MR. CONNOLLY:*  I don't believe they've given any

6  indication one way or the other.

7     *THE COURT:*  Probably a better question for the

8  Government?

9     *MR. CONNOLLY:*  Yeah.

10     *THE COURT:*  Let me take you back to the irreparable

11  harm prong.  And I hate to continue beating a dead horse, I

12  just want to make something clear for the record and for

13  whatever decision that I ultimately come to in this case.

14     So, if -- does the Court have to make a ruling that

15  the Secretary has clear Congressional authorizations, for

16  somewhere other than the HEROES Act, to be able to find that

17  you were denied a procedural right?  Does that make sense?

18  That's terribly articulated.

19     In other words, can you make the argument that you

20  suffered irreparable harm under the current case law, because

21  you didn't have notice and comment, and at the same time say

22  that there was no Congressional authorization to do what we

23  have in this case?  Boy, that's a terrible question.

24     *MR. CONNOLLY:*  I believe I --

25     *THE COURT:*  And I was an appellate judge for about

1   three years, I ought to be better than that.

2          *MR. CONNOLLY:*  I -- I believe I know what you're

3   getting at.

4          *THE COURT:*  Yeah.

5          *MR. CONNOLLY:*  And the answer is, no.  Because for

6   this inquiry, what matters is there's some possibility that

7   the -- that the -- that the Department of Education will

8   change its mind and issue a decision that helps our clients.

9          The fact that they believe they have this authority,

10  and that it's colorable, is all you need to -- is all you need

11  to cite.  Because there is some possibility, under the Fifth

12  Circuit case law, that they will go back and -- and do this

13  properly.

14         So, you don't need to affirmatively decide that,

15  yes, they have the authority to do this under the Higher

16  Education Act.  Because what's going to happen is, they're

17  going to go back, they're going to do it how they should have

18  done it in the first place.  And then once that rule is in

19  effect, I imagine there'll be various individuals who

20  challenge it, and the legality of that will be decided, you

21  know, in the future.

22         But what matters now --

23         *THE COURT:*  If that happens, please don't file

24  anything in Fort Worth.  We have enough to do.

25         *MR. CONNOLLY:*  What matters now is whether there's

1    some possibility that they will -- that they will go that

2    route, that's all that matters.

3              *THE COURT:*  All right.

4              *MR. CONNOLLY:*  And just to wrap up, for the Eighth

5    Circuit, they're -- once -- once -- the Eighth Circuit is

6    reviewing right now, they have a stay in place, they're

7    reviewing the motion for an injunction pending appeal.  And

8    presumably they're not going to issue a ruling before 5:00

9    tonight, when the states' brief is due.

10             But at any moment after that, an issue could pop

11   up -- or an order could pop up from the Eighth Circuit that

12   says, Your motion for an injunction pending appeal is denied,

13   the administrative stay is lifted and now the appeal

14   process -- the states' appeal will go through the normal

15   process where they -- they will try to argue that, you know,

16   that they had standing.  At that moment, there's nothing in

17   place, and the Department will be able to push the button and

18   all this loan -- all of these loans are forgiven and

19   irreparable harm will happen.

20             And the Court has -- so -- and my last final point

21   is, even though there's an administrative stay in place, that

22   doesn't stop the Court from issuing an injunction on top of

23   that.  There are lots and lots of cases and examples of courts

24   sort of issuing overlapping injunctions.  And it's for the

25   exact reasons that we have here, which is that it doesn't make

1  any sense for -- the Eighth Circuit's injunction is temporary,

2  and it could go away like that, and then the Court would be

3  scrambling.

4       THE COURT:  Here's a good question.  If this is such

5  an emergency, such a dire emergency, why didn't y'all move for

6  a TRO?

7       MR. CONNOLLY:  So, in hindsight, maybe we should

8  have.  But it wasn't clear to us at the time how fast this was

9  happening and how fast they were going to start processing

10  these.

11       They have -- they've got 22 million applications and

12  the Secretary said we're going to be doing this as quickly as

13  possible and they're going to be -- they will be doing this

14  with 8 million individuals automatically.  And so, you know,

15  in hindsight maybe we should have filed the TRO.

16       But this is briefed right now and the irreparable

17  harm based on their public statements of what's happening,

18  it's clear what's going to happen as soon as the

19  administrative stay is lifted by the Eighth Circuit.

20       THE COURT:  All right.

21       I'd like to hear from the Government.

22       MR. CONNOLLY:  Thank you.

23       THE COURT:  Tell me your name one more time, sir.

24       MR. NETTER:  My name, Your Honor?

25       THE COURT:  Yes, sir.

1          *MR. NETTER:*  Brian Netter.

2          *THE COURT:*  Netter, okay.  That's what I had in my

3     notes.  I just wanted to be sure.

4          One second.

5               *(Brief pause)*

6          *MR. NETTER:*  No worries, Your Honor.  Thank you and

7     may it please the Court.

8          *THE COURT:*  Yes, sir.

9          *MR. NETTER:*  I'm happy to start with some of the

10    logistical points on where the other cases stand before we --

11         *THE COURT:*  Yeah, use your discretion.

12         *MR. NETTER:*  Thank you, Your Honor.

13         With respect to the *Nebraska* case in the Eastern

14    District of Missouri, that Mr. Connolly and the Court were

15    just discussing, the six state plaintiffs in that case did

16    file a motion for preliminary injunction, which Judge Autrey

17    denied on the basis of lack of standing and therefore

18    dismissed the case.

19         The plaintiff states then filed -- noticed an appeal

20    to the Eighth Circuit and filed their motions for emergency

21    relief.  As Mr. Connolly indicated, the briefing deadline for

22    the states' reply is today, it's actually today at 5:00 p.m.

23    central time.  The Court has entered an administrative stay,

24    which is really an administrative injunction, that's

25    affirmatively prohibiting --

1          *THE COURT:*  Sure.

2          *MR. NETTER:*  -- the agency from acting.

3          *THE COURT:*  Do I have the case involving individual

4     plaintiffs?

5          *MR. NETTER:*  No, Your Honor.

6          *THE COURT:*  Tell me what else is out there.  I don't

7     even know.

8          *MR. NETTER:*  So, there was -- the case that's

9     furthest along is called *Brown County Taxpayers Association*,

10    which was filed in the Eastern District of Wisconsin.  That is

11    a case where, again, there was a motion for a TRO and a

12    preliminary injunction, the case was dismissed for lack of

13    standing.

14         *THE COURT:*  Sure.  Go ahead, sir.  And that's in ED

15    Wisconsin?

16         *MR. NETTER:*  Correct.

17         *THE COURT:*  Okay.  Go ahead.

18         *MR. NETTER:*  The plaintiff appealed to the Seventh

19    Circuit and cited emergency relief.  The Seventh Circuit

20    denied that relief.  The plaintiffs then applied to Justice

21    Barrett at the Circuit Justice --

22         *THE COURT:*  Right.

23         *MR. NETTER:*  -- and she denied the application for

24    emergency relief in that case.

25              There's another case that's also pending in the

1    Seventh Circuit, it's called *Garrison*, that was filed in the

2    Southern District of Indiana.  In the *Garrison* case, there was

3    a motion for preliminary injunction, it was denied and the

4    case was dismissed without prejudice.

5         *THE COURT:*  And just, really briefly, in *Garrison*,

6    plaintiffs, what -- tell me about the individual plaintiffs.

7    Are they similar to the plaintiffs we have here?

8         *MR. NETTER:*  So, as amended, the -- it was either

9    the first or second amended complaint in *Garrison*, it's two

10   individuals on behalf of a class, similarly situated

11   individuals, who claim that they have standing because they

12   will be subject to state taxes if their student loans are

13   discharged.

14        The *Garrison* case has been dismissed by the district

15   court, an appeal has been taken to the Seventh Circuit.  And I

16   believe, just yesterday, there was a motion for emergency

17   relief in the Seventh Circuit which is still pending.

18        There are a couple of other cases that are not as

19   far along.  The State of Arizona filed its own complaint in

20   the District of Arizona.  That was filed on October 30th.

21   There has been no additional action, beyond the filing of the

22   complaint in that case, at least when I last checked the

23   docket.

24        There was a case filed by the Cato Institute in the

25   District of Kansas.  They filed a preliminary injunction

1    motion on Friday.  The theory of that case is that the Cato

2    Institute, as an employer, has standing to challenge this

3    relief because --

4            THE COURT:  So, I guess, really what I'm getting at,

5    as far as you know, counsel, is the case here in Fort Worth,

6    are we the only case where the taxpayer standing is not an

7    issue?

8            MR. NETTER:  Oh, no, no.  The taxpayer standing was

9    not an issue in the *Garrison* case, not an issue in the *Cato*

10   *Institute* case, the Arizona case.  The only case that had

11   taxpayer standing was the *Brown County* case in the Eastern

12   District of Wisconsin.

13           THE COURT:  Okay.  But I guess in the *Cato* case,

14   paying taxes for its employees, et cetera, et cetera.  That

15   seems different from a case where we have two individual

16   plaintiffs who are arguing that one, which has a private

17   student loan, and the other is arguing that they would have

18   been entitled to additional money under the Pell Grant, which

19   they didn't get.

20           In other words, we have -- the argument would be

21   here, we have people that are particularly aggrieved, because

22   they were the people who were actually harmed in this case.

23   In other words, you have students, I guess is a better way to

24   put it.  Am I the only case that has students with student

25   debt?

```
1              Do you understand the difference?

2              MR. NETTER:  I do understand the difference, Your

3    Honor.  The Garrison case involves students, those are

4    students who would potentially have debt that would be

5    discharged automatically.

6              The Cato Institute case is not about taxes.

7              THE COURT:  Yeah.

8              MR. NETTER:  It does arise in a different posture.

9    The theory there is, that as an employer, the employer can

10   recruit employees through the Public Service Loan Forgiveness

11   Program, and would, allegedly, have a more difficult time

12   doing so if there were student loans that were discharged and

13   those individuals no longer have debts --

14             THE COURT:  Sure.

15             MR. NETTER:  -- in which they could have availed

16   themself of the PSLF.

17             THE COURT:  And all of these cases are in various

18   stages procedurally and the United States is, I'm assuming,

19   defending this program in all of them, standings in issue in

20   every one; is that a fair assumption?

21             MR. NETTER:  That's correct, Your Honor.  Insofar as

22   the Government has appeared.

23             THE COURT:  Yeah.

24             MR. NETTER:  There are some cases that are not far

25   enough along.
```

1          *THE COURT:*  Perhaps the Government has been sued but

2    not served yet?

3          *MR. NETTER:*  There is a pro se case in Oregon, for

4    example, where the Government hasn't appeared, hasn't

5    answered.  That deadline is still a ways, Your Honor.

6          *THE COURT:*  Am I the first court to hear a

7    preliminary injunction hearing, to actually hold a preliminary

8    injunction?

9          Like, did the -- in the Eighth Circuit case, for

10   instance, did the Court just make a ruling on the papers there

11   was no standing?

12         *MR. NETTER:*  No, no.  Judge Autrey conducted a

13   hearing in St. Louis probably a week and a half ago --

14         *THE COURT:*  Okay.

15         *MR. NETTER:*  -- that preceded his dismissal of that

16   case.

17         *THE COURT:*  All right.  Go ahead, counsel.

18         *MR. NETTER:*  I think that completes our survey of

19   the other cases that --

20         *THE COURT:*  No, that's very helpful.

21         *MR. NETTER:*  Let me move on then to the sum and

22   substance of this case.  So, as the Court is well aware,

23   Article 3 of the Constitution limits Federal courts to hearing

24   cases or controversies brought by an individual with injury in

25   fact that's traceable to a challenged conduct that can be

1    addressed by judicial action.

2            This case should be dismissed for lack of standing,

3    because the plaintiffs here lack a cognizable injury in fact.

4    Their supposed injury is not traceable to the invocation of

5    the HEROES Act that they're challenging.  And this Court

6    cannot take action to provide their requested redress.

7            To start with injury in fact, although the

8    plaintiffs filed this action to take down the debt forgiveness

9    program as it stands under the HEROES Act, their purported

10   injury as to the program isn't generous enough in providing

11   debt relief.  So, I think it's important for us to start with

12   the theories of standing that one would ordinarily think would

13   be associated with that sort of injury that aren't present

14   here and that don't work here.

15           First, the plaintiffs are not asserting that they

16   have any substantive right to loan forgiveness, nor do they

17   have standing because benefits have been provided to others.

18   That's the sort of generalized grievance taxpayer standing

19   theory that the Court just alluded to.  Nor do the plaintiffs

20   assert that they have procedural rights under the HEROES Act

21   itself, which would, in any event, require some tangible

22   manifestation under *Spokeo* and other related standing cases.

23           Rather, the plaintiffs' theory was they were denied

24   a right to comment on the rule that the Department of

25   Education has not pursued, but might pursue if the HEROES

1    invocation were to be invalidated.

2         Now, that's a quite remarkable theory of standing,

3    that I must say, is exceedingly broad and not supported by

4    precedent.  We haven't been able to identify other

5    circumstances in which there is a procedural right as to a

6    course not taken that supplies the basis for standing.

7    Indeed, were that an available pathway to standing, one could

8    rewrite all of the Supreme Court's standing cases and come up

9    with a different theory for why the Court --

10         *THE COURT:*  Who would be a plaintiff that would have

11    standing to challenge the agency action?  Who -- in your mind,

12    who does have standing?  Someone that really wants to pay

13    their student loans back, they would have standing to

14    challenge it?  There has to be somebody that can challenge

15    this.

16         So, who -- who does the Government think would be a

17    proper party to challenge this?

18         *MR. NETTER:*  So, Your Honor, I would fight the

19    nature of the hypothetical.  Because we don't approach

20    standing from the standpoint of --

21         *THE COURT:*  No, don't fight.  So, you don't have an

22    answer?  You don't need to spar with me, I'm just asking.

23         *MR. NETTER:*  No, I think --

24         *THE COURT:*  And so, is there anyone, in your

25    opinion, that can challenge this action?  Who has standing?

1          *MR. NETTER:*  Right.  So, it is theoretically --

2          *THE COURT:*  Is it -- if I understand what you're

3   saying, it would be a student out there that really, really

4   wants to pay the United States back their student loans.

5          Is that the only person that can challenge this?

6          *MR. NETTER:*  No, I don't think so.

7          I mean, just the way procedurally that we're

8   processing this is that, you know, complaints are coming in

9   and we're assessing them.  We have yet to identify one of the

10  complaints that satisfied the --

11         *THE COURT:*  I don't want you to concede to anything

12  that would hurt you in a future case.  I think you can at

13  least concede that there has to be someone, some entity

14  somewhere that has standing to challenge the administration's

15  actions at this point, right or wrong; right?

16         *MR. NETTER:*  So, I'm not sure that that's true, Your

17  Honor.

18         You know, Article III of the Constitution imposes

19  limitations on the judiciary.  And sometimes the result of

20  that is that there is executive or legislative action that

21  takes place for which there isn't an appropriate plaintiff.

22         *THE COURT:*  Give me another example.  Give me an

23  example that comes to your mind, where there's not one

24  individual in the entire United States that can challenge an

25  agency action, an executive action.

1          Can you think of one?

2          *MR. NETTER:*  Your Honor, I'm sure that examples

3     exist.  None comes -- none springs to mind immediately.

4          But, you know, typically in the context where the

5     Government is providing a benefit, it is difficult to imagine

6     who is harmed by the existence of that benefit, right?  So,

7     the reason why there have been attempts to -- to create a

8     theory of taxpayer standing, is because individuals have

9     objected to Congress appropriating funds and the Executive

10    implementing that Congressional appropriation.

11         In that context, the Court has said, even though

12    Federal tax dollars are being spent for this purpose, it

13    doesn't mean that there is, necessarily, a standing for

14    individuals whose grievance is only of a generalized nature.

15         So, I did want that talk --

16         *THE COURT:*  I get it.

17         But who is of a particularized nature that they

18    might be able to challenge this?  Do you even want to throw

19    out a guess, or are you afraid it's going to prejudice the

20    United States if you do so?

21         Who would be their perfect client?  There has --

22    there has to be somebody.

23         *MR. NETTER:*  Yeah.

24         *THE COURT:*  And based on what you're arguing, the

25    only person that I can think of that would qualify for

1   standing under your argument would be the person that gets a

2   large amount of Federal student loans and just really, really

3   has a hankering to pay them back, it's their patriotic duty.

4          MR. NETTER:  Although, Your Honor, in those

5   circumstances, the individual can opt out of receiving any

6   student loan debt.  So, there wouldn't even be an injury in

7   that context.

8          I would note also that, you know, there's no

9   standing, as my colleague points out here, to -- to challenge

10  grant of food stamps to other people.  So, in this context of

11  the Government providing benefits --

12         THE COURT:  I get it.  I'm just probing your mind.

13         MR. NETTER:  I appreciate that, Your Honor.

14         THE COURT:  All right.  Go ahead.

15         MR. NETTER:  And, you know, the hypotheticals that I

16  was thinking through in preparing for this argument, was how

17  the plaintiffs' theory in this case would affect some of the

18  Supreme Court's precedents.

19         So, the Court is surely aware, with Justice Scalia's

20  opinion of the Court in *Lujan*, that's a case finding that

21  there was no standing to challenge the Department of

22  Interior's regulation limiting the application of the

23  Endangered Species Act to actions taken limiting -- to actions

24  taken inside the United States around the high seas.  The

25  Court in that case found that there was no standing, based on

1    a future desire to observe wildlife in potentially a foreign

2    country.

3         But if we were to apply the plaintiffs' theory here,

4    you could say, Well, if the Department of Interior's rule were

5    taken down because it's unlawful, in the theory of the

6    plaintiffs, the Department could have pursued an alternative

7    course.  And maybe that alternative course would have involved

8    the use of consultants, and the defenders of the wildlife

9    could have been one of those consultants, so therefore there's

10   standing.

11        As we're thinking this through, it is difficult to

12   imagine a circumstance in which one cannot manufacture an

13   alternative in which the plaintiff could, you know,

14   potentially, theoretically, have some sort of stake.  So, if

15   there's a procedural right as to a course not taken that

16   supplies the basis for standing, then the doctrine of

17   standing, in a sense, becomes far less relevant when a party

18   seeks to challenge Government action.

19        We aren't aware of examples of other circumstances

20   in which a party is asserting, as its basis for standing, a

21   procedural right that doesn't apply under the statute, under

22   the actual administrative act that is being taken.

23        Here, the plaintiffs say, you know, It's a

24   procedural right, so the Court shouldn't look too hard.  There

25   should be standards that are not quite as assertive.

1          *THE COURT*:  Well, that's the -- not just the

2     plaintiffs, that's the -- it's the D.C. Circuit.  I can't

3     remember what the name of the case is, but there's also a

4     Fifth Circuit case, the *EEOC* case, where the Fifth Circuit

5     adopted that same language when it comes to standing in these

6     administrative challenges.  So, it's not just them.

7          How do you -- how does this not fit in with that --

8     those decisions?

9          *MR. NETTER*:  Well, that's right, Your Honor.

10          But in every one of those cases, the procedural

11     right arises within the statutory regime or the administrative

12     regime that's being challenged.

13          So, if we start by looking at the Fifth Circuit

14     decision in *Texas vs. EEOC*, that's a case in which the State

15     of Texas is challenging EEOC guidance as to the hiring of

16     individuals with criminal records, specifically individuals

17     who had previously committed felonies.  And the Fifth Circuit

18     in that case said that there were multiple injuries.

19          First, this was guidance that explicitly applied to

20     state employers, and the object of the guidance was to target

21     employers like Texas.  Texas had a different policy as to the

22     hiring of former felons than the EEOC was approaching.  So,

23     the Court acknowledged that there were at least two injuries.

24     There was an increased regulatory burden on the State, and

25     there was also a sovereign interest as to enforcing the

1   restrictions that appeared in Texas law as opposed to under

2   Federal law.

3        With respect to the separate procedural injury, and

4   I want to quote the Fifth Circuit here, the Court said, When a

5   litigant is vested with a procedural right, that litigant has

6   standing if there is some possibility that the requested

7   relief will prompt the injury-causing party to reconsider the

8   decision that allegedly harmed the litigant when a litigant is

9   vested with a procedural right.

10       So, that was a case in which the procedural right

11  that the State of Texas was asserting was as to the process

12  that the EEOC had actually followed, not as to an alternative

13  policy that the EEOC could have pursued under a different

14  statutory authority.

15       The same problem arises with respect to the

16  *Ecosystem Investment Partners* case that the plaintiffs

17  described as being on all fours with this case in their reply.

18            *THE COURT:*  That the D.C. Circuit case?

19            *MR. NETTER:*  No.  That's the unpublished Fifth

20  Circuit case.

21            *THE COURT:*  Oh, sure.

22            *MR. NETTER:*  That's to NEPA challenge to --

23            *THE COURT:*  Yes, yes.

24            *MR. NETTER:*  -- failing to consider the use of the

25  mitigation bank --

1          *THE COURT:*  Right.

2          *MR. NETTER:*  -- by the petitioner who had the only

3     supply of mitigation credits.  That, again, is a challenge to

4     assert rights under MEPA to challenge whether the NEPA policy

5     had been complied with.  And the plaintiff's theory was, if

6     NEPA had been followed, their injuries would have been

7     averted.

8          That's, you know, a pretty unextraordinary holding,

9     because the procedural injury in that case was associated with

10    the action being challenged, not with a process that could

11    have been required if the agency had decided to pursue a

12    theoretical alternative.

13         And while I'm describing this, now might be an

14    opportunity to respond to Mr. Connolly's confidence that the

15    agency would, if the HEROES Act indication were deemed

16    invalid, would pursue this settlement and compromise authority

17    approach.  I have not seen anything in the record to suggest

18    that there's any indication that the Department would pursue

19    that course.  I don't know where Mr. Connolly's confidence

20    comes from.  I think he's taking that from news reporting or

21    from assumptions.  But there's surely nothing in the record

22    here to suggest that the Department of Education has some

23    backup plan if the HEROES Act invocation were to be

24    invalidated.

25         *THE COURT:*  The administration has no backup plan?

1          If the Court makes a finding that the HEROES Act

2     doesn't apply here, there is no backup plan to do notice and

3     comment and go through the APA administrative process to enact

4     administratively the Federal Student Loan Forgiveness Program?

5     There is no backup plan?

6          That wasn't even considered by the United States?

7     We just said, We've got the HEROES Act, President Trump said

8     there was an emergency three years ago, by golly, let's ram it

9     through.

10         That's what you're saying?

11         *MR. NETTER:*  I certainly wouldn't use that -- that

12    description, Your Honor.

13         *THE COURT:*  Well, what description would you use?

14         *MR. NETTER:*  I would say that the Secretary of

15    Education was vested with authority under the HEROES Act to

16    respond to declared national emergencies.  And this was

17    authority that was deployed by Secretary DeVos two days after

18    President Trump declared a national emergency, in March of

19    2020.

20         *THE COURT:*  Okay.  That was three years ago.  When

21    does the national emergency end?

22         President Biden has said a couple of times, in the

23    60-Minute interview that I watched, that said the pandemic is

24    over with.  So, at what point -- I mean, if we never have a

25    rescinding action of President Trump's definition of an

1    emergency -- so from now until the end of time, even though

2    this administration says this is a one-time only thing, can we

3    have administration come back, use the HEROES Act to,

4    basically, forgive any type of student loans for anybody?

5                *MR. NETTER:*  No, Your Honor.

6                So, the HEROES Act --

7                *THE COURT:*  At what -- at what point does something

8    not become a national emergency, is my question.

9                *MR. NETTER:*  Well, the national emergency is

10   declared by the president.  And the statute defines when there

11   is a national emergency to be --

12               *THE COURT:*  I understand that, but I would like you

13   to answer my question.

14               *MR. NETTER:*  I understand, Your Honor.  The --

15               *THE COURT:*  And I'm sorry to be frustrated.

16               But, you know, you read the plain text, the history

17   of the HEROES Act, you look at the context that it was enacted

18   in.  Unless I need to turn in my law license, it seems to me

19   that the HEROES Act was passed in light of 9-11, and in light

20   of the Iraq and Afghanistan wars that we were involved in for

21   20 years.  You know, the commonsensical definition that any

22   kid in civics would give you or any teacher describing the

23   HEROES Act would be, this was meant to help servicemen and

24   women who are volunteering to serve their country in times of,

25   not only war, but national emergencies, such as one would

1    think, earthquakes, hurricanes, tornadoes, et cetera, et

2    cetera, that because they are serving, they are unable to pay

3    their loan.

4         We have a situation where we have maybe, maybe not,

5    a national emergency applying this to civilians.  So, you just

6    can't throw the language and throw the HEROES Act at me and

7    state that, Well, this applies, therefore, we can do what

8    we're doing.  You have to show me how you get there under the

9    HEROES Act.  And I just have a hard time seeing it.

10        Now, standing is one thing.  Whether these folks

11   have standing to bring this case is one thing.  But whether

12   the HEROES Act truly applies to the situation that we have

13   here, the argument, under that reasoning, I could expand the

14   HEROES Act to apply to just about anything.

15        *MR. NETTER:*  I don't think you could, Your Honor.

16   And I'm happy to walk through --

17        *THE COURT:*  Tell me -- tell me why not.

18        *MR. NETTER:*  -- how the HEROES Act applies here.

19        To start, as the Court acknowledged, a triggering

20   event of the HEROES Act is the requirement that the president

21   declares a national emergency, but that's not the only

22   requirement.  The substantive requirement of the HEROES Act is

23   that the Secretary of Education, upon the declaration of a

24   national emergency by the president, has the authority to

25   waive or modify statutory, regulatory requirements under the

1    Higher Education Act, and wouldn't cover loans from the USDA,

2    for example, as to affected individuals, so as to ensure that

3    an affected individual is not placed in a worse position

4    financially in relation to their financial assistance because

5    of their status as an affected individual.

6          So, there is, at the end of the day, an empirical

7    standard that Congress imposed on the Secretary of Education

8    in relation to the consequences resulting from a war or

9    national emergency.

10         Although, I appreciate the references to the

11   legislative history and the findings and in the context of

12   9-11 and the reauthorization of the Iraq war, there certainly

13   was an interest in helping military families who might be

14   called to deploy.  But the history of the statute, in its

15   plain text, demonstrates that it's surely not limited to

16   service members in the context of a national emergency.  An

17   affected individual is any individual who resides or works in

18   an area that has been declared a national emergency zone by

19   the president, by a governor, even by a local official.  And

20   from the very outset --

21         THE COURT:  So, effectively, that could be every

22   single American; is that correct?

23         MR. NETTER:  If there is a national emergency that

24   affects every American, you know, it could be.

25         And when Secretary DeVos invoked the HEROES Act two

1    days after President Trump's assertion of a national

2    emergency, her first action was to pause payments on Federal

3    student loans.  And she determined that every loan holder

4    constituted an affected individual under the HEROES Act under

5    that context.  Both because the national emergency -- perhaps

6    not the mind run of national emergencies, but the COVID

7    national emergency covers every county of the United States

8    and all the permanently occupied foreign territories abroad.

9         But even for individuals that don't live or work in

10   an area that's been declared a national emergency zone,

11   individuals who have suffered economic effects from the

12   national emergency, even if they're abroad, they qualify as

13   affected individuals.  And it's difficult to identify anybody

14   who holds Federal student loans who hasn't been economically

15   affected at this juncture by the national emergency that

16   persisted in this country for the past 2 1/2 years.

17        I do want to go back to the Court's point that the

18   President has made some public statements as to the current

19   state of the pandemic.  And what I think is important to

20   recognize here, is that the HEROES Act speaks not to actions

21   taken during the pandemic, but to actions that are necessary

22   to avert economic injuries resulting from a national

23   emergency.

24        So, an example that I gave at the preliminary

25   injunction hearing in St. Louis was that, you know, if you

1  take an example of a hurricane that causes damage in a

2  particular region of the country.  Just because the hurricane

3  has stopped rotating and the storm has passed, doesn't mean

4  that the authority of the President and the Secretary of

5  Education to declare a national emergency and provide relief

6  for the economic injuries in relation to student loans that

7  stem from that storm, it doesn't mean that authority has come

8  to an end.

9          So, the Secretary of Education has acknowledged here

10  that part of the reason why we believe the HEROES Act is

11  necessary and warranted here is because of the --

12          *THE COURT:*  I guess you have to know what I'm

13  getting at.  So, ten years from now, can we use the

14  declaration that people are still suffering because we went

15  through this two- to three-year period where there was

16  COVID-19 and people had to stay at home?  Could the president

17  ten years from now still invoke the HEROES Act and do what

18  we're doing now?

19          *MR. NETTER:*  So, just to make sure I understand the

20  hypothetical --

21          *THE COURT:*  It's not hard to understand, okay.

22  These are not trick questions.  You need to help me out here.

23          Ten years from now, could the HEROES Act still be

24  invoked because of the COVID-19 pandemic to forgive student

25  loan debt?

1          *MR. NETTER:*  Yes, to the extent that there is still

2    unresolved injury in relation to student loans resulting from

3    the national emergency.

4          Now, one would hope that that is a difficult factual

5    premise -- difficult empirical premise to fathom ten years

6    out.  But the statutory standard entitles the Secretary of

7    Education to provide this relief in relation to a national

8    emergency, so as to ensure that individuals who are affected

9    individuals under the statute are not worse off in relation to

10   their student loans because of the national emergency.

11         So, in the hypothetical circumstance in which there

12   is a national emergency that drags on for another decade and

13   there is unresolved economic injury with respect to student

14   loans --

15         *THE COURT:*  I think if President Johnson were here,

16   he would say, Why not just let Congress vote on it?  Wouldn't

17   that be the safest route?

18         *MR. NETTER:*  I don't --

19         *THE COURT:*  Better yet, why not just get notice and

20   comments and enact the -- giving it full vetting and see what

21   you come back with and the Secretary can go ahead and do what

22   they wanted to do, right?

23         Under Title IV, can't the Secretary make a finding

24   that the student loans be forgiven, even without the HEROES

25   Act?

1          *MR. NETTER:*  I don't think so, Your Honor.

2          So, the -- the Secretary has the authority to settle

3     or compromise, the settlement and compromise authority, which

4     is different from a discharge of loans.

5          I do want to point out --

6          *THE COURT:*  They can settle it and say you owe zero,

7     couldn't they?  They say, Well, here's the settlement, 22

8     million people don't owe anything, we hereby settle and

9     compromise this case.

10         *MR. NETTER:*  So, that's the context in which the

11    Federal Claims Collection standards apply.  Mr. Connolly

12    mentioned a conflict with Federal regulations.  And I think

13    the regulation he was referencing was 34 CFR, Section 30.70.

14    And that is the regulation implementing the settlement and

15    compromised authority that appears in the general powers of

16    the Secretary of Education.

17         That is not, however, a restriction or limitation on

18    the indication of the Secretary's HEROES Act authority,

19    because that's not a settlement or compromise.  It is a

20    discharge of debt and a waiver of other statutory provisions.

21    So, that -- that's the distinction that would apply there.

22         I feel like in order to keep our discussion

23    structured, maybe I should go back to standing and hit some of

24    these merits points once we --

25         *THE COURT:*  No, I think we're fine.

1          Why don't you go into your merits points.  I

2    understand the argument on standing.

3          *MR. NETTER:*  Well, there's one point on standing,

4    though, that hasn't come up that I think is critical, and

5    that's with respect to traceability.  One would think that in

6    a circumstance in which the plaintiffs are seeking a

7    procedural right under an invocation of authority that the

8    Secretary hasn't purported to exercise, that they would have

9    to exhaust all the other procedures that could provide that

10   process.  And that's the case here.

11         We noted it in our opposition brief, and the

12   plaintiffs didn't respond in their reply brief and didn't

13   mention and didn't bring this up today, that there's an

14   opportunity for any citizen to file a citizen petition with

15   the Department of Education asking the Department to issue,

16   amend or repeal a rule.  And the Department even has

17   regulations on this point, it's 34 CFR, Section 9.9(c).

18         The plaintiffs aren't seeking relief that's mutually

19   exclusive with the invocation of the HEROES Act.  They say

20   they want additional relief.  And if they want additional

21   relief, there's no reason why their interests and process

22   can't be vindicated by them following the procedures set forth

23   in 34 CFR, 9.9(c).

24         Which, were they to file a petition under -- at

25   regulations.gov, the Department then takes 60 days to review

1    the petition and the head of the principal operating component

2    then recommends how to proceed from there.  So, to the extent

3    this really is about the procedural injury to these

4    plaintiffs, they have recourse.  They have recourse that

5    doesn't require the Court to enjoin or to affect, in any way,

6    the indication of the HEROES Act.

7            Now, their response to this, as I understand it, not

8    specifically as to regulations, but in general, is that the

9    Secretary -- or they believe the Department has said that

10   they're only going to do this once.  But that's -- that's not

11   factually accurate.  To be sure, this is one-time relief, in

12   that it's not an ongoing program.

13           But at the same time, the Department has a message

14   posted on its website right now that says, The Department is

15   assessing whether there are alternative pathways to provide

16   relief to borrowers with Federal student loans not held by A,

17   a category that describes plaintiff Ms. Brown, including Pell

18   program loans and Perkins loans, and is discussing this with

19   private lenders.  So, the Department surely has not foreclosed

20   the possibility of providing additional relief, should it be

21   warranted.

22           Now, the fact that this pathway exists demonstrates,

23   you know, that Ms. Brown's rights, her procedural rights, as

24   she views them to exist, they would be satisfied if she filed

25   the citizen petition.

1          *THE COURT:*  All right.

2          I'd like for the -- you-all to address that in your

3    reply, please.

4          *MR. CONNOLLY:*  Oh, sure.

5          *THE COURT:*  Thank you.

6          Go ahead, counsel.

7          *MR. NETTER:*  Thank you, Your Honor.

8          *THE COURT:*  Take me to the merits.  Let's talk about

9    the major questions doctrine, and why don't you tell me how

10   that fits into this framework.

11         *MR. NETTER:*  Sure, Your Honor.

12         So, the major questions doctrine, I think it's

13   important for us to situate this in a Supreme Court

14   jurisprudence as to how the major questions doctrine fits in

15   with concepts of delegation to administrative agencies.

16         So, the principle underlying the major questions

17   doctrine is that, you know, Congress has the power and

18   authority to delegate powers to agencies.  But there are some

19   circumstances where the apparent delegation of authority is so

20   mismatched to the exercise of power by the agency that the

21   courts ought to be especially skeptical.

22         *THE COURT:*  Go ahead.

23         *MR. NETTER:*  That's -- that's effectively the

24   definition of a major question.  So, the way that we have

25   encapsulated this in our papers, is to try to describe the

1    disconnect between what Congress thought it was doing and how

2    the agency is exercising its authority.

3            Now, here there are at least six different reasons

4    why we don't think that there is a disconnect between what

5    Congress, you know, purported to be doing to the plain text of

6    the statute and how the Secretary of Education is exercising

7    its authority.

8            THE COURT:  And I guess, while you're weaving me

9    through your argument, tell me if the *Chevron* standard applies

10   to any of my analysis.

11           Any deference I have to give the agency in this

12   regard or not?

13           MR. NETTER:  So, Your Honor, I think that the Court

14   has understood the major questions doctrine to be,

15   effectively, an exception to *Chevron*.  That because the theory

16   that the Court is pursuing is that Congress has not delegated

17   the authority in a major questions case, that means you don't

18   get to the point of deferring to the agency if a major

19   question exists.

20           Now, we don't believe that a major question does

21   exist.  And the first reason for this is, this is a statute

22   that is specifically about wars and national emergencies.

23   Congress knew it was legislating in a space where the harms

24   could be large.  And on its face, the statute reflects an

25   intent to delegate authority to the Secretary of Education to

1   act swiftly and decisively, in a manner that is proportional

2   to the harm.  So, the very nature of a statute that has

3   addressed the economic harm stemming from a national emergency

4   is that the authority that is being vested in the Secretary of

5   Education grows as the magnitude of a national emergency

6   grows.

7         There are also, you know, particular choices of

8   words in the statute that indicate the intended breadth.  In

9   1098bb(a)(1) and (a)(2), Congress says the Secretary may waive

10   or modify any provision.  Now, any is a word choice that is --

11             *(Court Reporter interrupts)*

12        *MR. NETTER:*  -- that is typically used to connote

13   breadth.

14         Likewise, in 1098bb(a)(1) and (b)(1), Congress

15   authorized the Secretary to provide such relief as the

16   Secretary deems necessary.  The use of the word deems is, as

17   courts have generally understood it, that is intended to

18   suggest that the decision maker, in this case the Secretary of

19   Education, has broader than usual discretion to devise the

20   appropriate response.

21         Likewise, in 1098bb(b)(2), Congress specified that

22   the standard is what the Secretary of Education deems

23   necessary to ensure that the statute's objectives are

24   satisfied.  So, this is not a circumstance in which Congress

25   was trying to cabin the Secretary's authority to the minimum

1   necessary administrative staff.

2           Instead, ensuring that the statutory objective --

3   the objective of averting the economic harm to individuals who

4   have been adversely affected by a national emergency, the

5   Secretary is directed to ensure that those harms are averted.

6           Next, in 1098bb, Subsection (b)(3), Congress

7   specified that the Secretary is not required to exercise the

8   waiver of modification authority on a case-by-case basis.

9   Again, supporting the whole thrust of this statute, which is

10  the Secretary is supposed to be acting swiftly and

11  categorically in response to a national emergency.

12          And finally, 1098bb(b)(1), that there is no notice

13  and comment or negotiated rulemaking required when the

14  Secretary invokes the HEROES Act.

15          Now, you know, the Court mentioned that when there

16  are major issues that sometimes, perhaps, notice and comment,

17  it would be a good idea.  But whether or not notice and

18  comment is appropriate or is required, that's a question for

19  Congress.  Congress has determined, under the Administrative

20  Procedure Act, that ordinarily when there's a legislative

21  rule, there is going to be a requirement to conduct notice and

22  comment, unless some exception to notice and comment applies.

23          But it is up to Congress to determine where those

24  exceptions apply.  And Congress determined in this

25  circumstance that, you know, when you have a national

1    emergency and the Secretary of Education needs to act to

2    provide economic relief with respect to the student loan

3    portfolio, that is managed by the Secretary of Education, that

4    the notice and comment is not warranted.  It's not hard to

5    see, you know, why our Congress would have settled on such a

6    policy.

7            *THE COURT:*  Does the entire analysis rest on the

8    word notwithstanding?  Notwithstanding?

9            *MR. NETTER:*  Yes, Your Honor.

10           Yes, the word notwithstanding is what indicates that

11   the negotiated rulemaking and notice and comment procedures

12   are not required in this context.  I don't understand there to

13   be a dispute on that point.

14           *THE COURT:*  And what the word notwithstanding means.

15   I think drafting -- drafters often use that word as a

16   catchall.

17           It has to have some sort of meaning, doesn't it?

18           *MR. NETTER:*  Right.  So --

19           *THE COURT:*  So, why couldn't you -- you talk really

20   fast.  Monica -- we don't talk that fast in Texas, Monica is

21   having a tough time.

22           Go ahead, start over.  And believe me, I will give

23   you all the time that you need.  Go ahead.

24           *MR. NETTER:*  I appreciate that, Your Honor.

25           *THE COURT:*  Go ahead.

1          *MR. NETTER:*  Apology to the court reporter.

2          *THE COURT:*  Yeah.

3          *MR. NETTER:*  So, I think in this context that the

4     word notwithstanding connotes despite.  So, despite the

5     ordinary rules that apply, the only obligation here is for the

6     Secretary to publish the notice indicating what provisions are

7     being waived or modified in the Federal register.  And that

8     notice has, in this case, already been filed.

9              I don't understand there to be any dispute here,

10    that an assertion of the HEROES Act does not necessitate

11    notice and comment.  The disputes that the plaintiffs have

12    raised here is as to whether the HEROES Act applies at all.

13             Now, there is some overlap here as between the

14    merits argument on the HEROES Act and the standing argument,

15    and that's because of the -- the somewhat odd posture of the

16    plaintiffs here.  You know, their theory is that -- that they

17    want to participate in the notice and comment process so as to

18    guarantee that they obtain relief.

19             So, Your Honor, you asked Mr. Connolly, you know,

20    whether he believes that the Court needs to determine that

21    there actually is an alternative course -- an alternative

22    avenue where relief is available in order for them to prevail

23    here.

24          *THE COURT:*  So, are you saying that notice and

25    comment is not only not an irreparable injury for everything

1    that we've previously said, but it would be useless anyway;

2    therefore, how can the plaintiffs really they're irreparably

3    harmed when the notice and comment doesn't matter?

4           Is that what I just heard you say?

5           *MR. NETTER:*  Yes.

6           So, all of these arguments are -- they're knotted

7    together in a sense.  If the plaintiffs' theory is that

8    because of the major questions doctrine only Congress can act

9    here, then they don't have an injury that this Court can

10   redress.

11          *THE COURT:*  But this was the subject of a lot of my

12   questions to Mr. Connolly.  Is if the HEROES Act doesn't

13   apply, can we still get to irreparable harm?  And I think that

14   if you can just state it very succinctly why you believe we

15   don't, I think that would be helpful to me.

16          So, go ahead.

17          *MR. NETTER:*  Yes, Your Honor.

18          So, in order for the plaintiffs to articulate an

19   injury that can be redressed by this Court, they would need to

20   be able to identify the alternative pathway to get them the

21   substantive relief that they claim that they're entitled to.

22          Here, Ms. Brown says that she should be entitled to,

23   you know, some loan forgiveness, even though her loans aren't

24   federally held.  Mr. Taylor says that he should be entitled to

25   additional relief.  But if their whole theory takes down any

1    opportunity for relief to be provided, then -- then their

2    procedural right doesn't amount to anything.

3           So under *Spokeo*, the existence of a procedural right

4    is not sufficient to confer standing unless the plaintiff has

5    a substantive interest.  Here, I think the plaintiffs

6    acknowledge that, which is why they say that they have a

7    substantive interest and, you know, potentially increasing --

8    or being a participant in the Student Loan Forgiveness

9    Program.

10          But that whole arrangement collapses if their theory

11   of the major questions doctrine takes down any avenue that the

12   plaintiffs would have to actually get that loan forgiveness.

13   So, they don't have standing to, you know, take down the

14   HEROES Act program in a manner that would make it impossible

15   for anybody to get student loan relief.

16          And their theory of the major questions doctrine

17   seems to head there in a very direct line.

18          *THE COURT:*  That's a good question for the

19   plaintiffs.  Would -- and you can go ahead and respond.  What

20   if we had servicemen and women who had been called, for

21   instance, to serve on the hospital shifts that they had in

22   various ports of the United States.  Those were, I believe,

23   staffed by Navy and military personnel that had been called

24   out of their jobs, they had student loans.

25          In that case, could the Secretary of Education

1    invoke the HEROES Act and forgive their debt?

2             *MR. CONNOLLY:*  Our position is that under the HEROES

3    Act the Secretary does not have the power to cancel debt,

4    because that would be putting the individuals in a better

5    position.

6             *THE COURT:*  Doesn't matter who the individual is?

7    The example I gave with the service person.

8             *MR. CONNOLLY:*  I mean, that's certainly --

9             *THE COURT:*  Navy corpsmen.

10            *MR. CONNOLLY:*  -- closer --

11            *THE COURT:*  In fact, I had a law clerk's brother

12   that got called up, a navy reservist, during COVID to serve on

13   a hospital ship that was parked in New York.

14            *MR. CONNOLLY:*  Our position is that under the HEROES

15   Act, what the Secretary do are things that keeps them in the

16   same position as beforehand.  So, that does not amount to

17   canceling debt.

18            *THE COURT:*  Well, let's talk in layman's terms

19   again.  I'm just an Aggie lawyer and it takes me awhile.

20            You're saying under the Act, the Secretary, in the

21   situation that I just gave you, could pause loan payments, but

22   could not completely forgive the loan; is that correct?

23            *MR. CONNOLLY:*  That's -- that's our argument, yes.

24            *THE COURT:*  All right.

25            Taking you back to the example that I just gave you,

1   could the Federal Government with a Navy corpsman serving on

2   the ship outside of Manhattan, that had to leave his practice

3   here in Fort Worth as a pediatrician, gets called up to serve

4   on the marine corp navy ship, would there have to be notice

5   and comment before the Secretary of Education said that their

6   loans were tossed, under your argument?

7           *MR. CONNOLLY:*  No.  Because under the HEROES Act, if

8   this individual is an affected individual under the HEROES

9   Act, the Secretary could pause the payments that this

10  individual was -- needed to do while this individual was

11  serving abroad.

12          So -- but that would fit within the authority of the

13  HEROES Act.  If it doesn't fit within the authority of the

14  HEROES Act, then the traditional negotiated rulemaking and

15  notice and comment rules apply.

16          *THE COURT:*  Okay.  Counsel, go ahead, Mr. Netter.

17          *MR. NETTER:*  Thank you, Your Honor.

18          So, I think that's a useful segue to the Court's

19  earlier question about what is being waived or modified here.

20  So, there are statutes and regulations that require the

21  repayment of loans.  I refer the Court to 20 U.S.C., Section

22  1087dd, Subsection C, which requires the loan agreements to

23  provide for repayment of the principal amount.

24          Now, if I understood what Mr. Connolly was just

25  saying, he's saying that there's like a statutory categorical

1    prohibition on discharge of debts under the HEROES Act.  Now,

2    there certainly isn't anything in the language of the statute

3    that says that.  The statute says the Secretary has the

4    authority to waive or modify statutory or regulatory

5    requirements.  And I just cited a statutory requirement that

6    the Secretary can waive that has the effect of discharging

7    debt.

8              So, what I think the disagreement might be at the

9    end of the day, is not really about the statute, but about

10   the -- the follow-on empirical question of what is actually

11   necessary in order to ensure that affected individuals are

12   not -- are not worse off financially in respect to their

13   student debt as a result of the war or national emergency.

14             We haven't discussed the data that the Secretary

15   relied upon, which are provided in the decision memo that's in

16   the record before this Court.  But it is ultimately an

17   empirical question, and the plaintiffs haven't challenged the

18   reliance on this data.

19             In order to answer the question of what -- what form

20   of relief is warranted under the circumstances.  So, here the

21   Secretary of Education reviewed data showing that borrowers

22   are considerably less able to keep up with loan repayments now

23   compared to pre-pandemic times, supporting the inference of

24   their remained economic effect that have not abated and have

25   not been resolved.

1          Data from the CFPB corroborates that survey data, in

2    that delinquencies of nonstudent loan debt held by student

3    loan borrowers have returned to pre-pandemic levels, even

4    while those borrowers have not had to make payments on their

5    student debt.  And that supports the inference that if and

6    when student loan payments resume, this is supposed to happen

7    at the beginning of next year, there will be additional

8    delinquencies that will result and will exceed pre-pandemic

9    levels.

10          Likewise, the Department relied on data indicating

11    that recent circumstances in which payments were paused

12    because of other national emergencies, like hurricanes and

13    wildfires, the default rates skyrocketed when comparing

14    pre-disaster to post-disaster when the payment pause ended.

15    Going from 0.3% to 6.5%, that's a 21-times increase.

16          The Secretary also considered the sensitivity of

17    payment rates to borrower income, the relationship between

18    Pell eligibility, which is a proxy for family wealth and

19    delinquency rates, historical evidence as to how much

20    principal reduction is needed to meaningful reduce default

21    risks and the effects of COVID-induced inflation on the

22    ability of borrowers to repay student loans.

23          So, when it comes to the ultimate empirical question

24    of whether the relief -- where the Secretary had evidence

25    before him to support the relief that he deemed to be

1    necessary under the circumstances, there's -- there's quite a

2    robust record that the plaintiffs haven't engaged with here.

3    And that's the basis for the Secretary exercising the

4    authority that has been granted by Congress, authority to

5    respond in the context of a national emergency, to provide

6    whatever relief is required to ensure that those affected

7    individuals are not worse off in respect to their student

8    loans as a result of the emergency.

9           Now, on the equitable factors here, Your Honor.  I,

10   again, think that because of the way all the issues here are

11   knotted, there's a lot of overlap.  With respect to

12   irreparable injury, it does need to be the case that there

13   exists some valid Congressional authorization that the

14   Department, you know, could pursue and would pursue, for the

15   plaintiffs to vindicate their supposed interest.  And we don't

16   believe they've satisfied that point here.

17          Again, nothing about the HEROES Act is preclusive of

18   the relief the plaintiffs are seeking.  So they can pursue

19   other courses, including a citizen petition, in order to

20   obtain that relief.  And none of that requires the Court to

21   enter an injunction of any scope, in order to permit these

22   plaintiffs an opportunity to pursue their relief.

23          I would note that the first case that Mr. Connolly

24   noted as supporting their theory of irreparable injury was the

25   *Eli Lilly* case.  But that's notably a case in which the Court

1    halted implementation of a rule as to one plaintiff, not on a

2    nationwide basis, suggesting that there are other

3    opportunities for -- for a single plaintiff to -- to assert

4    and follow through with a notice and comment rulemaking

5    process and to defend procedural rights that may exist.

6            Because plaintiffs have pathways to obtain the

7    procedural rights that they, you know, purport to seek and

8    that are independent of the indication of HEROES, that

9    necessarily means that there's no irreparable injury here.

10           So, even to the extent that there are cases in which

11   a procedural right could, under some circumstances, support

12   the existence of irreparable injury, on the particular facts

13   that exist here there's no irreparable injury, because there

14   are alternative courses of relief.  And, you know,

15   prohibiting -- preventing other individuals from receiving

16   debt relief under the HEROES Act doesn't vindicate and advance

17   the interests of the plaintiffs here.

18           And I know that Mr. Connolly doubted whether the

19   equities here -- or doubted our position with respect to the

20   equitable principles.  But I think it's important to keep in

21   mind that -- that Congress made a decision here.  And, you

22   know, perhaps some of the concerns about the breadth of

23   Congressional action should be addressed to Congress, because

24   the alternative interpretation of the major questions

25   doctrine, an interpretation under which if an issue becomes

1    too meaningful that, you know, suddenly the authority that

2    Congress delegated, the actions that Congress wanted to take

3    place can no longer take place absent additional Congressional

4    action.  But this here is a statute that is about emergencies.

5         *THE COURT:*  You know, you could also make the

6    argument that so was the authority given to Hitler after the

7    Reichstag fire.

8         What is the Court's role if Congress has given away

9    too much of the authority that is supposed to be deemed in

10   that branch under the Constitution?  There has to be some sort

11   of recourse, doesn't there?

12        *MR. NETTER:*  Well, Your Honor --

13        *THE COURT:*  Just because -- if Congress says, You

14   know what, we don't want to do our job anymore, we'll give it

15   all to the executive branch, that wouldn't be constitutional,

16   would it?

17        *MR. NETTER:*  There's the non-delegation doctrine.

18   The plaintiffs here don't raise a claim under the

19   non-delegation doctrine.

20        *THE COURT:*  No, I'm just talking.  These are some

21   thoughts that are going through my head.

22        That, you know, you're kicking everything back to

23   Congress.  Well, Congress is the one that's telling us to do

24   this in this case.  Am I correctly stating the Government's

25   position, the administration's position?

1          *MR. NETTER:*  Yes.  So, Congress provided a pathway

2     to relief that the Secretary then exercised.

3          And if there is a disagreement now as to the scope

4     of relief that Congress authorized, then objections as to the

5     scope of that statutory authority should be directed to

6     Congress.  And if Congress, in the future, wants to limit

7     relief, the political processes should play out and let the

8     political branches determine how they want this operation to

9     exist.

10          Now, there are constitutional limitations, what

11    authority Congress can exercise and what can be delegated, and

12    there's a role for the courts in that context.  But the fact

13    that there may be -- we may be living through an era of

14    political divisiveness, doesn't mean that the authority of the

15    courts to intervene and require additional legislation, even

16    though there's legislation on the books already exists.

17          *THE COURT:*  No, I think you -- you've heard my story

18    that I said earlier, that's why I told you the Lyndon Johnson

19    story.  It is a shame that the political branches don't seem

20    to be functioning, and that's the way it is.

21          All right.  Anything else?

22          *MR. NETTER:*  So, I would note, Your Honor, that on

23    the question of whether issues are economically sensitive,

24    that in the context of a national emergency affecting a

25    student loan portfolio that has more than 1 1/2 trillion

1    dollars in it, actions that the Department of Education takes

2    are necessarily going to be large.

3         The student loan pause that was started by Secretary

4    DeVos has had an estimated economic effect of $150 billion

5    with respect to the Federal Government.  Now, that hasn't been

6    challenged, either by these plaintiffs here or more broadly.

7    But I think it's indicative of the fact that if you exist in a

8    world in which you think that your decisions have a large

9    dollar signs attached to them that necessarily create major

10   questions, then it inhibits the ability of Congress to decide

11   when to delegate authority to an agency.  And there is harm

12   associated with that in the context of an emergency.

13        So, Your Honor, I think we've addressed the whole

14   panoply of issues here.  But the bottom line position of the

15   United States is there's no standing here.  That these are not

16   plaintiffs who are appropriately situated to present a claim;

17   therefore, the first act that we're asking for from the Court

18   is to dismiss the complaint, and therefore to deny the

19   preliminary injunction as moot.

20        Short of that, if the Court were to disagree with us

21   on standing, we do believe that the HEROES Act is

22   appropriately invoked here, such that the plaintiffs don't

23   have any procedural right under the HEROES Act or under any

24   other statute that the HEROES Act specifically carves out the

25   need for notice and comment when it's going to be asserted by

1    the Secretary of Education.

2              We thank the Court for its time.  And absent further

3    questions, I'll sit down.

4              *THE COURT:*  All right.  Thank you.

5              Mr. Connolly, one of the things that I'd like for

6    you to briefly address, and if you can try to keep your reply

7    brief.  Actually while I've been up here I had to schedule

8    another hearing at 11:15.  If you need to come back after the

9    hearing or after lunch, that's fine.

10             What I would like for you to address would be these

11   alternative remedies that the Government has pointed out that

12   would seem to argue that there is no need in this case for the

13   extreme remedy and extreme relief that you get from the

14   preliminary injunction, particularly a nationwide injunction.

15             What are the other methods of redress that you have

16   and why aren't those acceptable?

17             *MR. CONNOLLY:*  Sure.

18             So, I'll start -- I'll start with that point.  And

19   just a few -- I don't have much, just a few quick points in

20   response to what the Department said.

21             So, the argument they appear to be making is that

22   you should keep this program in place, and then -- because

23   there are other alternatives for the plaintiffs to be involved

24   in the process.  And that is not what the case law requires.

25             So, if you look at a case like *U.S. Steel vs. EPA*,

1    out of the Fifth Circuit, 595 F.2d 207.  In that case, the EPA

2    violated the notice and comment requirements of the APA, and

3    the EPA said, Hey, we can cure this because we accepted

4    comments later.  And what the Fifth Circuit said is, If you

5    accept this rationale you would -- you would gut the APA.  And

6    the reason you would gut the APA is because an agency could

7    always go, do whatever it wants, public -- go ahead and enact

8    its rule without notice and comment, and then say, Hey, you

9    know, we're accepting comments or, hey, you have these other

10   options to seek relief, and keep this -- keep the rule that

11   we've already adopted in place.

12           And the Fifth Circuit and numerous other courts say

13   that relief -- if that argument were accepted, it would gut

14   the APA.  Because what the APA requires is that individuals,

15   at the point where the decisions are being made, that is when

16   the individuals have procedural rights to talk to the

17   Government and influence the program.  But what this would do

18   is this would -- what the Government is asking you to do is

19   keep the program in place, even though it received absolutely

20   no comments from the public at all, it didn't go through the

21   negotiated rulemaking process.  And that would gut the APA.

22           The second program, as a practical matter, is that

23   by keeping that process in place, the plaintiffs are

24   already -- my clients are already at a disadvantage.  Because

25   as -- practically speaking, once you've forgiven half a

1    trillion dollars in student debt, there has to be some limit

2    of what the Department can do.  And in the words of the D.C.

3    Circuit, the egg has been scrambled.

4            So, instead of our -- my clients being able at the

5    very beginning to say, Here's how you should go about doing

6    this process, now we're going to be in the position of saying,

7    Hey, I know you've already handed out $400 billion in loans,

8    how about us.  And that is a far different process than what

9    the APA and the negotiated rulemaking require, which is at the

10   point of decision making, right at the beginning, that's when

11   the plaintiffs need to be involved, that's when we need to be

12   involved so we can say our piece.

13           So, saying we're going to keep this program in place

14   and go off and try to do a citizen petition affords us

15   absolutely none of the procedural rights, because we had a

16   procedural right to comment and be involved when this program

17   is being adopted.

18           Quickly, some of the other points.  About the other

19   cases that are percolating.  Every -- unless -- I believe I

20   got this right, and this is confirmed in my notes, every

21   single case has been dismissed at this point except this one.

22   And, frankly, some of the ones were fairly farfetched.

23           *THE COURT:*  The Government is smiling and shaking

24   their heads.

25           *MR. CONNOLLY:*  No?

1          *MR. NETTER:*  That is not true.

2          *MR. CONNOLLY:*  Okay.  Oh, I'm sorry, the *Cato* case.

3          *MR. NETTER:*  The *Cato*, *Arizona* and the *Oregon*.

4          *MR. CONNOLLY:*  So, I'll go through each.

5          *THE COURT:*  You got the pro se out in Oregon.

6          *MR. CONNOLLY:*  Right.  So, I'll go through all three

7   of those.

8          The pro se one is pro se, I've read it.  The second

9   one, *Arizona*, all they've done is they filed a complaint.

10  They haven't done -- they haven't moved to do anything.  The

11  third one, *Cato* was just filed last week and, you know, they

12  have -- they have a unique form of standing, if I remember

13  right.

14          But the key -- the key case here is the states case,

15  that one was dismissed.  The one that went up to the Supreme

16  Court --

17          *THE COURT:*  Putting aside the pro se, I don't know

18  the situation of the pro se.  Is it fair to say that this is

19  the only case where we have two folks -- two individual folks

20  who have some type of student loan?

21          *MR. CONNOLLY:*  Yes.  This is the only case bringing

22  this --

23          *THE COURT:*  So, I'll ask you the same question that

24  I asked Government's counsel, there has to be somebody that

25  has standing.  Let's say it's not your clients.

1              In your world, who would be the perfect client?

2       Would it be the taxpayer out there that just doesn't want --

3       or the student loan holder who just doesn't want the benefit,

4       is that -- would that person have standing?

5              The Government seemed to indicate that they

6       wouldn't, it would be akin to somebody refusing Federal food

7       stamps, and then suing so nobody else could get the food

8       stamps.

9              Do you agree with that analysis?

10              MR. CONNOLLY:  I believe that it's my clients that

11      have the perfect standing.  They have concrete interests and

12      they're being affected by what the student -- what the

13      Department has done here.

14              And so, you know --

15              THE COURT:  They weren't allowed to take -- they

16      weren't even given the option to take the food stamps or I

17      guess they applied for the food stamps and didn't get them.

18              MR. CONNOLLY:  Right.

19              So, you know, in the -- you know, like the case that

20      they cite in the Fifth Circuit, I believe it's called

21      *Henderson*.

22              THE COURT:  Yeah.

23              MR. CONNOLLY:  There -- in that case, someone was

24      complaining that Louisiana had created license plates in which

25      the license plate said Choose Life.  And they said, Well, you

1    know, we want our own license plate that has our --

2              THE COURT:  Pro choice.

3              MR. CONNOLLY:  Pro choice, that's our message.  And

4    what the Fifth Circuit says, if we -- you can't get any relief

5    by the fact -- you're not injured by the fact that other

6    people are having this license plate.  But the critical

7    difference is that there was no procedural injuries involved

8    with the Henderson case.  And so that -- that obviously is the

9    distinction here.

10             And if I can focus on standing, the Department's

11   argument is really with the Supreme Court precedent and the

12   Fifth Circuit precedent here.  We are not trying to extend any

13   of the doctrine into, you know, unchartered territory.  The

14   Fifth Circuit case law we cited is relying on cases like

15   Massachusetts vs. EPA, from the Supreme Court.  This doctrine

16   about procedural injury is well -- it's well settled and it's

17   been applied in a number of cases.  And we, obviously, cite a

18   bunch in our -- in our briefs.

19             The Department makes this point a few times saying

20   we don't have a procedural right under the HEROES Act.  I

21   mean, they're mixing apples and oranges here.  They're relying

22   on a statute that we say doesn't apply at all.  We have

23   procedural rights under the APA to notice and comment and

24   under the HEA to engage in negotiated rulemaking.  That is

25   where our procedural injuries come from.

1          They can't cite the statute that we say doesn't even

2     apply and say that we need to allege we have procedural

3     injuries under the HEROES Act.  No case, that I'm aware of,

4     stands for the proposition that -- that they can avoid notice

5     and comment rulemaking and avoid negotiated rulemaking for

6     that.

7          The Department said a couple of times that we have

8     no evidence that they will do this under -- under their

9     authority under the AGA.  Again, that is not the standard.

10    The standard is, is there some possibility that after this

11    Court rules, the Department will change its mind.  And, in

12    fact, in the *Ecosystem* case, they say it's not even likely

13    that that agency there would change its mind.  And they still

14    -- the Fifth Circuit still found the plaintiffs had standing.

15         And here the -- the provision under which they would

16    have standing -- they believe they have standing is 20 U.S.C.,

17    1092.  And that gives the Department of Education the

18    authority to compromise, waive or release any right, title,

19    claim, lien or demand.  And there it is.  And that's -- they

20    say in their own brief multiple times, on page 24, 25, 1, 3,

21    that they have this authority to do this type of program.

22         And so, all we have to prove -- we don't have to --

23    I don't have to -- we don't have to prove that there is a, you

24    know, a memo at the Department, Here's our backup plan;

25    though, there probably is.  But all we have to prove is that

1    there's some possibility that if their -- if this Court finds

2    that they lack authority under the HEROES Act, that they will

3    invoke this other authority to -- to pursue their debt relief

4    program.

5              And the -- they point to the data that was attached

6    to their -- in their appendix.  And in my opinion, this sort

7    of shows the -- sort of how, you know, how far afield we've

8    come from -- from the proper way that rulemaking should be

9    done.  In the evidence they provide you in the appendix, the

10   Secretary of Education, on the morning of August 24th,

11   received a 13-page memo.  At 9:25 a.m., he apparently read

12   that memo and signed off and said, Yes, we're good to go.

13             This is a 13-page, untested memo, many of which on

14   the footnotes are just citing their own internal data.  It's

15   inconceivable that Congress would have given the Secretary of

16   Education the power to adopt a program involving half a

17   trillion dollars of loans based on a 13-page memo with -- that

18   has never been presented to the public.

19             And finally, the -- you know, the Court has

20   mentioned a few times the role of the Court.  And I -- you

21   know, I agree that this is -- the agency should not,

22   obviously, have adopted this program.  This is something that

23   Congress should have done.

24             But the Supreme Court, in the recent major questions

25   case -- cases that we mentioned, and especially *West Virginia*

1    and some of the concurrences really lay this out nicely, it is

2    the Court's role to preserve the separation of powers.  And

3    that is how -- that is -- it is -- this is where the Court is

4    most needed to preserve the separation of powers by saying

5    Congress did not give the Secretary of Education the power to

6    pass a half a trillion dollar debt relief program.

7            And so, it is -- it is incredibly important for this

8    Court to act.  And the only way that my clients can receive

9    the relief is by this Court issuing the injunction that --

10   that we've requested.

11           And I'm happy to answer any other questions.  But I

12   would urge the Court to issue a preliminary injunction as

13   expeditiously as it can.

14           *THE COURT:*  I appreciate everyone's arguments here

15   today.  Both of you guys have done an extremely good example,

16   competent example of good advocacy on behalf of your clients.

17   I have enjoyed it immensely.  Thank you for indulging my many

18   questions and many hypotheticals.

19           As with anything else when it comes to my job, a lot

20   of this is going to be going back to my office, taking the

21   record of the cases and closing the door and doing my best to

22   come up with the right decision.  And I need some time to do

23   that.

24           And I do understand that plaintiffs are of the

25   mindset that this needs to happen as soon as possible.  I

100

1    can't guarantee you when I will get a decision.  But I will

2    endeavor to get one as soon as possible, but I will also

3    endeavor to make the decision that's right on the law, at

4    least as I understand it.

5           But I have enjoyed the argument.  I know that

6    you-all have traveled from out of town.  I hope you take

7    advantage of some of our good barbecue restaurants here in

8    town.

9           Perhaps you can go downstairs and see the famous

10   courtroom from the 1948 election.  That's a good example of

11   the influence of courts.  But for President Johnson winning

12   that case, we might not have had a man go on to be, not only

13   be Senator, but Senate Majority Leader and a very influential

14   President.

15          So, I get the magnitude of the things that we're

16   asked to do.  I also get the admonishment of President James

17   Madison in the Federalist papers that when the legislature,

18   executive and judiciary are all under one authority, that's

19   the definition of tyranny.

20          So, I agree with what you're saying when it comes to

21   separation of powers and the Court's role.  And whether that's

22   required in this case remains to be seen.

23                    *(Proceedings adjourned)*

24

25

REPORTER'S CERTIFICATE

1

2

3      I, Monica Willenburg Guzman, CSR, RPR, certify

4  that the foregoing is a true and correct transcript from

5  the record of proceedings in the foregoing entitled matter.

6      I further certify that the transcript fees format

7  comply with those prescribed by the Court and the Judicial

8  Conference of the United States.

9      Signed this 31st day of October, 2022.

10

11                      /s/Monica Willenburg Guzman
                        Monica Willenburg Guzman, CSR, RPR
12                      Texas CSR No. 3386
                        Official Court Reporter
13                      The Northern District of Texas
                        Fort Worth Division
14

15  CSR Expires:       7/31/2023

16  Business Address:  501 W. 10th Street, Room 310
                       Fort Worth, Texas  76102
17

18  Telephone:         817.850.6681

19  E-Mail Address:    mguzman.csr@yahoo.com

20

21

22

23

24

25