**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| MYRA BROWN and ALEXANDER TAYLOR,<br><br>            Plaintiffs,<br><br>     v.<br><br>U.S. DEPARTMENT OF EDUCATION and MIGUEL CARDONA, in his official capacity as Secretary of Education,<br><br>            Defendants. | Civil Action No. 4:22-cv-00908-P |

**APPENDIX TO DEFENDANTS'
MOTION TO STAY JUDGMENT PENDING APPEAL**

**CONTENTS**

| Description | Bates Number |
|---|---|
| Second Declaration of Under Secretary James Richard Kvaal | 1 |

Dated: November 15, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Cody T. Knapp*
CODY T. KNAPP (NY #5715438)
KATE TALMOR
R. CHARLIE MERRITT
SAMUEL REBO
Trial Attorneys
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005
Telephone: (202) 532-5663
Facsimile: (202) 616-8470
E-mail: cody.t.knapp@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| MYRA BROWN, <br><br> & <br><br> ALEXANDER TAYLOR, <br><br>                Plaintiffs, <br><br>     v. <br><br> U.S. DEPARTMENT OF EDUCATION, *et al.,* <br><br>            Defendants. | Civil Action No. 4:22-cv-00908-P |

## <u>DECLARATION OF JAMES RICHARD KVAAL</u>

I, James Richard Kvaal, do declare under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and accurate to the best of my information and belief:

1.      I am the Under Secretary of Education at the United States Department of Education (Department). My nomination for this position was confirmed by the United States Senate on September 14, 2021, and I was sworn in on September 15, 2021. As such, I am fully competent to make the statements contained in this Declaration. I make this declaration based on my personal knowledge and based on information provided to me in my official capacity.

2.      As the Under Secretary of Education, my responsibilities include the coordination of major policies, programs, and activities related to Postsecondary Education and Federal Student Aid for the Department. This includes, but is not limited to, the development of policies, procedures, and directives related to the August 24, 2022, decision of the Secretary of Education

(Secretary) to provide one-time student loan debt relief under the Higher Education Relief Opportunities for Students Act of 2003 (HEROES Act).

3.      On November 10, 2022, the court in the above-captioned case entered judgment in favor of plaintiffs, declared the one-time student loan debt relief program unlawful, and vacated the program (ECF Nos. 37 & 38).

4.      As quickly as possible after this decision, the Department ceased accepting new applications for the program. It has not provided debt relief to any student loan borrowers under the program.

5.      During the time the application was open, the Department had or obtained the necessary information of 26 million Americans to be considered for debt relief, including the 16 million borrowers whose applications have already been approved. With up to approximately 40 million student loan borrowers eligible for debt relief, millions more are expected to apply.

6.      Preventing the Department from effectuating the debt relief as planned causes significant financial harm to these approximately 40 million student loan borrowers:

      a.    For a borrower on the standard 10-year repayment plan and five years of payments remaining with a typical balance of $29,400 and whose loan debt exceeds the amount of relief for which they are eligible, monthly payments would be $200 to $300 more than they would be if they received debt relief. This corresponds to an increase of $2,400 to $3,600 in annual payments.

      b.    On a hypothetical loan taken out at 5% interest, $10,000 in loan forgiveness would save the borrower $500 in accrued interest per year,

while $20,000 in loan forgiveness would save the borrower $1,000 per

year.

c.  In the past, borrower default rates increased an average of twentyfold

following natural disasters despite the Department's grant of

administrative forbearances to affected borrowers.[1] We also know that

vulnerable borrowers who needed to spend a longer time in an

administrative forbearance following a major disaster were more likely

to default on their federal student loans after leaving forbearance.[2]

Unless the Department is allowed to provide debt relief, we anticipate

there could be an historically large increase in the amount of federal

student loan delinquency and defaults as a result of the COVID-19

pandemic. This could result in one of the harms that the one-time

student loan debt relief program was intended to avoid.

d.  The consequences of defaulting on Federal student loans are severe:

The entire unpaid balance of a borrower's loan and any interest owed

becomes immediately due and payable; a borrower loses the ability to

receive a deferment of repayment as well as eligibility for other

program benefits, such as the ability to choose a repayment plan

carrying a lower monthly payment amount, receiving additional

federal student aid, and receiving credit toward Public Service Loan

---

[1] In the year before the disaster declarations, only an average of 0.3% of borrowers entered default while 6.5% of borrowers entered default after leaving mandatory administrative forbearance.

[2] Among borrowers who had shorter mandatory administrative forbearance spells, 0.3 percent entered default in the year before the disaster declaration and 5.9 percent entered default in the year after, an approximately 19-fold increase. Among borrowers who had longer mandatory administrative forbearance spells, 0.2 percent entered default in the year before the disaster declaration and 7.5 percent entered default in the year after, an approximately 36-fold increase.

Forgiveness; a borrower's wages may be garnished and Federal tax refunds or payments offset by the Department of the Treasury; and the default is reported to credit bureaus, often impacting for years the ability of the borrower to purchase a home or car or get a credit card.

e. Once a borrower defaults, the majority do not return to good standing: In the years prior to the COVID-19 pandemic, approximately 80 percent of those who defaulted were still in default one year later, and 66-70 percent were still in default two years later.[3]

f. The burden of default is disproportionately shouldered by lower-income borrowers: Research shows that student loan repayment is correlated with income, and lower income borrowers are more likely to experience delinquency and default.[4] This is especially true for Pell Grant recipients. Forty-two percent of Pell recipients default on their loans at least once, compared to just 18 percent of borrowers who never received a Pell Grant – a 24 percentage point difference.[5]

7. Preventing the Department from effectuating the debt relief as planned also causes significant confusion that will lead to further harm to borrowers:

a. Most borrowers have been told that all they need to do is submit an application to obtain one-time student loan debt relief. Now, as a result

---

[3] Blagg. "Underwater on Student Debt: Understanding Consumer Credit and Student Loan Default." *Urban Institute*, August 2018, pp. 14, *available at* https://www.urban.org/sites/default/files/publication/98884/underwater_on_student_debt.pdf.

[4] Looney, Adam, and Constantine Yannelis. "A crisis in student loans?: How changes in the characteristics of borrowers and in the institutions they attended contributed to rising loan defaults." Brookings Papers on Economic Activity, 2015, no. 2, 2015, pp. 1-89.

[5] Department of Education estimates using administrative Federal Student Aid data and imputed income from Census data.

of litigation they are left to wonder when, if at all, if debt relief will be effectuated. Despite the Department's efforts to keep borrowers informed, many borrowers may remain uncertain or confused about their repayment obligations.

b. The group most at risk of default is the approximately 18 million borrowers eligible for one-time debt relief who would have their federal student loans discharged in their entirety under the program. These student loan borrowers had the reasonable expectation and belief that they would not have to make additional payments on their federal student loans. This belief may well stop them from making payments even if the Department is prevented from effectuating debt relief. Unless the Department is allowed to provide one-time student loan debt relief, we expect this group of borrowers to have higher loan default rates due to the ongoing confusion about what they owe.

8. Given these harmful effects on tens of millions of Federal student loan borrowers, the Department is examining all available options. But those options are not without their own costs.

9. For example, the Department estimates that if it temporarily extends the existing COVID-19 pandemic payment and interest accrual pause for federal student loan holders, it will cost taxpayers several billion dollars a month in unrecovered loan revenue.

5

Executed on this 15th day of November, 2022.

JAMES KVAAL
_____
James Richard Kvaal

Digitally signed
by JAMES
KVAAL
Date:
2022.11.15
22:45:10 -05'00'

6